STATE OF SOUTH CAROLINA ) 25705   MASTER DEED OF
                        )         THE RENAISSANCE TOWER
COUNTY OF HORRY         )         HORIZONTAL PROPERTY REGIME

KNOW ALL MEN BY THESE PRESENTS, THIS MASTER DEED is made this 27th day of November, 1984, by RESORT INVESTMENT CORPORATION (hereinafter called the "Declarant"), a Delaware corporation authorized to do business in the State of South Carolina with its principal office and place of business at 1400 Main Street, Post Office Box 11496, Columbia, South Carolina 29211, for the purposes hereinafter set forth.

Deed Bk 917
By 885

W I T N E S S E T H :

WHEREAS, Delcarant is the owner in fee simple of certain real property, buildings and improvements thereon located in the County of Horry, State of South Carolina, which is more particularly described in the Exhibits attached hereto and incorporated herein by reference (hereinafter called the "Submitted Property" or "Property"); and

WHEREAS, Declarant desires to submit the Submitted Property to the provisions of the South Carolina Horizontal Property Act, Title 27, Chapter 31, Code of Laws of South Carolina, 1976, (hereinafter called the "Act"), hereby creating a Horizontal Property Regime known as The Renaissance Tower Horizontal Property Regime; and

WHEREAS, Declarant desires to publish a plan for the individual ownership of the several Apartments of the Submitted Property together with an undivided ownership interest in the general common elements and limited common elements (if any) of the Submitted Property as defined herein and in the Act; and

WHEREAS, Declarant desires to convey the Submitted Property pursuant to and subject to certain protective covenants, conditions, restrictions, reservations, liens and charges hereinafter set forth;

NOW, THEREFORE, Declarant does hereby submit the Property to the provisions of the South Carolina Horizontal Property Act, Title 27, Chapter 31, Code of Laws of South Carolina, 1976, and hereby publishes its plan for the division of the Property and the imposition of conditions, restrictions, reservations, liens and charges thereon and the individual ownership thereof, and Declarant hereby specifies that this Master Deed and the declarations herein shall constitute covenants, conditions, reservations and restrictions which shall run with the Submitted Property and shall bind and inure to the benefit of the Declarant, its successors and assigns and all subsequent owners of any interest in the Submitted Property, their grantees, successors, heirs, executors, administrators, legatees and/or assigns.

ARTICLE I
Definitions

As used in this Declaration and all Exhibits hereto, all amendments hereof and thereof unless the context otherwise requires, the following definitions shall prevail:

1. Act means the South Carolina Horizontal Property Act, Title 27, Chapter 31, Code of Laws of South Carolina, (1976), as presently constituted.

2. Apartment means as defined in the Act. The location, floor plan and dimensions of each are as shown in

I hereby certify that the within deed has been this 11th day of [illegible] A.D. 19 84 Transferred on Auditor's Book 3 Page 131 [illegible] Auditor of [illegible] County

BILLIE C. RICHARDSON CLERK OF COURT 84 NOV 28 PM 2:03

11-2894

HORRY COUNTY ASSESSOR
NEW PARCEL 192-05-03-001 thru 345
SPLIT FROM 192-00-01-013
Map  Blk  Parcel  11/29/84
BOOK 917 PAGE 885

the Exhibits heret__

3. **Association** or **Council of Co-Owners** means the Council of Co-Owners as defined in the Act and specifically formed for the purpose of exercising the powers and duties of the Council of Co-Owners of such Horizontal Property Regime.

4. **Assessment** means a share of the fund required for the payment of common expense, capital improvements and expenses which from time to time are assessed to some or all of the Unit Owners.

5. **Board of Directors** or **Board** means the executive and administrative body designated as the governing body of the Association.

6. **Buildings** means as defined in the Act.

7. **By-Laws** means the by-laws of the Association as they exist from time to time.

8. **Common Elements** means and includes all of the Submitted Property excluding the Apartments and specifically includes both the general common elements and limited common elements (if any).

9. **Common Expenses** means and includes:

(a) All expenses incident to the administration, maintenance, repair and replacements of the Submitted Property after excluding therefrom any and all expenses which are the responsibility of a particular Co-Owner as hereinafter set forth;

(b) Expenses determined by the Board of Directors of the Association to be Common Expenses;

(c) Expenses in this Master Deed and/or Exhibits denominated as Common Expenses; and

(d) Any other expenses declared by the Act to be Common Expenses.

10. **Common Surplus** means the excess of all receipts of the Association over and above the amount of Common Expenses and not otherwise reserved or designated for a specific use.

11. **Condominium Unit** or **Unit** means an individual Apartment as defined herein, in the Act and as described in the Exhibits hereto together with an undivided share of the Common Elements, vote, Common Surplus and liability for Common Expenses and other assessments appurtenant thereto.

12. **Co-Owner** means as defined in the Act, and specifically owning an apartment in the Regime.

13. **Declarant** or **Developer** means Resort Investment Corporation, its successors and assigns.

14. **Exhibits** means the exhibits to this Declaration, as they may be amended from time to time.

15. **General Common Elements** means as defined in the Act.

16. **Institutional Mortgagee** means a bank, savings and loan association, insurance company or union pension fund authorized to do business in the United States of America, an agency of the United States Government, a real estate or

or mortgage investment trust, the Declarant, any of its affiliates and any lender generally recognized as an institutional type lender, having a lien on the Property or any part or parts thereof.

17. <u>Limited Common Elements</u> means as defined in the Act.

18. <u>Long Term Lease</u> means those certain leases and agreements which are included in the Exhibits to this Master Deed or shall be added by Amendment to the Exhibits to this Master Deed and to which the Association and each and every Co-Owner is and shall be bound.

19. <u>Majority</u> or <u>Majority Vote</u> or <u>Majority of the Co-Owners</u> means as defined in the Act.

20. <u>Master Deed</u> means this Master Deed establishing and recording the Property of the Regime and thereby submitting it to Condominium Ownership.

21. <u>Occupant</u> means any person or persons residing in a Unit.

22. <u>Ownership</u> means as defined in the Act.

23. <u>Person</u> means as defined in the Act.

24. <u>Record</u> means as defined in the Act.

25. <u>Submitted Property</u> or <u>Property</u> means and includes that property shown as contained within The Renaissance Tower Horizontal Property Regime, as described in the Exhibits hereto and includes the land, the buildings, all improvements and structures thereon and all easements, rights and appurtenances belonging thereto and subject to all easements, rights-of-way and rights of use as described herein, in the Exhibits and/or of record.

ARTICLE II
The Renaissance Tower Horizontal Property
Regime Council of Co-Owners

1. The administration of the affairs of the Regime and the maintenance, repair, replacement and operation of the Common Elements as herein provided, the enforcement of all rules, regulations, by-laws and those acts required of the Association by the Master Deed and/or by the Act shall be the responsibility of the Association acting through the Board of Directors. Such administration shall be in accordance with and under the powers granted by the provisions of the Act, this Master Deed, the Articles of Incorporation and the By-Laws of the Association.

2. The Association through its Board of Directors (including the initial Board of Directors) shall be and hereby is authorized to enter into such agreemetns and to bind itself and all Co-Owners as it may deem necessary or desirable for the administration and operation of the Regime. Each Co-Owner who acquires an interest in a Unit shall thereby be deemed to agree to be bound by the terms and conditions of all such agreements. A copy of each such agreement shall be made available at the office of the Association for review by any Co-Owner.

3. There shall be only one Voting Member for each Unit. If a Unit is owned by more than one Person, the Owners thereof shall designate one of their number as the Voting Member. If a person other than an individual owns a Unit, a partner, trustee, officer or employee thereof shall be designated as the Voting Member for such Unit. The designation of the Voting Member shall be made as provided in the By-Laws. The vote of a Voting Member shall not be divisable.

The Apartments of the Regime consist of one hundred seventy-eight (178) two bedroom Apartments, one hundred thirty-five (135) Suites, nine (9) one bedroom Apartments, and five (5) commercial Units. There is hereby assigned five (5) votes to the Apartments designated as Grand two bedroom and Front two bedroom Units containing respectively approximately 969 square feet and 982 square feet, four (4) votes to the Apartments designated as Side two bedroom Units containing approximately 908 square feet, three (3) votes to each one bedroom Apartment, Apartments designated as Front Suite Units containing approximately 548 square feet, and Commercial Units B, C, and D, two (2) votes to each of the remaining Suites, one (1) vote to Commercial Unit E, and sixteen (16) votes to Commercial Unit Unit A. The vote assigned to each has been determined by the value of each respectively in relation to the value of the Property as a whole.

Each Voting Member (and only the Voting Member) shall be entitled to cast the vote for each Unit he represents, on each matter submitted to a vote at a meeting of the Association, regardless of the number of Persons who own such Unit it owns.

Each Voting Member shall be entitled to cast his vote(s) at each meeting of the Association in person or, if permitted by the By-Laws, by proxy.

4. Declarant shall appoint an initial Board of Directors to serve until Declarant shall relinquish control and their successors have been elected and qualified. Declarant shall release control upon calling a meeting of the unit Owners for purposes of taking control, which meeting shall be called no later than nine (9) months from the date of the recording of this Master Deed.

ARTICLE III
Property Rights

1. The Condominium consists essentially of Apartments in buildings, and other improvements and certain lands as the same are described in the Exhibits. For the purposes of identification, each Apartment in the Regime is identified by number and is delineated in the Exhibits hereto. No two Units have the same identifying number and/or letter designation.

The aforesaid building and Apartments therein and other improvements are constructed in accordance with the plats, plans, descriptions and surveys contained in the Exhibits.

2. Ownership of an Apartment includes title to the Apartment and an undivided interest in the Common Elements and the Common Surplus (if any). Any attempt to divide an Apartment by separating title to the Unit from the undivided interest in the Common Elements and Common Surplus (if any) shall be void.

The undivided interests in the Common Elements, the Common Surplus (if any) and the liability for Commn Expenses which the Co-Owners of the Apartments are acquiring are set forth, as percentages, in the Exhibits.

3. Neither the Association, any Co-Owner, the Declarant, nor any other party who owns an interest in the

Common Elements s ll have the right to brin, .ny action for partition or divis ı of the Common Elements.

Initial rules and regulations governing the use of the Submitted Property shall be promulgated by the Declarant on behalf or the Board of Directors. Additional and/or amended rules and regulations may be adopted or repealed by the Board of Directors. The Board of Directors may amend or repeal any rule or regulation adopted by it or by the Declarant provided such does not affect any right(s) of Declarant or any affiliate of it. All rules and regulations shall be posted in conspicuous places in the Common Elements.

Each Co-Owner, by acquiring his Unit, shall be deemed to agree to be bound by, among other things: (i) all rules and regulations adopted for the use of the Submitted Property; (ii) such rules and regulations as the Declarant may adopt pursuant to the Long Term Lease; and (iii) the Master Deed and by By-Laws.

The Association shall have the right to deny any Co-Owner or Occupant the right to use the Common Elements for a period not to exceed thirty (30) days for a violation of the rules and regulations promulgated for the use of the Property.

If a Co-Owner fails to pay an Assessment for the period specified herein, the Association may deny such Co-Owner or any Occupant of that Co-Owner's Apartment the right to occupy that Apartment and the right to use the Common Elements until such time as all Assessments are paid. There shall be no reduction in the Assessments payable by any Co-Owner during any period while his right to use an Apartment or the Common Elements is suspended.

Any Occupant may use the Common Elements reserved for the use of the Apartment he occupies during the time such Occupant is actually in residence in the Apartment. Guests and invitees of an Occupant of an Apartment and the Co-Owner of an Apartment (while another occupies his Apartment) may only use the Common Elements, including facilities under the Long Term Lease, with the express permission of the Board of Directors and subject to such terms and conditions as the Board of Directors may specify in its sole discretion, including the payment of a fee for the use thereof.

4. There are no Limited Common Elements presently designated except that portion of the Common Elements so designated which is adjacent to the Commercial Unit A. Said Limited Common Element so designated shall and may be used by the Co-Owner of Commercial Unit A, his lessees, assignees and guests for seating, tables and like furnishings and for the service and consumption of food and beverage and such other uses as are consistent with or required thereby. The maid/storage areas located on the various residential floors shall be Limited Common Elements appurtenant to Commercial Unit B.

5. Parking spaces shall not be reserved solely for the use of Occupants of any particular Apartment nor shall they be numbered. Further, Declarant hereby reserves unto itself (including the right to grant to others) and grants to all present and future Owners of real property interests within, Occupants of and visitors within Myrtle Beach Resort (as hereafter described) an easement for vehicular parking upon the parking spaces within the Regime, together with an easement for ingress and egress for access to and from such parking. Declarant does further hereby grant unto the Co-Owners, Occupants and visitors of the Regime like easements for access and parking over the appropriate vehicular access and parking areas of Myrtle Beach Resort Horizontal Property Regime and Myrtle Beach Resort Oceanfront Spa Horizontal Property Regime.

6.   Common Expenses:

(a)   All costs of maintenance, repair and replacements of Common Elements (including General Common Elements and Limited Common Elements, if any) necessitated by the negligence or misuse by any Occupant of an Apartment shall be borne solely by the Co-Owner of such Apartment and the Board of Directors shall have the right to assess such Co-Owner for such costs.

(b)   All other costs of maintenance, repair, replacements, preservation and improvement of the Common Elements (including General Common Elements and Limited Common Elements) and all other assessments and payments declared in the Act and/or herein declared to be Common Expenses shall be, unless the Board of Directors otherwise decides, Common Expenses.

7.   Development Plan:

(a)   Declarant has included within the Regime certain property and improvements which includes one building consisting of twenty-one (21) floors, containing three hundred twenty-two (322) Residential Apartments.  There are one hundred seventy-eight (178) two bedroom Apartments numbered as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 210, | 211, | 212, | 213, | 214, | 215, | 216, | 217 |
| 310, | 311, | 312, | 313, | 314, | 315, | 316, | 317 |
| 410, | 411, | 412, | 413, | 414, | 415, | 416, | 417 |
| 510, | 511, | 512, | 513, | 514, | 515, | 516, | 517 |
| 610, | 611, | 612, | 613, | 614, | 615, | 616, | 617 |
| 710, | 711, | 712, | 713, | 714, | 715, | 716, | 717 |
| 810, | 811, | 812, | 813, | 814, | 815, | 816, | 817 |
| 910, | 911, | 912, | 913, | 914, | 915, | 916, | 917 |
| 1010, | 1011, | 1012, | 1013, | 1014, | 1015, | 1016, | 1017 |
| 1110, | 1111, | 1112, | 1113, | 1114, | 1115, | 1116, | 1117 |
| 1210, | 1211, | 1212, | 1213, | 1214, | 1215, | 1216, | 1217 |
| 1410, | 1411, | 1412, | 1413, | 1414, | 1415, | 1416, | 1417 |
| 1510, | 1511, | 1512, | 1513, | 1514, | 1515, | 1516, | 1517 |
| 1610, | 1611, | 1612, | 1613, | 1614, | 1615, | 1616, | 1617 |
| 1710, | 1711, | 1712, | 1713, | 1714, | 1715, | 1716, | 1717 |
| 1810, | 1811, | 1812, | 1813, | 1814, | 1815, | 1816, | 1817 |
| 1910, | 1911, | 1912, | 1913, | 1914, | 1915, | 1916, | 1917 |
| 2010, | 2011, | 2012, | 2013, | 2014, | 2015, | 2016, | 2017 |
| 2110, | 2111, | 2112, | 2113, | 2114, | 2115, | 2116, | 2117 |
| 2210, | 2211, | 2212, | 2213, | 2214, | 2215, | 2216, | 2217 |
| 1401, | 1402, | 1501, | 1502, | 1601, | 1602, | 1701, | 1702, |
| 1801, | 1802, | 1901, | 1902, | 2001, | 2002, | 2101, | 2102, |
| 2201 | 2202 | | | | | | |

There are nine (9) one bedroom Apartments numbered as follows:

1406,   1506,   1606,   1706,   1806,   1906,   2006,   2106,   2006

There are one hundred thirty-five (135) suites numbered as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 201, | 202, | 203, | 204, | 205, | 206, | 207, | 208, | 209 |
| 301, | 302, | 303, | 304, | 305, | 306, | 307, | 308, | 309 |
| 401, | 402, | 403, | 404, | 405, | 406, | 407, | 408, | 409 |
| 501, | 502, | 503, | 504, | 505, | 506, | 507, | 508, | 509 |
| 601, | 602, | 603, | 604, | 605, | 606, | 607, | 608, | 609 |
| 701, | 702, | 703, | 704, | 705, | 706, | 707, | 708, | 709 |
| 801, | 802, | 803, | 804, | 805, | 806, | 807, | 808, | 809 |
| 901, | 902, | 903, | 904, | 905, | 906, | 907, | 908, | 909 |
| 1001, | 1002, | 1003, | 1004, | 1005, | 1006, | 1007, | 1008, | 1009 |
| 1101, | 1102, | 1103, | 1104, | 1105, | 1106, | 1107, | 1108, | 1109 |
| 1201, | 1202, | 1203, | 1204, | 1205, | 1206, | 1207, | 1208, | 1209 |
| 1405, | 1407, | 1408, | 1409, | 1505, | 1507, | 1508, | 1509, | 1605 |

890

1607, 1608, 1609, 1705, 1707, 1708, 1709, 1805, 1807
1808, 1809, 1905, 1907, 1908, 1909, 2006, 2007, 2008
2009, 2106, 2107, 2108, 2109, 2206, 2207, 2208, 2209

There are five (5) Commercial Units designated as A, B, C, D and E.  Commercial Unit A is to be used as a restaurant, kitchen and lounge.  Commercial Unit B consists of the Registration Desk and adjoining offices.  Commercial Units C and D are to be used as meeting rooms or for retail or other reasonable commercial purposes.  Commercial Unit E is to be used as a Game Room.  The principal improvements included within the Common Elements are an outdoor pool, exercise room, two (2) saunas, two (2) whirlpools, meeting rooms, laundry rooms, lobby and library.

(b)  By reason of the relative values of the Grand two bedroom and Front two bedroom Apartments (each having an equal value to the others), the Side two bedroom Apartments (each having an equal value to the others), the one bedroom Apartments and the Front Suites containing approximately 548 square feet (each having an equal value to the others), the other remaining Suites (each having an equal value to the others), and Commercial Units A, B, C, D and E (each being of different values and square footage but comparable to various Residential Apartments) with regard to the Submitted Property as a whole, there is appurtenant to each Grand two bedroom and Front two bedroom Apartment an undivided percentage share of ownership interest in the Common Elements as described in the Exhibits, to each one bedroom Apartment and Front Suite containing approximately 548 square feet an undivided percentage of ownership in the Common Elements as described in the Exhibits, to each remaining Suite an undivided percentage of ownership in the Common Elements as described in the Exhibits, and to each Commercial Unit an undivided percentage of ownership in the Common Elements, all as described in the Exhibits.

(c)  Ownership in the Common Elements and Common Surplus, pro rata share of Common Expenses due and percentage of total votes attributable to each Unit are shown in the Exhibits.

ARTICLE IV
Architectural Control

To preserve the original architectural appearance of the Regime, no exterior construction of any nature whatsoever except as specified in this Master Deed shall be commenced or maintained upon any building and/or Common Element and all such additions as are herein specified shall be architecturally compatible with existing structures.  No Co-Owner shall paint, decorate or change the color of any exterior surface, gate, fence or roof, nor shall any Co-Owner change the design or color of the exterior or lighting, nor shall any Co-Owner install, erect or attach to any part of the exterior any sign of any kind whatsoever, nor shall any exterior addition or change, including, without limiting the generality of the foregoing, the erection or construction of any fence or wall, be made unless and until plans and specifications showing the nature, kind, shape, height, material, color and location of the same shall have been submitted to and approved in writing as to harmony of exterior design, color and location in relation to the surrounding structures by the Board of Directors (or its designee), all Institutional Mortgagees and (so long as Declarant, or its successors or assigns, owns one or more Apartments in the Regime) the Declarant or its successors and assigns.  Failure of the Board of Directors (or its designee) and, if appropriate, of the Declarant to approve or disapprove such plans and specifications within sixty (60) days after their being submitted in writing shall constitute approval.

BOOK 917 PAGE 891

891

ARTICLE V
Expenses and Common Surplus

The Common Expenses of the Regime and the monetary obligations of the Co-Owners under any agreements entered into by the Association shall be shared by the Co-Owners in the percentages set forth in the Exhibits. Such percentages shall not be altered because of any increase or decrease in the purchase price or square footage of an Apartment or its location.

Each Co-Owner's interest in the Common Surplus (if any) shall be equal to his interest in the Common Elements.

ARTICLE VI
Amendment of the Master Deed

This Master Deed may be amended at the regular or any special meeting of the Association of the Regime, called and convened in accordance with the By-Laws, upon the affirmative vote of sixty-seven (67%) percent of all the Voting Members of the Association; provided, however, that this Master Deed may not be cancelled nor any amendment be made hereto having as its effect a termination of the Regime without the written agreement of all the Co-Owners in the Regime and all mortgagees holding mortgages of record upon the Regime or any portion thereof, as provided in the Act.

All amendments hereto shall be recorded and certified as required by the Act. No amendment(s) shall change any Apartment or the proportionate share of the Common Expenses or Common Surplus attributable to each Apartment, nor the voting rights of any Apartment, unless all Co-Owners of the Regime and all mortgagees holding any mortgages or othe liens upon the Property or any part(s) thereof shall join in the execution of such amendment. No amendment shall be passed which shall impair or prejudice rights and/or priorities of any Institutional Mortgagee or change the provisions of this Master Deed with respect to Institutional Mortgagees without the written approval of all Institutional Mortgagees of record.

No amendment shall change the rights and privileges of Declarant, its successors and assigns, without written approval and consent of the Declarant, or its successors or assigns.

Notwithstanding the foregoing provisions of this Article, the Declarant reserves the right to alter the interior design and arrangement of all Apartments and to alter the boundaries between Apartments as long as the Declarant owns all the Apartments so altered; However, no such change shall increase the number of Apartments nor alter the boundary of the Common Elements, except the party wall between any Apartments, without amendment of this Master Deed in the manner herein set forth. If the Declarant shall make any changes in Apartments as provided in this paragraph, such changes shall be reflected by an amendment of this Master Deed and the recording thereof reflecting such authorized alteration of Apartments and said amendment need only be executed and acknowledged by the Declarant and any holder of mortgage(s) encumbering the said altered Apartments. Such shall be certified and recorded in the manner required in the Act.

Notwithstanding the foregoing provisions of this Article, it is understood and agreed that as of the time this Master Deed is dated and recorded in the public records of Horry County, South Carolina, all of the improvements shown on the Exhibits may not be completed; however, said improvements shall be as and located as described and shown in the Exhibits; provided, however, that all improvements

must be completed within fourteen (14) months of the date hereof; provided, however, said time may be extended by virtue of delays caused by acts of God, acts of governmental authorities, strikes, labor conditions or any other condition(s) beyond Delcarant's control.

## ARTICLE VII
## By-Laws

The operation of the Regime shall be governed by the By-Laws of the Association which are attached to this Master Deed as an Exhibit and made a part hereof.

No modification of, or amendment to, the By-Laws of the Association shall be valid unless set forth in or annexed to a duly recorded amendment. The By-Laws may be amended in the manner provided for therein but no amendment to said By-Laws shall be adopted which will affect or impair the validity or priority of any mortgage upon the Submitted Property or any portion thereof without written consent of the mortgagee thereof and of all Institutional Mortgagees of record. No amendment shall change the rights and privileges of the Declarant without written approval of the Declarant, its successors or assigns.

## ARTICLE VIII
## The Operating Entity

The operating entity of the Regime shall be the Association. The Association shall have all the powers and duties set forth in the Act as well as all the powers and duties granted to and imposed upon it by Master Deed, the Act and the By-Laws of the Association, and, in addition, all other powers and duties necessary to operate the Regime which shall be exercised through its Board of Directors.

Every Co-Owner, whether he has acquired his Apartment by purchase, gift, devise or other conveyance or transfer, by operation of law or otherwise, shall be bound by this Master Deed, the Act, the By-Laws, all other Exhibits hereto and any and all Rules and Regulations of the Association.

## ARTICLE IX
## Assessments

The Association, through its Board of Directors, shall have the power to fix and to provide for the Common Expenses of the Regime including such sums as are necessary for the care, repair, replacement, maintenance, preservation and improvement of the Submitted Property, as are necessary to meet expenses and payments under the Long Term Lease and to meet the pro rata share of expenses payable by the Co-Owners for maintaining streets, roads, marsh and roadside areas, entrance ways, facilities and lighting within and for the Myrtle Beach Resort (herein the "Resort") as hereafter described (which shall be included as an item of Common Expense). The Board of Directors shall have the power to fix and determine from time to time the sum or sums necessary and adequate to provide fr the Common Expenses of the Regime and such other expenses as are provided for herein, in the Act or deemed necessary and appropriate expenses of the Regime. The procedure for the determination of sums necessary and Assessments upon Co-Owners and the method of collection of the same shall be as set forth in the By-Laws of the Association, as provided herein and in the Exhibits hereto and in the Act.

A Co-Owner shall become liable for the payment of Assessments upon issuance of a statement of Assessments by the Board of Directors of the Association.

Upon assessments that are unpaid for over ten (10) days after due date, at the sole discretion of the Board of Directors (and if not prohibited by law), a late charge not to exceed Ten ($10.00) Dollars or ten (10%) percent of the amount due, whichever is greater, shall also be due and payable to defray the expense of late collection. Regular Assessments shall be due and payable on the first day of each month (unless set otherwise by the Board of Directors) and monthly bills for the same need not be delivered or mailed to the Co-Owners by the Board; provided, however, that on or before December 1st of the preceding year, the amount of regular monthly Assessments due from each Co-Owner for each month of that year shall be mailed by the Board of Directors to each Co-Owner and provided, further, that notice of any increase or decrease in regular monthly Assessments shall likewise be mailed or delivered to each and every Co-Owner by the Board of Directors no later than thirty (30) days prior to the time the first regular monthly Assessment so changed shall be due.

Further, the Board of Directors, on behalf of the Council, shall have a lien on each Apartment together with the Common Elements appurtenant thereto in the amount of any Assessment not paid when due as provided in the Act (provided, however, such lien shall be valid against third parties without notice only from the date and time of recording of notice thereof), which may be collected and/or the lien foreclosed upon as provided in the Act. Reasonable attorneys' fees incured by the Board of Directors incident to the collection of such Assessments or the enforcement (including but not limited to foreclosure) of such lien together with all sums advanced and/or paid by the Association for taxes and payments on account of a superior mortgage lien(s) or encumbrance(s) which may be required to be advanced by the Association to preserve and/or protect its lien and all other changes allowed by the Act shall be payable by the delinquent Co-Owner and secured by such lien. The Board of Directors may take such action as it deems necessary to collect Assessments as provided in the Act and further may settle and/or compromise the same if deemed in its best interest.

No mortgagee of any mortgage of record or other purchaser of an Apartment who obtains title to the same at the foreclosure sale upon foreclosure of such mortgage shall be liable for the share of the Common Expenses or Assessments accruing after the date of recording of such mortgage but prior to the acquisition of title by such acquirer. In addition, any Co-Owner, person having executed a contract for the purchase of an Apartment or lender considering the loan of funds to be secured by an Apartment shall be entitled upon request to a statement setting forth the amount of Assessment(s) past due as provided in the Act. Failure to respond timely shall extinguish the lien for such assessment(s), to be extinguished as provided in the Act. Except in the foregoing circumstances, any acquirer shall be jointly and severally liable for such expenses with the former Co-Owner.

The Board of Directors shall have the right to assign any claim and/or lien rights for the recovery of any unpaid Assessments.

No Co-Owner may exempt himself from liability for his share of the Common Expenses or any other Assessment by waiving the use or enjoyment of any of the Common Elements or by abandoning his Apartment.

## ARTICLE X
### Insurance

1.    The Board of Directors of the Association

shall obtain insurance upon the Submitted Property insuring it (including both Common Elements and all Apartments) against all risks, all premiums of which shall be included as part of the Common Expenses. The provisions of this Article shall relate to all residential Units and all Common Elements; provided, however, because of the unique nature of the Commercial Units, the Co-Owner of a Commercial Unit may have that Unit exempted from any master hazard, casualty, liability or other insurance policy(ies) required to be maintained upon the Units (and have the amount of Common Expenses due from that Unit reduced accordingly), provided such Co-Owner provides evidence to the Board, and any Institutional Mortgagee requesting same, of equivalent insurance coverage with a carrier equivalent to that herein required.

The Board, on behalf of the Association, shall obtain extended insurance coverage (by policies, each having, if such can be obtained, a term of not less than three (3) years) upon the Submitted Property and improvements thereon, including the Apartments and Common Elements, insuring the Co-Owners and their mortgagees against loss from fire, earthquake, flood, vandalism and the elements (windstorm, etc.), as well as any other risks the Institutional Mortgagees described in Section 2 (if any) may deem it reasonable to require, in an amount (the "Insured Amount") not less than one hundred fifteen (115%) percent of the amount necessary to completely restore and replace all improvements within the Regime without deduction for depreciation. In addition, such insurance shall provide for an automatic quarterly increase for inflation of two (2%) percent of the Insured Amount. Not less than thirty (30) days prior to the anniversary of such policy(ies), the Board shall obtain three (3) written estimates from reputable general construction contractors who have engaged in construction of projects similar to the Regime and who are acceptable to the Institutional Mortgagees described in section 2 hereof, of the total costs of reconstruction and replacement of all improvements in the Regime. The Insured Amount shall be adjusted on that anniversary date to an amount equal to one hundred fifteen (115%) percent of the average of these estimates. In the event such coverage as obtained contains deductible(s) and/or is insufficient to so restore or replace, the Insurance Trustee (as hereafter described), with the advice of the Board, shall determine the amount(s) necessary to cover such deductible(s) and/or deficiencies and establish a self-insurance fund shall have the same loss payee as the policies obtained (i.e., the Insurance Trustee for the benefit of the Co-Owners and their mortgagees, etc.). Such self-insurance fund and any increase and/or replacement(s) thereto shall be funded by assessment of all of the Co-Owners by the Insurance Trustee acting on behalf of the Baord, which shall be, when so assessed, an item of Common Expense. Such funds so maintained (except for excess funds, which shall be distributed as provided in Section 4), together with interest threon (if any) may be expended only in the event of: (i) a loss which such funds insure against; (ii) the obtaining of other insurance to cover such deductible(s) and/or insufficiency(ies); (iii) the consent of all Co-Owners and their mortgagees; or (iv) upon termination of the Regime. In the event of distribution of such funds for any or the latter three events, such funds so expensed and/or distributed shall be considered as, owned as and distributed as Common Surplus.

2.     Any Institutional Mortgagees holding mortgages recorded prior to July 1, 1985, encumbering Apartments in the Regime having collectively an aggregate of original principal balances of $1,000,000 or more shall have the right to approve all such insurance policy or policies, the company or companies, insurance upon such insurance coverage, the amount(s) thereof and, if appropriate, self-insurance sufficient to cover deductibles. Declarant reserves the

BOOK 917 PAGE 895

895

right to, by amendment, change the date by which mortgages must be recorded in order for an Institutional Mortgagee to qualify for the rights granted herein.

3.     Insurance premiums are and shall be a part of the Common Expenses; provided, however, they shall be paid separately and to the Insurance Trustee by each Co-Owner at such address as it shall designate.  The Insurance Trustee shall notify the Co-Owners of the place of payment and monthly payment amount, which shall be due and payable by the first day of each month by each Co-Owner.  The amount collected monthly from each Co-Owner shall be an amount equal to his percentage share in the Common Expenses multiplied by not less than 1/12th of the annual premiums of all insurance policies maintained upon the Regime.  Further, the Insurance Trustee is hereby subrogated to and assigned the lien rights of the Council of Co-Owners as to each Co-Owner failing to pay any payment due from him to the Insurance Trustee for insurance premiums or self-insurance to the extent of the amounts due and owing but unpaid, which rights include the right to file notice of, perfect and foreclose·upon a lien(s) against such Co-Owner(s) as granted to the Council of Co-Owners by the Act and this Master Deed.  Sufficient funds shall be collected and maintained, if necessary in advance, by the Insurance Trustee (as hereinafter defined) such that with monthly installments received by it, it will have sufficient funds to pay the next annual premium on each policy maintained under Section 1 hereof not less than sixty (60) days prior to the date such premium on such policy is due and payable.  Such funds so held shall be disbursed and used by it solely to pay premiums on said insurance policies described in Section 1.  Unless such carrier fails to meet the requirements of Section 13 hereof or unless otherwise instructed by the Board of Directors and agreed to by the Institutional Mortgagees described in Section 2, the Insurance Trustee shall renew each policy with and pay the renewal premium to the same carrier then carrying said coverage.  Such funds shall not be otherwise used or disbursed except upon written instruction of the Board of Directors consented to by all of the Institutional Mortgagees within the classification described in Section 2 of this Article.

4.     Mellon Bank, N.A., it successors and assigns, is hereby appointed and designated Insurance Trustee.  The Insurance Trustee shall receive all funds designated for the self-insurance fund (if any) described in Section 1 hereof, to be held in trust for the benefit of the Co-Owners and their mortgagees, to be distributed as provided, and only as provided, in this Article.  The funds comprising such self-insurance fund shall be placed in one or more demand accounts of a federally insured bank or trust company (which shall be interest bearing account(s) if allowed by such institution and permitted by law).  To the extent such funds exceed those required (as defined in Section 1), they shall be paid over to the Council of Co-Owners as Common Surplus.

5.     The Insurance Trustee is hereby designated and appointed as agent for the Council of Co-Owners, its Board of Directors, each and every present and future Co-Owner thereof and each and every mortgagee (if any) of each and every such Co-Owner for the purpose of this Article.  Any person, by acquiring any ownership or security interest whatsoever in any Apartment, shall be deemed to have appointed the Insurance Trustee as his, her or its agent for the purpose of this Article.  Further, such appointment is and shall be irrevocable; provided, however, the present Insurance Trustee may resign upon the acceptance by a successor insurance trustee of all rights, powers and duties herein granted the Insurance Trustee and, further, provided such successor must be a federally insured bank or other federally insured depository having a corporate trust department, and must be

acceptable to all Institutional Mortgagees within the classification described in Section 2 of this Article. In its capacity as agent, the Insurance Trustee shall cause itself, as Insurance Trustee, to be designated as named insured and loss payee, for the benefit of those for whom it is herein designated as agent, of the insurance policies procurred pursuant to Section 1 of this Article, and in such capacity to receive all proceeds from such policies and execute as duly authorized agent such releases, endorsements or other documents or things as may be necessary to be able to receive such proceeds. In the event of any casualty or loss, the Board of Directors shall be responsible to accomplish reconstruction, replacement and repair, provided the Insurance Trustee shall collect the proceeds of insurance (and to the extent appropriate, from the self-insurance fund) and distribute such proceeds (by, if appropriate, a percentage of completion basis) to the parties entitled thereto satisfying itself as to the effectuation of such repairs, replacement and reconstruction.

6.    The proceeds of any such insurance shall be applied to reconstruct the improvements as provided in the Act; provided, further, notwithstanding any provision of the Act to the contrary, reconstruction shall be complusory in all events. Any Co-Owner hereof, by accepting title to a unit, and any Institutional Mortgagee or other lien holder, by accepting any unit, any interest therein, or any interest in the Submitted Property as security of any type of nature, shall be deemed by such acceptance to have waived the provisions of Section 27-31-250 of the Act to the extent such provisions allow or otherwise provide for a failure to reconstruct. As a consequence, as aforesaid, reconstruction shall be required whether it comprises the whole, more than two-thirds or less than two-thirds of the Submitted Property. The provisions hereof are for the express protection of each and every Co-Owner and Institutional Mortgagee and may not be waived without the written consent of each and every Co-Owner and Institutional Mortgagee.

7.    If the Property is not insured or if the insurance proceeds are insufficient to cover the costs of reconstruction, rebuilding costs shall be paid by all of the Co-Owners directly affected by the damage and each shall be responsible for a share equal to the total cost times a fraction, the numerator of which is one and the denominator of which is the number of Apartments so directly affected. Failure or refusal of payment of any of the Unit Owners so affected shall result in a lien uopn his Unit in favor of the Association in such amount and may be enforced in the manner provided for collection of unpaid Assesments herein and/or in the Act.

8.    Nothing herein contained or contained in the By-Laws shall prevent or prejudice the right of each Co-Owner and/or his mortgagee(s) from insurance his Apartment on his account and for the benefit of himself and/or his mortgagee(s).

9.    Any repair and/or restoration must be substantially in accordance with the plans and specifications fo the original buildings and improvements or as the buildings or improvements were last constructed or according to plans approved by the Board of Directors and all Institutional Mortgagees of record, which approval shall not be unreasonably withheld.

10.    The Insurance Trustee is further hereby irrevocably appointed agent for each Co-Owner, the Council, its Co-Owners and their mortgagees for the purpose of comprising and settling claims arising under insurance policies purchased under the provisions of this Article and

to execute and to liver releases therefor u n the payment of claims.

11. Should the Association fail to pay insurance premiums when due or should the Council or Co-Owners fail to comply with other insurance requirements required herein or by the Act or imposed by Institutional Mortgagees having the right to impose the same, said Institutional Mortgagees or any one of them shall have the right to obtain insurance policies and to advance such sums as are required to maintain or procure such insurance and to the extent of the monies so advanced said mortgagee(s) shall be subrogated to the Assessment and lien rights of the Association and its Board of Directors against the individual Co-Owners for reimbursement of such sums.

12. The Board of Directors of the Association is authorized and directed to purchase such additional insurance and for such additional purposes, including liability insurance (in an amount of not less than Five Hundred Thousand ($500,000.00) Dollars per occurrence) and, if required by law or deemed advisable by it, workmen's compensation insurance, to carry out its purposes and/or to protect itself, the Regime, its Common Elements, Apartments, the Co-Owners thereof and their mortgagees.

13. Any and all insurance coverage(s) obtained under Section 1 above by the Association pursuant to this Article must be obtained from an insurance carrier(s) admitted and authorized to do business in the State of South Carolina, and having an Alfred M. Best Financial Rating of at least "A+15", which company(ies) shall be affirmatively presumed to be a good and responsible company(ies) and the Declarant, the Board of Directors, the Association and Institutional Mortgagees shall not be responsible for the quality or financial responsibility of the insurance company(ies) provided same are so rated and are so licensed, admitted and approved to do business and provide such coverage in the State of South Carolina.

ARTICLE XI
Use and Occupancy

The Co-Owner of each Apartment (other than the Commercial Units) shall occupy and use his Apartment as a single family private dwelling for residential purposes for himself and the members of his family and/or his social guests or designees and for no other purposes; provided, however, nothing herein contained nor any present or further action by the Council of Co-Owners or its Board of Directors shall prevent any Co-Owner from leasing or renting his Apartment for such period or periods as he shall determine in his sole discretion to third parties; provided, however, such Apartment shall, if so rented or leased, be used for residential purposes only by such lessee or renter and in compliance with this Master Deed and its Exhibits, the Act and Rules and Regulations properly promulgated. Such renter or lessee may be removed from the Property and/or refused further entrance by the Board of Directors of the Association or its designee for non-compliance, and the Co-Owner of that Apartment shall be liable for all damages caused by his lessee or renter and all costs of removal which shall be a lien upon his Apartment the same as the lien for unpaid Common Expenses. No commercial or business activity shall be carried out in any Apartment or other part of the Submitted Property except the Commercial Units and further except that the Declarant, its successors and assigns, may maintain and use one or more Apartments of the Condominium owned or leased by it, its successors or assigns, designated by Declarant as a model and/or for management, sales and/or rental offices, and commercial laundry and vending equipment may be

BOOK 917 PAGE 898

898

maintained and ma__cenance and laundry equipı ıt kept and maintained in areas of the Common Elements suitable for such purposes. Notwithstanding the foregoing, nothing contained in this Declaration shall be construed to restrict the Declarant or any successor in interest to the Declarant as developer of the Regime from seling and/or conveying any Apartment under any plan of multiple use, interval ownership or time sharing arrangement; provided, further, no Apartment may be sold, leased or otherwise marketed under any plan of multiple use, interval ownership or time sharing arrangement without express written consent of Declarant.

No Co-Owner shall permit or suffer anything to be done or kept in or about his Apartment or upon the Common Elements which will obstruct or interfere with the rights of other Co-Owners, their guests or assigns or annoy them by creating any unreasonable noises or otherwise, nor shall any Co-Owner permit or commit any nuisance or illegal act in or about the Submitted Property.

No animals or pets of any kind shall be kept in any Apartment or on any property of the Regime except with written consent of, and subject to, the Rules and Regulations adopted by the Board of Directors of the Association; provided, however, that in no case shall they be kept, bred or maintained for any commercial purposes; and provided, further, any animal or pet causing or creating a nuisance or unreasonable disturbance may be permanently removed from the Submitted Property by the Board of Directors upon three (3) days written notice to the owner thereof. Once permission to allow a pet to be kept in any Apartment is given, it shall not be withdrawn or terminated unless such pet has caused or created a nuisance or unreasonable disturbance as provided herein.

No Co-Owner shall cause anything to be affixed or attached to, hung, displayed or placed on the exterior walls, doors or windows of the Apartments or upon the general or limited common Elements; nor shall he plant any type of plants, shrubbery, flower, vine or grass outside an Apartment nor shall he cause awnings or storm shutter, screens, enclosures and the like to be affixed or attached to any Apartment, limited or general Common Element; nor shall he place any furniture or equipment outside an Apartment except with the written consent of the Board of Directors of the Association; and, further, where approved, subject to the Rules and Regulations of the Board of Directors. No clothesline or similar device shall be allowed on any portion of the Submitted Property nor shall clothes be hung anywhere except where designated by the Board of Directors. Co-Owners may not screen or enclose any exterior pation which abuts a Unit, where applicable, nor may any Co-Owner screen or enclose any exterior deck and/or balcony which abuts his Apartment, where applicable, with any type of material without the prior written consent of the Board of Directors.

No person shall use the Common Elements or any part(s) thereof or a Unit or any part of Submitted Property in any manner contrary to, or not in accordance with, such Rules and Regulations pertaining thereto as may from time to time be promulgated by the Board of Directors of the Association, provided, however, no rule or regulation may be passed unduly restricting the quiet and peaceful use of an Apartment for its intended purpose. The Board may impose penalities (including, but not limited to, fines, enforceable by lien as Common Expenses) for violation of such rules and regulations.

The Board of Directors may further, if it determines appropriate, suspend use of the Common Elements for a period of up to thirty (30) days for any violation of the provisions hereof and/or said Rules and Regulations. Such remedy is not exclusive.

Notwithstanding the provisions hereof, the Declarant, its successors and assigns in interest as developer or the Regime, shall be allowed to maintain one (1) or more Apartments as laundry and/or maintenance areas, management, as a model, sales and/or rental office(s); to display and place signs upon the premises to aid in sales or rentals; and to engage in sale or rental activities and provide laundry and maintenance service upon the Submitted Property.

## ARTICLE XII
### Maintenance and Alterations

1. The Board of Directors (including the initial Board appointed by the Declarant) may enter into contracts with firm(s), person(s) or corporation(s), or may join with other regimes and/or entities in contracting for the maintenance and/or repair of the Submitted Property and any properties belonging to the Regime; may contract for or may join with other associations in contracting for the maintenance and management of the Regime; and may delegate to such contractor or manager all power and duties of the Association and its Board of Directors except such as are specifically required by this Master Deed, by its By-Laws or by the Act to have approval of the Board of Directors and/or of the Association.

2. There shall be no alterations or additions to the Common Elements or any part(s) thereof except as authorized by the Board of Directors and approved by not less than seventy-five (75%) percent of the total vote of the Co-Owners of the Regime provided the aforesaid alterations or additions do not affect the rights of any Co-Owner and/or his Institutional Mortgagee(s) of record unless the consent of both have been obtained. The cost of the foregoing shall be assessed as Common Expenses. Where alterations or additions as aforesaid are exclusively or substantially for the benefit of the particular Co-Owner(s) requesting the same, then the cost of such alterations or additions shall be assessed against and collected solely from the Co-Owner(s) exclusively or substantially benefiting therefrom. The assessment shall be levied in such proportion as may be determined as fair and equitable by the Board of Directors taking into account the benefit to each and the relative value of each such Apartment as opposed to the others so improved. Where such alterations or additions exclusively or substantially benefit Co-Owner(s) requesting same, said alterations or additions shall only be made when authorized by the Board of Directors approved by not less than seventy-five (75%) percent of the total votes of the Co-Owners exclusively or substantially benefiting therefrom, and where said Co-Owners are ten (10) or less, the approval of all but one (1) shall be required.

Where the approval of Co-Owners for alterations or additions to the Common Elements of this Regime is required, the approval of Institutional Mortgagees whose mortgages encumber Apartments representing not less than ninety (90%) percent of the total unpaid dollar indebtedness as to principal on said Apartments at said time shall also be required.

3. Each Co-Owner is hereby required:

(a) To maintain in good condition and repair his Apartment, all interior surfaces and the entire interior of his Apartment and to maintain and repair the fixtures and equipment therein, which includes, but is not limited to, the following, whre applicable: air conditioning and heating units, including condensers and all apurtenances thereto wherever situated; hot water heaters; refrigerators, ranges and ovens and all other appliances; drains, plumbing fixtures

and connections, sinks, all plumbing and water lines within the Apartment; electric panels; lines outlets and fixtures within the Apartment; interior doors, windows, screens and glass; all exterior doors (except the painting of the exterior of an exterior door shall be a Common Expense). Water, sewerage, disposal and waste fees, electricity or other utility charges, if applicable, shall be part of the Common Expenses if billed to the Regime; however, if the individual bills are sent to each Co-Owner by the provider of such services, each such Co-Owner shall pay said bill for his Apartment individually. Electricity for the Units and all other purposes for the Regime may be metered to the Regime as a whole, rather than to individual Apartments, and, if so, shall be a Common Expense. Where an Apartment is carpeted, the cost of maintaining and replacing the carpeting shall be borne by the Co-Owner of said Apartment. Each Co-Owner shall maintain, care for and preserve those portions of the Limited Common Expenses (if any) exclusively for his use or exclusively for his use together with certain other Co-Owners. Where there is a light fixture or fixtures attached to the exterior wall or walls of the Apartment, the Co-Owner thereof shall replace the bulb(s) by the same color and bulb wattage at his cost and expense unless the Board of Directors decides to replace same as a Common Expense. Each Co-Owner is responsible for and will pay for his telephone service.

(b)    Not to make or cause to be made any structural addition or alteration to his Apartment or to the Common Elements or any part(s) thereof. Alterations within an Apartment may be made with prior written consent of the Board of Directors and any Institutional Mortgagee holding a mortgage upon such Apartment as could be affected by such alteration. Upon approval of such alteration, the Board of Directors shall have the right to require approval of any contractor and/or sub-contractor employed by such Co-Owner for such purpose. Said parties shall comply with all Rules and Regulations adopted by the Board of Directors. Further, such Co-Owner shall be liable for all damages to any other Apartment(s), Common Element(s) or Submitted Property caused by the Co-Owner's contractor, sub-contractor or employee whether such damage be caused by negligence, accident or otherwise.

(c)    To allow the Board of Directors or its representative, agent or employee to enter into his Apartment for the purposes of maintenance, inspection, repair or replacement of improvements within the Apartment and/or Common Elements; to determine in the case of emergency, circumstances threatening the Apartment and/or Common Elements; or to determine compliance with the provisions of this Declaration and/or any By-Law or Rule or Regulation of the Association.

(d)    To show no signs, advertisements or notices of any type on the Common Elements, Apartments or buildings and to erect no exterior antennae or aerials except as consented to by the Board of Directors.

4.    In the event that a Co-Owner fails to maintain his Apartment and all parts thereof as required, makes any alterations or additions without the required consent, or otherwise violates the provisions hereof, the Board of Directors, on behalf of the Association, shall have the right to proceed with an action at law for damages or to obtain an injunction to prevent such activity and/or to require compliance with the provisions hereof, with the By-Laws, the Act or any Rules or Regulations. In lieu thereof and in addition thereto, the Board of Directors shall have the right to levy an assessment against such Co-Owner for such necessary sums to remove any unauthorized additions or

90/

alterations and/or to restore the property to good condition
and repair. Said assessments shall have the same force and
effect as all other special assessments. The Board of
Directors shall have the right to have its employees or
agents, or subcontractors appointed by it, enter an Apartment
at all reasonable times to do such work as it deems necessary
to enforce compliance with the provisions hereof.

5. The Board of Directors shall determine the
exterior color scheme of all buildings and all exterior and
interior color scheme(s) of the Common Elements (subject to
the approval rights of the Association), and shall be
responsible for the maintenance thereof. No Co-Owner shall
paint an exterior wall, door, window or any exterior surface
or place anything thereon or affix anything thereto without
the written consent of the Board of Directors.

6. The Council of the Co-Owners shall be
responsible for the maintenance and repair and replacements
of the Common Elements and all portions of the Submitted
Property not required to be maintained and/or repaired and/or
replaced by individual Co-Owners. Notwithstanding each
Co-Owner's duty of maintenance, repair, replacement and other
responsibilities to his Apartment, the Association, through
its Board of Directors, may enter into an agreement with such
firm(s) or company(ies) as it may determine from time to time
to provide certain services and/or maintenance for and/or on
behalf of the Co-Owners whereby maintenance and services are
provided on a regularly scheduled basis, such as air
conditioning maintenance services, exterminating services and
other types of maintenance and services as the Board of
Directors deems advisable and for such periods of time and on
such basis as it determines. Further, the Board of Directors
may lease equipment and/or service (such as MATV or Cable TV
service and telephone systems) and grant easements for the
location and/or installation of the same if it determines
advisable. Said agreements shall be on behalf of each of the
Co-Owners and the Monthly Assessment due from each Co-Owner
for Common Expenses shall be increased by such sum as the
Board of Directors deems fair and equitable under the
circumstances in relation to the monthly charge for said
equipment maintenance or services. Each Co-Owner shall be
deemed a party to such agreement with the same force and
effect as though said Co-Owner has executed said agreement.
It is understood and agreed that the Association through its
Board of Directors shall execute said agreements as the agent
for each Co-Owner. The aforesaid assessment shall be deemed
to be an assessment under the provisions of Article IX of
this Master Deed.

## ARTICLE XIII
### Termination

This Regime may be voluntarily terminated at any
time upon the terms and conditions and in the same manner set
forth and described in the Act; provided, however,
notwithstanding anything to the contrary in the act as to
termination in the event of destruction, the Regime may not
be terminated unless and until all Co-Owners and all
Institutional Mortgagees of record of all Apartments agree
thereto and said Institutional Mortgagees agree in writing to
accept such termination and to accept as security the
unidvided portion of the Submitted Property owned by the
debtors of each. In the event of such termination, all
Co-Owners shall become tenants in common of the real property
and improvements constituting the Apartment and Common
Elements. The ownership of each Co-Owner upon termination as
tenants in common shall be the same percentage as his
percentage ownership in the Common Elements at that time.

902

ARTICLE XIV

Easements

       Each Person who acquires an interest in an Apartment shall be deemed, thereby, to agree that: (i) if any portion of an Apartment shall encroach upon any portion of the Common Elements or another Apartment or any portion of the Common Elements shall encroach upon any Apartment, there shall exist a valid easement for such encroachment and for the maintenance and repair of the same so long as it stands; and (ii) in the event a building or other improvement or an Apartment is partially or totally destroyed and the reconstruction thereof shall create an encroachment on portions of the Common Elements or on any Apartment, there shall exist a valid easement for such encroachment and the maintenance thereof.

       The Property is subject to all conditions, limitations, restrictions, reservations and all other matters of record, the rights of the United States of America, the State of South Carolina and any governmental authority or agency, including those pertaining to the use and ownership of any submerged lands and any lands lying below the natural high water line of the surrounding bodies of water, any taxes, applicable zoning ordinances which now exist or are hereafter adopted and easements and ingress and egress, for pedestrian and vehicular purposes and for utility services and drainage which now exist or are hereafter granted easements for such purposes as it determines in its sole discretion appropriate and designate the beneficiaries thereof for such time as it determines in its sole discretion. Such rights include, but are not limited to, reservation unto itself, its successors and assigns, and the right to grant to others (including owners, occupants and users of other properties, facilities and horizontal property regimes within the Resort or in proximity thereto) easements for access and for ingress and egress across portions of the Submitted Property suitable for such purpose, for pedestrian and vehicular purposes and for utility services and drains, and easements and licenses of use of the beach area, and amenities and facilities of the Regime, provided any grant of use(s) of facilities or amenities shall require the grantee(s) thereof to pay fees commensurate with such use(s) for such use(s). When the Declarant relinquishes such right, the Association shall be empowered to grant such easements. While the Declarant has the right to grant easements, the consent and approval of the Association to the granting thereof shall not be required. No easement shall be granted by the Declarant or the Association if as a result thereof any buildings or other improvement in the Regime would be structurally weakened or the security of any mortgagee of record would be adversely affected without its written consent.

       The Declarant reserves for itself, its successors, assigns, designees, and licensees, the right to place a satellite dish in an unobtrusive location on the Submitted Property and/or the right to place cable wiring on the Submitted Property in order to facilitate television reception to the Regime and hereby reserves such general easement to the Submitted Property as is necessary and consistent with this purpose.

       The rights of all Co-Owners shall be subject to all such easements as presently exist or as are hereinafter granted.

       The Association, all present and future Co-Owners and Occupants, the Declarant and their respective successors, assigns, designees, invitees, licensees and guests are hereby granted a perpetual easement over, through and across and a license to use the areas of the Common Elements in the manner for which such is ordinarily intended and are further granted a pedestrian easement over, through and across the Common Elements upon such paths and ways as are suitable for pedestrian traffic and a license to use the same.

## ARTICLE XV
### Certain Rights of Declarant

1. Notwithstanding any other provisions herein, so long as the Declarant continues to own any of the Apartments, the following provisions shall be deemed to be in full force and effect, none of which shall be construed so as to relieve the Declarant from any obligations as a Co-Owner to pay assessments as to each Apartment owned by the Declarant after the construction of said Apartment has been completed.

(a) The Declarant shall have the right at any time to sell, transfer, lease or re-let any Apartment(s) which the Declarant continues to own after this Master Deed has been recorded, without regard to any restrictions relating to the sale, transfer, lease or form of lease of Apartments contained herein and without the consent or approval of the Association or any other Co-Owner being required.

(b) During the period of time in which structures are under construction by the Declarant and not completed, no dues shall be charged against the Declarant as the Co-Owner of the Apartments included therein until the completion of said Apartments and the dues shall be assessed against the Co-Owners (including the Declarant) of those Apartments which shall have been completed, proportionately, inter se.

(c) Without limiting the foregoing, the Declarant shall have the power, but not the obligation, acting alone, at any time (and from time to time) so long as the Declarant owns or holds a mortgage upon at least one Apartment to amend the Declaration to cause the same to conform to the requirements of the Federal National Mortgage Association and/or the Federal Home Loan Mortgage Corporation, as set forth, respectively, in "FNMA Conventional Home Mortgage Selling Contract Supplement" and "Seller's Guide Conventional Mortgages," as the same may be amended from time to time.

(d) The Declarant shall have the rights: (i) to use or grant the use or a portion of the Common Elements for the purpose of aiding in the sales or rentals of Apartments; (ii) to use portions of the Submitted Property for parking for prospective purchasers or lessees of Apartments and such other parties as the Declarant determines; (iii) to erect and display signs, billboards and placards and store and keep the same on the Submitted Property; (iv) to distribute audio and visual promotional material uopn the Common Elements; and (v) to use any Apartment which it owns or leases as a sales and/or rental office, model, management office or laundry and/or maintenance facility.

(e) In order to provide the Regime with, among other things, adequate and uniform water service, sewage disposal service, utility services, telephone services and television reception, the Declarant reserves the exclusive right to contract for the provision of such services. The Declarant, as agent for the Association and the Co-Owners, has entered into or may enter into arrangements, binding upon the Association and the Co-Owners, with governmental authorities or private entities for furnishing such services. The charges therefor will be Common Expenses.

(f) The Declarant reserves the right to enter into, on behalf of and as agent for the Association and the Co-Owners, agreements with other Persons for the benefit of the Regime, the Association and the Co-Owners. The provisions of any such Agreement shall bind the Association and the Co-Owners. The Declarant as agent for and on behalf of Association and the Co-Owners, has entered into an

agreement with Capital TeleCommunications Co oration, pursuant to which it will provide a color tel vision set in each Unit togethe with cable and satellite evision reception, service, programming and maintenance and service therefor. This agreement, a copy of which is attached as an Exhibit and incorporated herein by reference is binding upon the Association and the Co-Owners, to the extent allowed by law. The fees for rental of such television sets and for such services shall be Common Expenses. If the Association fails to pay the amounts due under the agreement with Capital TeleCommunications Corporation, the latter, if it duly performs its obligations under such agreement, shall be subrogated to all rights of the Association as to Common Expenses. The agreement with Capital Telecommunications Corporation may be amended only by a written amendment executed by the Association and Capital TeleCommunications Corporation. The Declarant has also entered into an agreement with Capital TeleCommunications Corporation, pursuant to which it will provide a telephone in each Apartment tied to a central PBX system and maintenance and service therefor. This agreement, a copy of which is attached as an Exhibit and incorporated herein by reference is binding upon the Association and the Co-Owners, to the extent allowed by law. The fees for rental of such telephone sets and service shall be Common Expenses. If the Regime fails to pay the amounts due under the agreement with Capital TeleCommunications Corporation, the latter, if it duly performs its obligations under such agreement, shall be subrogated to all rights of the Association as to Common Expenses. The agreement with Capital TeleCommunications Corporation may be amended only by a written amendment executed by the Association and Capital TeleCommunications Corporation.

2. THE DECLARANT SPECIFICALLY DISCLAIMS ANY INTENTION TO HAVE MADE ANY WARRANTY(IES) OR REPRESENTATION(S) IN CONNECTION WITH THE SUBMITTED PROPERTY (INCLUDING ANY WARRANTIES AS TO MERCHANTABILITY OR FITNESS FOR USE OR FITNESS FOR A PARTICULAR PURPOSE) OR THE DOCUMENTS ESTABLISHING OR GOVERNING THE REGIME, EXCEPT THOSE WARRANTIES AND REPRESENTATIONS (IF ANY) EXPLICITLY SET FORTH HEREIN. NO PERSON SHALL BE ENTITLED TO RELY UPON ANY WARRANTY OR REPRESENTATION NOT EXPLICITLY SET FORTH HEREIN. STATEMENTS (IF ANY) AS TO COMMON EXPENSES, TAXES, ASSESSMENTS OR OTHER CHARGES MADE BY THE DECLARANT OR ANY REPRESENTATIVE THEREOF ARE ESTIMATES ONLY AND NO WARRANTY, GUARANTEE OR REPRESENTATION IS MADE THAT THE ACTUAL AMOUNT OF SUCH COMMON EXPENSES, ASSESSMENTS OR OTHER CHARGES WILL CONFORM WITH SUCH ESTIMATES. The Buildings and the other improvements located in the Regime have been or will be constructed substantially in accordance with the representations made in the Exhibits. Such representations specify the full extent of the Declarant's liability and responsibility for the materials and methods utilized in the construction of the Buildings and the other improvements located in the Condominium.

The Declarant shall not be responsible for any condition caused by condensation on or expansion or contraction of materials, including paint (over interior or exterior walls), for loss or injury in any way due to the elements, the water tightness (or absence thereof) of windows and doors, the collection of water within the buildings or on any portion of the Submitted Property or defects which are the result of characteristics common to the type of materials used, or for damage due to ordinary wear and tear or abusive use or any other cause, except as the Declarant and a Co-Owner may specifically agree in writing. The enforcement of any guaranty or warranty from any contractor, sub-contractor, supplier or manufacturer shall be the obligation of the Association and its members and the Declarant shall bear no responsiblity therefor.

905

## ARTICLE XVI
### Provisions Respecting Construction Lender

Notwithstanding anything to the contrary contained in this Master Deed, until the satisfaction of record of any construction mortgage given by Declarant upon the Submitted Property to secure a loan with which to develop the improvements for the Submitted Property such as would be commonly classified as a construction loan mortgage (hereinafter referred to as the "Construction Mortgage"), the following provisions shall be a part of this Declaration and shall supersede any inconsistent provisions contained heretofore in this Master Deed.

1.    Whenever the consent of the Declarant is required under this Master Deed, the written consent of the holder of the Construction Mortgage (hereinafter referred to as "Construction Mortgagee") shall also be required.

2.    In the event that the Declarant shall violate any of its obligations as a Co-Owner, the Association shall be required to give Construction Mortgagee written notice of such failure or violation, and the Association shall be prohibited from instituting any suit or exercising any other remedy against the Declarant for any such failure or violation until it has given Construction Mortgagee ten (10) days' prior written notice of its intention to file such suit or exercise such remedy during which time Construction Mortgagee shall have the right to cure any such failure or violation.

3.    Construction Mortgagee shall be given written notice by the Association of any meeting of the Co-Owners together with the agenda of such meeting.

4.    No amendment shall be made to this Declaration or to the By-Laws of the Association, which would alter the rights of Construction Mortgagee or in any other way affecting the security of Construction Mortgagee without its joinder and written consent to such amendment.

5.    If Construction Mortgagee either assumes possession of any portion of the Submitted Property of Common Elements upon which said Construction Mortgage is a lien or acquires title to unsold Submitted Property upon foreclosure of the Construction Mortgage, by purchase of the unsold Submitted Property upon foreclosure sale, or by deed in lieu of foreclosure, Construction Mortgagee and its successors and assigns shall have and enjoy all of the rights, privileges and exemptions granted to Declarant by this Master Deed and/or by the By-Laws.

## ARTICLE XVII
### Rights of Lenders

Notwithstanding any other provision hereof, any mortgagee of record (including, but not limited to, the Construction Mortgagee while such Construction Mortgage shall remain unsatisfied) shall:

1.    Upon request, be permitted to inspect the books and records of the Association during normal business hours;

2.    Receive a copy of any audit performed by or for the Association and all proposed and adopted budgets;

3.    Upon request, receive written notice of all meetings of the Association and be permitted to designate a representative to attend and observe all such meetings; and

BOOK 917 PAGE 906

906

Declarant, its successors and assigns in interest
as developer of the Resort, and/or Present Owner, may, in its
sole discretion, declare certain other areas upon inclusion
within the Resort as natural marsh and forest areas and may,
within such areas, create plantings, lagoons or such other
features as it determines in its sole discretion add to the
esthetic qualities of such areas, which areas shall, upon so
declaring, be held by Declarant, its successors and assigns
(or Present Owner) (which declaration(s) shall be filed in
the public records of Horry County, South Carolina) in trust
as areas of natural beauty and scenery for use and enjoyment
of the Co-Owners and their occupants, such other owners of
dwellings Apartments and occupants within the Resort and such
third parties as Declarant, its successors and assigns (or
Present Owner) may select in its sole discretion (which shall
become, upon so declaring, part of the Resort Facilities and
the pro rata share of upkeep, maintenance, management and
replacement of such areas as so set shall be part of the
Resort Expenses to be paid pro rata by the Council of
Co-Owners and the Co-Owners thereof as an item of Common
Expense as is herein described).

Declarant further reserves unto itself, its
successors and assigns, and Present Owner, the right to grant
easements for ingress and egress across appropriate areas of
the Submitted Property to the Atlantic Ocean and its beach
(including that portion of the beach of the Atlantic Ocean
which is included with the Submitted Property) and easements
and licenses of use to use the beach area of the Submitted
Property for uses consistent with its being a natural beach
and dune area and provided such does not unduly interfere
with the activities and rights of the Co-Owners of the
Regime.

The Co-Owners shall each be members of The Myrtle
Beach Resort Homeowners Association and as such shall pay pro
rata with the Owners of other dwelling Apartments and other
interests in real property within the Resort who shall be
given similar easements and license of use all costs of
maintenance, upkeep and repair arising out of or associated
with the Resort Facilities as such exist from time to time;
such costs to include, but not be limited to, providing
management supervision and control thereof, property taxes,
insurance, maintenance and reserve funds and all other costs
connected or associated therewith (herein collectively
"Resort Expenses").   Such Resort Expenses shall be included
as an item of Common Expense and paid over by the Council of
Co-Owners to Declarant, its successors or assigns in interest
as developer of the Resort (or Present Owner, as the case may
be), or its designee, upon such schedule (but not more
frequently than once a month) and in advance for use for such
purposes, provided the Board or the Council of Co-Owners
shall be entitled to an annual accounting of the use of all
Resort Expenses by Declarant or its designee.   In the event
of non-payment of Resort Expenses, Declarant, or if
appropriate its designee, shall be subrogated to the rights
of the Council of Co-Owners as to the individual Co-Owners to
collect the Resort Expenses from the Co-Owners, including
being subrogated to all lien rights for non-payment of Common
Expenses as described in this Master Deed.

Declarant (its successors or assigns or Present
Owner, as the case may be) or its designee shall establish
rules and regulations for use of the Resort Facilities and
the Board of Directors shall appoint a Resort Facilities
committee and, if appropriate, one member to serve on the
Board of Directors of the Homeowners (as herein defined) to
assist in formulating and enforcing the same, it being the
intent that such rules and regulations shall encourage
safety, use and enjoyment of the Resort Facilities, provided
Declarant makes no warranties whatsoever that said rules and

and regulations will be inclusive or allow absolute safety of use.

Declarant (its successors or assigns in interest as developer of the Resort or Present Owner, as the case may be) may, in its sole discretion, establish The Myrtle Beach Resort Homeowners Association (herein "Homeowners"), which shall be an associaiton (which may, in Declarant's sole discretion, be incorporated as a corporation or as a corporation not for profit or unincorporated) and all Co-Owners shall, in addition ot being Co-Owners, automatically become members thereof. In addition, the Board of Directors shall elect one of its members who shall serve on the Board of Directors of Homeowners. The Board of Directors of Homeowners shall be comprised of one representative from this Regime, one representative from Myrtle Beach Resort Horizontal Property Regime, one representative from Myrtle Beach Oceanfront Spa Horizontal Property Regime and one representative from each other development as Declarant as developer of the Resort shall designate. In the event of such establishment, Declarant shall designate Homeowners as its designee to carry out the duties and responsibilities and have the powers herein granted to Declarant's designee.

In addition, Declarant (its successors or assigns in interest as developer of the Resort or Present Owner as the case may be) may, in its sole discretion, at any time convey to the Regime and its Co-Owners and/or any other horizontal property regimes or other multi-family developments within the Resort or which Declarant has developed in proximity to the Resort having like non-exclusive easements and licenses of use, or to Homeowners, all or any portion of the Resort Facilities or any interests therein, provided such shall be for no consideration other than the actual cost of such improvement or facility. Declarant shall have no liability whatsoever for any taxes, assessments, utility charges or other matters whatsoever arising out of the ownership of any Resort Facilities so conveyed and such conveyance shall be subject to Declarant (its successors or assigns in interest as developer of the Resort or Present Owner, as the case may be) retaining unto itself and the right to grant to such third parties as it may designate easements and licenses for use consistent with the conveyed facilities and contract(s) for management thereof and all matters and right theretofore of record. In such event, such documents shall be considered an amendment to this Master Deed and execution only by the Declarant (or its successors or assigns in interest as developer of the Resort or Present Owner as the case may be), shall be sufficient and no execution, concurrence or consent shall be required of the Council of Co-Owners, any Co-Owner, any Mortgagee or any third party whatsoever.

ARTICLE XIX
Miscellaneous Provisions

1. The Co-Owners of the respective Apartments shall not be deemed to own the undecorated and/or unfinished surfaces of the perimeter walls, floors and ceilings surrounding their respective Apartments nor shall any Co-Owner be deemed to own pipes, wires, conduits or other public utility lines running through said respective Apartments which are utilized for or serve more than one Apartment, which items are hereby made a part of the Common Elements. Each Co-Owner shall, however, be deemed to own the walls and partitions which are contained in said Co-Owner's Apartment and shall also be deemed to own the interior decorated and finished surfaces of the perimeter walls, floors and ceilings, including plaster, paint, wallpaper, etc.; however, all load-bearing walls, and, if applicable,

the floor between the first or ground floor and second floor located within an Apartment, are part of the Common Elements to the unfinished surface of said walls and/or floors.

2. No Co-Owner may exempt himself from liability for his contribution toward the Common Expenses or other assessments duly made by the Association and/or the Board of Directors by waiver of the use of enjoyment of any of the Common Elements or the Recreational Facilities of the Regime or the Resort or by abandonment of his Apartment.

3. Each Co-Owner shall pay all ad valorem taxes and other taxes assessed against his Apartment and shall file any tax returns required in connection therewith. No Co-Owner shall have a right of contribution or a right of adjustment against any other Co-Owner because the value of his Apartment as fixed by any taxing authority may differ from that stated herein.

4. For the purposes of ad valorem taxation, the interest of the Co-Owner of an Apartment in his Apartment and Common Elements appurtenant thereto shall be considered an Apartment. The value of said Apartment as compared to the value of the Regime shall be equal to the percentage of the value of the entire Regime as then constituted, including land and improvements, as has been assigned to said Apartment and as set forth in this Master Deed. The total of all said percentages equal one hundred (100%) percent of the value of all the land and improvements as it shall then be constituted.

5. All provisions of this Master Deed and all Exhibits hereto and amendments hereof shall be construed as covenants running with the land and of every part thereof and interest therein including, but not limited to, every Apartment and the appurtenances thereto and every Co-Owner and/or occupant of the Submitted Property or any part thereof or owning any interest therein, his heirs, executors, successors, administrators and assignees shall be bound by all the provisions of this Master Deed and Exhibits hereto and any amendments to the same and the Act.

6. If any of the provisions of this Master Deed of the Exhibits hereto, of the Act or any section, clause, phrase, work or the application thereof in any circumstances is held invalid, the validity of the remainder of same and of the application of any provision, action, sentence, clause, phrase or work in other circumstances shall not be affected thereby.

7. Whenever notices are required to be sent hereunder, the same may be delivered to each Co-Owner either personally or by mail addressed to such Co-Owner at his place of residence in the Regime unless the Co-Owner has by written notice, duly receipted for, specified a different address. Proof of such mailing or personal delivery by the Association shall be given by affidavit of the person mailing or personally delivering such notice. Notices to the Association (including the Board of Directors) shall be delivered by mail to the Secretary of the Association at the Secretary's address within the Regime or, in the case of the Secretary's absence, then to the President of the Association at his address in the Regime; provided, however, that the Association may specify a different address by written notice delivered to all Co-Owners, Institutional Mortgagees of record, and any third party affected thereby. Notices to the Declarant shall be sent by mail to Post Office Box 11496, Columbia, South Carolina 29211. All notices shall be deemed delivered when mailed. Any party may change his or its mailing address by written notice duly receipted for. The change of the mailing address of any party as specified herein shall not require an amendment to this Master Deed.

Notices required to be given the personal representative of a deceased Co-Owner may be delivered either personally or by mail to such party at his or its address appearing in the records of the probate court wherein the estate of such deceased Co-Owner is being administered.

8.   All remedies for non-compliance provided in the Act shall be in full force and effect.  In addition thereto, should the Association find it necessary to bring an action to bring about compliance with any provision of law, the Act, this Master Deed and/or the Exhibits attached hereto, upon finding by the Court that the violation claimed was wilful or deliberate, the Co-Owner so violating shall reimburse the Association for reasonable attorneys' fees incurred in prosecuting such action.

9.   Subsequent to the filing of this Master Deed, the Association when authorized by a vote of the majority of the total voting members of the Association and the Institutional Mortgagees of record encumbering condominium Apartments who represent the majority of the dollar institutionally mortgaged indebtedness against this Regime may, together with other owners' associations and/or others, purchase and/or acquire leaseholds, memberships, and other possessory or use interest in lands and/or facilities, including, but not limited to country clubs, golf courses, marinas and other recreational facilities, whether or not contiguous to lands of the Regime, intended to provide for the enjoyment and/or recreation and/or other use and/or benefit of the Co-Owners.  The expenses of such ownership, rental, membership fees, operations, replacement and other undertakings in connection therewith shall be Common Expenses together with all other expenses and costs herein or by law defined as Common Expenses.

10.   Declarant presently holds certain options to purchase certain real property lying between the Regime (as it will be comprised upon inclusion of all phases, if included) and U.S. Highway 17.  Declarant, its successors and assigns may, but are not required to, use such for commercial development and/or multi-family development and to include the same within the Resort.  As a consequence, Declarant reserves unto itself, its successors and assigns, the right to grant unto itself and owners and/or occupants of said real property easements for ingress and egress across areas of the Regime suitable for such purposes for access to the Atlantic Ocean and its beaches, and to amenities and facilities within the Regime, together with licenses to use such facilities and amenities provided such users may abe required to pay reasonable fees commensurate with such use.

11.   Whenever the context so requires, the use of any gender shall be deemed to include all genders and the use of the singular shall include the plural and plural shall include the singular.  The provisions of this Master Deed shall liberally construed to effectuate its purposes of creating a uniform plan for the operation and development of a Horizontal Property Regime.

12.   The captions used in this Master Deed and the Exhibits attached hereto are inserted solely as a matter of convenience and shall not be relied upon and/or be used to construe the effect or meaning of the text of this Master Deed or Exhibits hereto annexed.

13.   Where an Institutional Mortgagee by some circumstance fails to be a first mortgagee, it shall nevertheless for the purposes of the Master Deed and the Exhibits hereto be deemed to be an Institutional First Mortgagee of record.

*911*

14. If any term, covenant, provision, phrase or other elements of this Master Deed or the Exhibits hereto or the Act are held invalid or unenforceable for any reason whatsoever, such holding shall not be deemed to affect, alter, modify or impair in any manner whatsoever any other term, provision, covenant or element of this Master Deed, Exhibits and the Act.

15. Notwithstanding the fact that the present provisions of the Act are incorporated by reference and included thereby, the provisions of the Master Deed and the Exhibits hereto shall be paramount to the Act as to those provisions where permissive variances are permitted; otherwise, the provisions of the Act shall prevail and shall be deemed incorporated herein.

16. Each Co-Owner by virtue of acceptance of a Deed of Conveyance of an Apartment and/or any portion of or interest in the Common Elements and other parties by virtue of their occupancy of Apartments or use of the Common Elements, hereby approves the provisions hereof and all covenants, terms, conditions, duties and obligations hereof and Exhibits hereto and the Act, and does agree to be bound by all the terms, conditions, duties and obligations contained herein, in the Exhibits hereto and in the Act.

17. No Co-Owner shall bring or have any right to bring any action for partition or division of the Property.

IN WITNESS WHEREOF, this Master Deed has been executed under seal as of this day and year first above written.

| Signed, Sealed & Delivered In The Presence Of: | RESORT INVESTMENT CORPORATION |
|---|---|
| | By _____ (SEAL) |
| | ATTEST: _____ |

| STATE OF SOUTH CAROLINA | ) | |
| --- | --- | --- |
| | ) | PROBATE |
| COUNTY OF RICHLAND | ) | |

PERSONALLY appeared before me the undersigned witness and made oath that (s)he saw the within named RESORT INVESTMENT CORPORATION, by and through its duly authorized agent, execute the within written MASTER DEED OF THE RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME, and that (s)he, with the other witness whose signature appears above witnessed the execution thereof.

_____
WITNESS

SWORN and subscribed to before me this 27th day of November, 198_.

_____ (L.S.)
NOTARY PUBLIC FOR SOUTH CAROLINA
My Commission Expires: 3/14/92 .

NO RENUNCIATION OF DOWER NECESSARY. DEVELOPER IS A DELAWARE CORPORATION.

FOR GOOD AND VALUABLE CONSIDERATION, the receipt whereof is hereby acknowledged, THE RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME COUNCIL OF CO-OWNERS hereby agrees to and does on behalf of itself and all its present and future Co-Owners, accept all the benefits and all the duties, responsibilities, obligations and burdens imposed upon it and them by the provisions of this Master Deed together with all the Exhibits hereto and as set forth in the Act.

IN WITNESS WHEREOF, the above named THE RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME COUNCIL OF CO-OWNERS has caused these presents to be signed in its name by its duly authorized agent this 29 day of ___November___, a 1984.

SIGNED, SEALED & DELIVERED
In The Presence Of:

THE RENAISSANCE TOWER
HORIZONTAL PROPERTY REGIME
COUNCIL OF CO-OWNERS

By _____
Its ____President____

ATTEST: _____
Its ___Vice President___

STATE OF SOUTH CAROLINA )
                        )        PROBATE
COUNTY OF RICHLAND      )

PERSONALLY appeared before me the undersigned witness and made oath that (s)he saw the within named THE RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME COUNCIL OF CO-OWNERS, by and through its duly authorized agent, execute the within written MASTER DEED OF THE RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME, and that (s)he, with the other witness whose signature appears above, witnessed the execution thereof.

_____
WITNESS

SWORN and subscribed to before me this 29th day of ___November___, 1984.

_____ (L.S.)
NOTARY PUBLIC FOR SOUTH CAROLINA
My Commission Expires: 3|19|92 .

EXHIBIT I

LEGAL DESCRIPTION

AND SURVEY

FILED
HORRY COUNTY

1984 NOV 28 PM 2: 02

BILLIE G. RICHARDSON
CLERK OF COURT

BOOK 917 PAGE 914

914

LEGAL DESCRIPTION

All that piece, parcel, or tract of land, situate in the County of Horry, State of South Carolina, and Township of Socastee, situate, lying, and being on the South Eastern side of U.S. Highway 17 containing 8.672 acres, more or less, and designated as a Portion of Lot 5 of Lakewood Plantation Tract, further designated as Phase III of The Myrtle Beach Resort, and described on a Map prepared by Culler Land Surveying Co., Inc. dated November 16, 1984, also being shown as Phase III on a Plat of 44.668 +/- Acres, Lot 5 of Lakewood Plantation Property, Socastee Township, Horry County, South Carolina, revised November 27, 1984, prepared by Culler Land Survey Co., Inc.  Said Plats being recorded with the Condominum Plats and Plans in Condominium Plat Book __8__, Page __6__, Office of the Clerk of Court, Horry County, South Carolina, to wit:

THE POINT OF BEGINNING is located by commencing at iron on the southern margin of U.S. Highway 17, the common corner of lands deeded to Resort Investment Corporation and lands serving as Ocean Lakes Campground, and thence running S28°08'10"E a total of 2972.19 feet, more or less, to the highwater mark of the Atlantic Ocean; thence N40°52'00"E 216.7 feet, more or less, to the POINT OF BEGINNING of the property; thence N38°08'08"W 1201.36 feet, more or less, to a point; thence N40°52'00"E 240.18 feet, more or less, to a point; thence N42°15'00"W 23.61 feet, more or less, to a point; thence N63°00'00"W 195.30 feet, more or less, to a point; thence N63°00'00"W an arc distance of 107.62 feet, more or less, to a point; thence S51°51'50"W 330.0 feet, more or less, to a point; thence S38° 08'10"E 1454.47 feet, more or less, to a point; thence N51°51'50"E 104.0 feet to a point, thence S38°08'10"E 116.79 feet to a point, thence N40°52'00"E 110.75 feet to the POINT OF BEGINNING.

Said parcel has appurtenant to it non-exclusive easements for access and ingress and egress to and from said parcel and for parking over, across and upon those portions of the Submitted Property suitable for vehicular and pedestrian traffic, and non-exclusive easements for the installation and maintenance upon the Submitted Property of utilities to service said parcel including, but not limited to, water, sewer, telephone, electrical, cable television, satellite dish, and drainage structures, including the right to connect such utilities to those servicing the Submitted Property.

TOGETHER WITH all right, title and interest in and to all the land lying between the southeastern boundary of said tract and the low water mark of the Atlantic Ocean formed by an extension of the northeastern and southwestern boundaries of said tract.  PROVIDED, HOWEVER, no warranties of title are made as to said parcel lying between said boundary and the low water mark of the Atlantic Ocean.

The above described tract is bounded on the northeast by parcel designated as "Ocean Spa Phase II", on the southwest by the Ocean Lakes Campground and on the southeast by the Atlantic Ocean.

TOGETHER WITH a non-exclusive easement for purposes of ingress and egress for vehicular and pedestrian traffic from U.S. Highway 17 Business to and from the parcel designated as "Phase I", on a Plat of 44.668 +/- Acres, Lot 5 of Lakewood Plantation Property, Socastee Township, Horry County, South Carolina dated June 10, 1982, revised July 13, 1982, and July 19, 1982, prepared by Culler Land Surveying Co., Inc., which plat is recorded in the Office of the Clerk of Court for Horry County, South Carolina in Plat Book 74 at Page 32, said easement being 75 feet in width whereon it adjoins U.S. Highway 17 Business, thereupon being reduced to 50 feet in width, the location and dimensions of which are shown upon the plats to which reference has been made above; reference being craved thereto for additional description; AND a non-exclusive easement for the underground installation and maintenance of utilities including, but not limited to, water, sewer, telephone, electrical, cable television and drainage structures from U.S. Highway 17 Business

9/5

to the parcel designated as "Phase I"; said easement being 30 feet in width; all as more fully shown uopn said plat to which reference has been made above; reference being craved thereto for additional description.

SUBJECT TO a non-exclusive permanent easement for purposes of ingress and egress for vehicular and pedestrian traffic from the fifty (50') foot road leading from U.S. Highway 17 Business to Phase I, Myrtle Beach Resort, which easement was previously granted by deed which was recorded in Deed Book 725 at Page 30, Horry County Records and shown on plat recorded in Plat Book 72 at Page 58 and Plat Book 74 at Page 32, Horry County Records and leading from said road to Phase II, Myrtle Beach Resort, said easement being thirty (30') feet in width and more particularly described as follows:  Commencing at an iron located at the Northwest corner of Phase II, thence running S40°52'W for a distance of 27.5 feet to the center line of said easement; thence running along said center line N50°30'W for a distance of 180 feet, more or less, to a point intersecting with the Southeastern edge of said fifty (50') foot road, said easement being thirty (30') feet in width with fifteen (15') feet on either side of said center line.  Said easement is more particularly described and delineated on a plat by Culler Land Surveying Company, Inc. dated June 10, 1982, last revised April 13, 1983 and recorded in the Office of the Clerk of Court for Horry County, S.C. as a part of the Plat and Plans prepared by Culler Land Surveying Company, Inc. and Stevens and Wilkinson, Inc., respectively, which are recorded as referenced above; and being more particularly described in the easement from R. Grant Singleton and Elizabeth G. Singleton dated April 13, 1983 and recorded in the Office of the Clerk of Court for Horry County, South Carolina.

TOGETHER WITH a non-exclusive easement for purposes of ingress and egress for vehicular and pedestrian traffic over, across and upon the paved roads of Myrtle Beach Resort Horizontal Property Regime (which was established by Master Deed recorded in the Office of the Clerk of Court for Horry County, South Carolina, in Deed Book 750 at Page 642 on June 15, 1982) for the purposes of ingress and egress for vehicular and pedestrian traffic from the terminus of the easement described above and over, across and upon the property designated as Phase I to the parcel designated as Phase II and across the property designated as Phase II to the parcel designated as Phase III on the above referenced Plat dated November 27, 1984.  AND TOGETHER WITH non-exclusive easements for the underground installation and maintenance of utilities including, but not limited to, water, sewer, telephone, electrical, cable television and drainage structures from the terminus of the easement at Phase I as described above, over, across, upon and through the property designated Phase I (which constitutes Myrtle Beach Resort Horizontal Property Regime) to the parcel designated as Phase II and above, over, across, upon and through the property designated as Phase II (which constitutes Ocean Front Spa Horizontal Property Regime) to the parcel designated as Phase III set forth above, the right to grant said easements having been reserved by Resort Investment Corporation in the Master Deed establishing Myrtle Beach Resort Horizontal Property Regime to which reference has been made above, said easements and the right to grant the same having been specifically reserved and described by Resort Investment Corporation in that certain Easement which is recorded in the Office of the Clerk of Court for Horry County, South Carolina on September 29, 1982 in Book 764 at Page 55.

9/6

THE FOREGOING described parcel comprising the Regime is a part of the same property conveyed to Resort Investment Corporation by deed of R. Grant Singleton and Elizabeth G. Singleton which is recorded in the Office of the Clerk of Court for Horry County, South Carolina, in Deed Book 807 at Page 747.  The foregoing non-exclusive easements from U.S. Highway 17 Business to the parcel designated as Phase I (which now constitutes Myrtle Beach Resort Horizontal Property Regime) were granted to Resort Investment Corporation by deed of R. Grant Singleton and Elizabeth G. Singleton which is recorded in the Office of the Clerk of Court for Horry County, South Carolina, in Deed Book 725 at Page 030.

ALSO SUBJECT TO all easements, reservations, restrictions, conditions and matters or record.

The aforesaid real property and the particular improvements thereon which are hereby committed (the location of such improvements) are shown and described on the plats and plans which are recorded in the Condominium Plat Book set forth above and those which are attached hereto as part of this Exhibit, all of which are incorporated in this Description by reference and which constitute, together with this Description, Exhibit 1 to the Master Deed of The Renaissance Tower Horizontal Property Regime (the "Regime"). The improvements consisting of the buildings within which apartments are located and the location of individual apartments within the buildings are located as shown and described upon the aforesaid parts of this Exhibit, which locations and descriptions are also incorporated in this description by reference.  Each apartment has appurtenant to it an undivided interest in the Common Elements as shown and described on the attached plats and plans and those recorded in the Condominium Plat Book to which reference is made above and as described in the Master Deed to which this is an Exhibit.  All areas not contained within the Apartment as the term "Apartment" is defined in the aforesaid Master Deed constitute Common Elements.  Improvements which constitute Common Elements are the streets and driveways, sidewalks, parking areas, all stairways, elevators, walkways, corridors and halls providing access to individual Apartments, an outdoor pool with deck, two (2) saunas, two (2) whirlpools, an exercise room, bathroom with lockers, lobby, library, meeting room, common area laundry rooms, water and utility lines and all other improvements not contained with or a part of any Apartment(s).



BOOK 917 PAGE 918

918

EXHIBIT 2

REGIME DESCRIPTION, APARTMENT DESIGNATION,

SQUARE FOOTAGE AND ARCHITECTURAL PLANS

The Regime consists of one building containing twenty-one (21) floors, which contains a ground floor with Amenities and twenty (20) residential floors (there is no thirteenth floor).

Each Apartment includes:

(a)  The space enclosed by the unfinished surfaces of perimeter and interior walls, ceilings and floors thereof, including vents, doors, windows and such other structural elements that are ordinarily regarded as enclosures of space.

(b)  All interior dividing walls and partitions (including the space occupied by such walls and partitions).

(c)  The decorated interior surfaces of all interior walls (including the decorated surfaces of all interior load-bearing walls) and floors, ceilings, consisting as the case may be of wallpaper, paint, plaster, carpeting, tiles and all other furnishings, materials and fixtures affixed or installed and for the sole and exclusive use of any dwellings space, commencing at the point of disconnection of the structural body of the building and from utility lines, pipes, or systems serving dwelling space.  No pipes, wires, conduits or other public utility lines or installation constituting a part of the overall system designed for the service of any particular dwelling space of a building or any property of any kind, including fixtures and appliances within an apartment, which are not removable without jeopardizing the safety or usefulness of the remainder of the building shall be deemed to be part of any apartment.

Apartments located on floors 2-12 and numbered "01", "02", "03", "04", "05", "06", "07", "08" and "09" are all Suites, and apartments located on floors 2-12 and numbered "10", "11", "12", "13", "14", "15", "16" and "17" are all Two Bedroom apartments, all with the square footages and unit numbers as set forth on the attached chart entitled "Unit Square Footage."  Apartments located on floors 14-22 and numbered "01", "02", "10", "11", "12", "13", "14", "15", "16" and "17" are all Two Bedroom apartments, apartments located on floors 14-22 and numbered "05", "07", "08" and "09" are all Suites, and apartments located on floors 14-22 and numbered "06" are all One Bedroom apartments, all with the square footages and unit numbers as set forth on the attached chart entitled "Unit Square Footage."

All Commercial Units are located as shown on the attached Architectural Plans.  Commercial Unit A consists of the restaurant and kitchen located on the ground floor, together with the Limited Common Elements consisting of that portion of the Common Elements designated as an outside patio which is adjacent to Commercial Unit A.  Commercial Unit B consists of the front desk, reception area and adjacent offices on the ground floor, together with the maid/storage areas on various residential floors which are Limited Common Elements appurtenant thereto.  Commercial Unit C consists of a meeting room containing approximately 688 square feet and located on the ground floor.  Commercial Unit D consists of an area containing approximately 767 square feet on the ground floor and designated for future commercial or rental use. Commercial Unit E consists of a Game Room located on the ground floor.

The principal improvements included within the Common Elements are an outdoor pool, exercise room, two (2) saunas, two (2) whirlpools, meeting rooms, laundry rooms, lobby and library.

UNIT SQUARE FOOTAGE

| Floor | Unit No. | Type | Areas of Unit Square Footage |
|-------|----------|------|------------------------------|
| 2 | 201 | Suite | 548 |
| | 202 | Suite | 417 |
| | 203 | Suite | 417 |
| | 204 | Suite | 548 |
| | 205 | Suite | 413 |
| | 206 | Suite | 407 |
| | 207 | Suite | 407 |
| | 208 | Suite | 382 |
| | 209 | Suite | 382 |
| | 210 | 2BR | 908 |
| | 211 | 2BR | 908 |
| | 212 | 2BR | 908 |
| | 213 | 2BR | 908 |
| | 214 | 2BR | 908 |
| | 215 | 2BR | 908 |
| | 216 | 2BR | 969 |
| | 217 | 2BR | 969 |
| 3 | 301 | Suite | 548 |
| | 302 | Suite | 417 |
| | 303 | Suite | 417 |
| | 304 | Suite | 548 |
| | 305 | Suite | 413 |
| | 306 | Suite | 407 |
| | 307 | Suite | 407 |
| | 308 | Suite | 382 |
| | 309 | Suite | 382 |
| | 310 | 2BR | 908 |
| | 311 | 2BR | 908 |
| | 312 | 2BR | 908 |
| | 313 | 2BR | 908 |
| | 314 | 2BR | 908 |
| | 315 | 2BR | 908 |
| | 316 | 2BR | 969 |
| | 317 | 2BR | 969 |
| 4 | 401 | Suite | 548 |
| | 402 | Suite | 417 |
| | 403 | Suite | 417 |
| | 404 | Suite | 548 |
| | 405 | Suite | 413 |
| | 406 | Suite | 407 |
| | 407 | Suite | 407 |
| | 408 | Suite | 382 |
| | 409 | Suite | 382 |
| | 410 | 2BR | 908 |
| | 411 | 2BR | 908 |
| | 412 | 2BR | 908 |
| | 413 | 2BR | 908 |
| | 414 | 2BR | 908 |
| | 415 | 2BR | 908 |
| | 416 | 2BR | 969 |
| | 417 | 2BR | 969 |
| 5 | 501 | Suite | 548 |
| | 502 | Suite | 417 |
| | 503 | Suite | 417 |
| | 504 | Suite | 548 |
| | 505 | Suite | 413 |
| | 506 | Suite | 407 |
| | 507 | Suite | 407 |
| | 508 | Suite | 382 |
| | 509 | Suite | 382 |
| | 510 | 2BR | 908 |
| | 511 | 2BR | 908 |
| | 512 | 2BR | 908 |
| | 513 | 2BR | 908 |
| | 514 | 2BR | 908 |
| | 515 | 2BR | 908 |
| | 516 | 2BR | 969 |
| | 517 | 2BR | 969 |

BOOK 917 PAGE 921

921

| Floor | Unit No. | Type | Areas of Unit Square Footage |
|-------|----------|------|------------------------------|
| 6 | 601 | Suite | 548 |
| | 602 | Suite | 417 |
| | 603 | Suite | 417 |
| | 604 | Suite | 548 |
| | 605 | Suite | 413 |
| | 606 | Suite | 407 |
| | 607 | Suite | 407 |
| | 608 | Suite | 382 |
| | 609 | Suite | 382 |
| | 610 | 2BR | 908 |
| | 611 | 2BR | 908 |
| | 612 | 2BR | 908 |
| | 613 | 2BR | 908 |
| | 614 | 2BR | 908 |
| | 615 | 2BR | 908 |
| | 616 | 2BR | 969 |
| | 617 | 2BR | 969 |
| 7 | 701 | Suite | 548 |
| | 702 | Suite | 417 |
| | 703 | Suite | 417 |
| | 704 | Suite | 548 |
| | 705 | Suite | 413 |
| | 706 | Suite | 407 |
| | 707 | Suite | 407 |
| | 708 | Suite | 382 |
| | 709 | Suite | 382 |
| | 710 | 2BR | 908 |
| | 711 | 2BR | 908 |
| | 712 | 2BR | 908 |
| | 713 | 2BR | 908 |
| | 714 | 2BR | 908 |
| | 715 | 2BR | 908 |
| | 716 | 2BR | 969 |
| | 717 | 2BR | 969 |
| 8 | 801 | Suite | 548 |
| | 802 | Suite | 417 |
| | 803 | Suite | 417 |
| | 804 | Suite | 548 |
| | 805 | Suite | 413 |
| | 806 | Suite | 407 |
| | 807 | Suite | 407 |
| | 808 | Suite | 382 |
| | 809 | Suite | 382 |
| | 810 | 2BR | 908 |
| | 811 | 2BR | 908 |
| | 812 | 2BR | 908 |
| | 813 | 2BR | 908 |
| | 814 | 2BR | 908 |
| | 815 | 2BR | 908 |
| | 816 | 2BR | 969 |
| | 817 | 2BR | 969 |
| 9 | 901 | Suite | 548 |
| | 902 | Suite | 417 |
| | 903 | Suite | 417 |
| | 904 | Suite | 548 |
| | 905 | Suite | 413 |
| | 906 | Suite | 407 |
| | 907 | Suite | 407 |
| | 908 | Suite | 382 |
| | 909 | Suite | 382 |
| | 910 | 2BR | 908 |
| | 911 | 2BR | 908 |
| | 912 | 2BR | 908 |
| | 913 | 2BR | 908 |
| | 914 | 2BR | 908 |
| | 915 | 2BR | 908 |
| | 916 | 2BR | 969 |
| | 917 | 2BR | 969 |

922

| Floor | Unit No. | Type | Area of Unit Square Footage |
|---|---|---|---|
| 10 | 1001 | Suite | 548 |
| | 1002 | Suite | 417 |
| | 1003 | Suite | 417 |
| | 1004 | Suite | 548 |
| | 1005 | Suite | 413 |
| | 1006 | Suite | 407 |
| | 1007 | Suite | 407 |
| | 1008 | Suite | 382 |
| | 1009 | Suite | 382 |
| | 1010 | 2BR | 908 |
| | 1011 | 2BR | 908 |
| | 1012 | 2BR | 908 |
| | 1013 | 2BR | 908 |
| | 1014 | 2BR | 908 |
| | 1015 | 2BR | 908 |
| | 1016 | 2BR | 969 |
| | 1017 | 2BR | 969 |
| 11 | 1101 | Suite | 548 |
| | 1102 | Suite | 417 |
| | 1103 | Suite | 417 |
| | 1104 | Suite | 548 |
| | 1105 | Suite | 413 |
| | 1106 | Suite | 407 |
| | 1107 | Suite | 407 |
| | 1108 | Suite | 382 |
| | 1109 | Suite | 382 |
| | 1110 | 2BR | 908 |
| | 1111 | 2BR | 908 |
| | 1112 | 2BR | 908 |
| | 1113 | 2BR | 908 |
| | 1114 | 2BR | 908 |
| | 1115 | 2BR | 908 |
| | 1116 | 2BR | 969 |
| | 1117 | 2BR | 969 |
| 12 | 1201 | Suite | 548 |
| | 1202 | Suite | 417 |
| | 1203 | Suite | 417 |
| | 1204 | Suite | 548 |
| | 1205 | Suite | 413 |
| | 1206 | Suite | 407 |
| | 1207 | Suite | 407 |
| | 1208 | Suite | 382 |
| | 1209 | Suite | 382 |
| | 1210 | 2BR | 908 |
| | 1211 | 2BR | 908 |
| | 1212 | 2BR | 908 |
| | 1213 | 2BR | 908 |
| | 1214 | 2BR | 908 |
| | 1215 | 2BR | 908 |
| | 1216 | 2BR | 969 |
| | 1217 | 2BR | 969 |
| 14 | 1401 | 2BR | 982 |
| | 1402 | 2BR | 982 |
| | 1405 | Suite | 413 |
| | 1406 | 1BR | 590 |
| | 1407 | Suite | 407 |
| | 1408 | Suite | 382 |
| | 1409 | Suite | 382 |
| | 1410 | 2BR | 908 |
| | 1411 | 2BR | 908 |
| | 1412 | 2BR | 908 |
| | 1413 | 2BR | 908 |
| | 1414 | 2BR | 908 |
| | 1415 | 2BR | 908 |
| | 1416 | 2BR | 969 |
| | 1417 | 2BR | 969 |

BOOK 917 PAGE 923

| Floor | Unit No. | Type | Areas of Unit Square Footage |
|-------|----------|------|------------------------------|
| 15 | 1501 | 2BR | 982 |
| | 1502 | 2BR | 982 |
| | 1505 | Suite | 413 |
| | 1506 | 1BR | 590 |
| | 1507 | Suite | 407 |
| | 1508 | Suite | 382 |
| | 1509 | Suite | 382 |
| | 1510 | 2BR | 908 |
| | 1511 | 2BR | 908 |
| | 1512 | 2BR | 908 |
| | 1513 | 2BR | 908 |
| | 1514 | 2BR | 908 |
| | 1515 | 2BR | 908 |
| | 1516 | 2BR | 969 |
| | 1517 | 2BR | 969 |
| 16 | 1601 | 2BR | 982 |
| | 1602 | 2BR | 982 |
| | 1605 | Suite | 413 |
| | 1606 | 1BR | 590 |
| | 1607 | Suite | 407 |
| | 1608 | Suite | 382 |
| | 1609 | Suite | 382 |
| | 1610 | 2BR | 908 |
| | 1611 | 2BR | 908 |
| | 1612 | 2BR | 908 |
| | 1613 | 2BR | 908 |
| | 1614 | 2BR | 908 |
| | 1615 | 2BR | 908 |
| | 1616 | 2BR | 969 |
| | 1617 | 2BR | 969 |
| 17 | 1701 | 2BR | 982 |
| | 1702 | 2BR | 982 |
| | 1705 | Suite | 413 |
| | 1706 | 1BR | 590 |
| | 1707 | Suite | 407 |
| | 1708 | Suite | 382 |
| | 1709 | Suite | 382 |
| | 1710 | 2BR | 908 |
| | 1711 | 2BR | 908 |
| | 1712 | 2BR | 908 |
| | 1713 | 2BR | 908 |
| | 1714 | 2BR | 908 |
| | 1715 | 2BR | 908 |
| | 1716 | 2BR | 969 |
| | 1717 | 2BR | 969 |
| 18 | 1801 | 2BR | 982 |
| | 1802 | 2BR | 982 |
| | 1805 | Suite | 413 |
| | 1806 | 1BR | 590 |
| | 1807 | Suite | 407 |
| | 1808 | Suite | 382 |
| | 1809 | Suite | 382 |
| | 1810 | 2BR | 908 |
| | 1811 | 2BR | 908 |
| | 1812 | 2BR | 908 |
| | 1813 | 2BR | 908 |
| | 1814 | 2BR | 908 |
| | 1815 | 2BR | 908 |
| | 1816 | 2BR | 969 |
| | 1817 | 2BR | 969 |

92

| Floor | Unit No. | Type | Areas of Unit Square Footage |
|-------|----------|------|------------------------------|
| 19 | 1901 | 2BR | 982 |
| | 1902 | 2BR | 982 |
| | 1905 | Suite | 413 |
| | 1906 | 1BR | 590 |
| | 1907 | Suite | 407 |
| | 1908 | Suite | 382 |
| | 1909 | Suite | 382 |
| | 1910 | 2BR | 908 |
| | 1911 | 2BR | 908 |
| | 1912 | 2BR | 908 |
| | 1913 | 2BR | 908 |
| | 1914 | 2BR | 908 |
| | 1915 | 2BR | 908 |
| | 1916 | 2BR | 969 |
| | 1917 | 2BR | 969 |
| 20 | 2001 | 2BR | 982 |
| | 2002 | 2BR | 982 |
| | 2005 | Suite | 413 |
| | 2006 | 1BR | 590 |
| | 2007 | Suite | 407 |
| | 2008 | Suite | 382 |
| | 2009 | Suite | 382 |
| | 2010 | 2BR | 908 |
| | 2011 | 2BR | 908 |
| | 2012 | 2BR | 908 |
| | 2013 | 2BR | 908 |
| | 2014 | 2BR | 908 |
| | 2015 | 2BR | 908 |
| | 2016 | 2BR | 969 |
| | 2017 | 2BR | 969 |
| 21 | 2101 | 2BR | 982 |
| | 2102 | 2BR | 982 |
| | 2105 | Suite | 413 |
| | 2106 | 1BR | 590 |
| | 2107 | Suite | 407 |
| | 2108 | Suite | 382 |
| | 2109 | Suite | 382 |
| | 2110 | 2BR | 908 |
| | 2111 | 2BR | 908 |
| | 2112 | 2BR | 908 |
| | 2113 | 2BR | 908 |
| | 2114 | 2BR | 908 |
| | 2115 | 2BR | 908 |
| | 2116 | 2BR | 969 |
| | 2117 | 2BR | 969 |
| 22 | 2201 | 2BR | 982 |
| | 2202 | 2BR | 982 |
| | 2205 | Suite | 413 |
| | 2206 | 1BR | 590 |
| | 2207 | Suite | 407 |
| | 2208 | Suite | 382 |
| | 2209 | Suite | 382 |
| | 2210 | 2BR | 908 |
| | 2211 | 2BR | 908 |
| | 2212 | 2BR | 908 |
| | 2213 | 2BR | 908 |
| | 2214 | 2BR | 908 |
| | 2215 | 2BR | 908 |
| | 2216 | 2BR | 969 |
| | 2217 | 2BR | 969 |
| Ground | Commercial Unit A | | 3974 |
| | Commercial Unit B | | 597 |
| | Commercial Unit C | | 688 |
| | Commercial Unit D | | 767 |
| | Commercial Unit E | | 25600 |

BOOK 917 PAGE 925

2BR = two bedroom apartment
1BR = one bedroom apartment

925

Grand

217-1217
A2

Grand

216-1216
A1

TYPICAL FLOORS 2-12

215-1215
B2

214-1214
B1

213-1213
B4

212-1212
B3

211-1211
B6

210-1210
B5

209-1209
C2

208-1208
C1

207-1207
D2

206-1206
D1

205-1205
E1

201-1201
F2

202-1202
G2

203-1203
G1

204-1204
F1

BOOK 617 PAGE 825



928

BOOK 917 PAGE 928

# THE RENAISSANCE TOWER

Two Bedroom Units 178

One Bedroom Units 9

Sun Suites 135







931



STATE OF SOUTH CAROLINA      )
                             )    ARCHITECT'S CERTIFICATE
COUNTY OF HORRY                 )

      I certify to the best of my knowledge, information and
belief that the descriptions, surveys, plats, plot plans and
building plans constituting this Exhibit "l" to the Master Deed
of the Renaissance Tower or referred to in this Exhibit "l"
adequately and accurately depict and show graphically the
dimensions, area and location of each Apartment, and the Common
Elements, including elevations, in accordance with the
requirements of Title 27, Chapter 31, Code of Laws of South
Carolina, 1976.

                         STEVENS & WILKINSON, INC.

                  BY: _____

BOOK 917 PAGE 933

EXHIBIT 3
BY-LAWS OF THE RENAISSANCE TOWER
HORIZONTAL PROPERTY REGIME COUNCIL OF CO-OWNERS

BY LAWS OF
THE RENAISSANCE TOWER
HORIZONTAL PROPERTY REGIME COUNCIL OF CO-OWNERS

## ARTICLE I
### Name

The name of the Association shall be THE
RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME.

## ARTICLE II
### Offices

The principal office of the Association shall be
located at The Renaissance Tower Horizontal Property Regime,
Horry County, South Carolina. The Association may have other
offices within and without the State of South Carolina as the
Board of Directors may determine or as the affairs of the
Association may require from time to time. The Association
shall have and continuously maintain in the State of South
Carolina, registered agent whose office shall be located in
the State of South Carolina. The registered agent may be
changed from time to time by the Board of Directors.

## ARTICLE III
### Purpose

The purpose of this Association shall be to provide
a collective government form of administration for the Co-
Owners of The Renaissance Tower Horizontal Property Regime
(the "Regime") to manage and control said Condominium and the
activities of the Units Owners therein and of all persons
using or occupying the facilities of the said Condominium and
all things pertinent to and/or related thereto and to carry
out all activities, promulgate all Rules and Regulations and
to have all responsibilities and purposes that are given to
the Association in the Master Deed of The Renaissance Tower
Horizontal Property Regime (hereinafter called the ("Master
Deed") in the South Carolina Horizontal Property Regime Act,
Title 27, Chapter 31, Code of Laws of South Carolina (1976),
(the "Act") and in these By-Laws, and to be the Association
for this Regime as defined and called for in the Act and the
Master Deed.

## ARTICLE IV
### Definitions

All terms and phrases used herein shall, unless the
context otherwise requires, have the same definition and
meaning as set forth in the Master Deed and/or in The Act, as
the case may be.

## ARTICLE V
### Members

Each and every Co-Owner of an Apartment or an
interest in a Unit in the Regime shall be a Member of this
Association. Further, there shall be appurtenant to each
Apartment in the Regime the number of votes assigned in the
Master Deed which shall be voted collectively by the Voting
Member of that Apartment as set forth in the Master Deed.
Upon the sale, conveyance, devise or other transfer of any
kind or nature of any Apartment, such subsequent transferee
shall automatically become a member hereof and likewise the
vote appurtenant to the Apartment shall automatically pass
and the membership of the transferor immediately terminated
whether any membership certificate or voting certificate be
EXHIBIT 3-1

transferred or not; provided, however, the Association shall
for all purposes be entitled to rely upon the right to
membership and voting rights of the person shown as Co-Owner
of an Apartment in its records until notified of such
transfer by delivery of written notice thereof to the
secretary of the Association.

## ARTICLE VI
### Application

All present and future Co-Owners, tenants, future
tenants, agents, servants, employees, guests, invitees and
any other person using the facilities of the Regime or
occupying any Apartment thereof shall be and are hereby
subject to all matters, Rules and Regulations set forth in
these By-Laws, Rules and Regulations promulgated by the Board
of Directors hereof, and all things set forth in the Master
Deed and in The Act.

A mere acquisition or rental of an Apartment or use
of the facilities of the Regime shall signify these By-Laws
and all Rules and Regulations and provisions contained within
the Master Deed, the Act, or promulgated by the Board of
Directors are accepted, ratified and shall be complied with.

## ARTICLE VII
### Voting Majority

Section 1. There is hereby assigned to each
Apartment the number of votes as described and assigned in
the Master Deed which shall be voted by the voting member
thereof as described in the Master Deed. The vote so
assigned to each may not be split in any fashion. If one
person is the Co-Owner of an Apartment, he shall be the
Voting Member. If an Apartment be owned by more than one
person, they shall designate one of them as the Voting Member
and notify the Secretary in writing of such designation. In
the event a corporation owns an Apartment, the corporation
shall designate one agent thereof as the Voting Member and so
notify the Secretary in writing. In the case of multiple or
corporate ownership of an Apartment, the vote appurtenant
thereto shall not be exercised until written designation of
the Voting Member has been delivered to the Secretary. The
Voting Member so designated shall remain the Voting Member,
entitled to cast the vote of that Apartment on all matters to
come before the Association for vote until the Secretary be
given written notice of change. The vote assigned to each
Apartment represents that percentage value of that Apartment
as opposed to the Association as a whole as then comprised.

Section 2. As used in these By-Laws, the term
Majority of Co-Owners shall mean those Co-Owners who are
Voting Members holding fifty-one (51%) percent of the total
vote of all the Co-Owners of the Regime as then constituted
and thereby represents fifty-one (51%) percent of the basic
value of the Submitted Property as a whole. Unless otherwise
required herein, in the Master Deed or in the Act, majority
vote shall constitute fifty-one (51%) percent of the total
outstanding votes of all Co-Owners and shall be required to
adopt any decisions affecting the Regime.

Section 3. Except as otherwise provided or
required in these By-Laws, the Master Deed or the Act, the
presence in person or by proxy of a Majority of Co-Owners, as
is defined above, shall be required to constitute a quorum.

Section 4. Votes may be cast in person or by
proxy. Each proxy shall be in a form as determined by the
Board of Directors and must be filed with the Secretary at
least fifteen (15) days before the appointed time for a

EXHIBIT 3-2          BOOK 917 PAGE 536

936

regular meeting and at least one day before the appointed time for a special meeting.

Section 5. Membership in the Association is not transferable or assignable (except as the same may be assigned by way of proper proxy properly executed). Transfer of a Co-Owner's Unit or his interest therein in any fashion shall automatically terminate his membership herein and all his voting rights.

## ARTICLE VIII
### Administration

Section 1. The Association shall be managed and governed by a Board of Directors (herein called the Board) consisting of five (5) members. The initial Board of Directors shall be appointed by the Declarant as the initial Board of Directors and shall consist of three (3) members (who need not be present or future Co-Owners) and who shall serve until the Declarant calls a meeting of the Co-Owners to relinquish control and until their successors are elected and qualified. The Board of Directors to replace the initial Board of Directors appointed by the Declarant shall be nominated and elected at the organizational meeting called by Declarant to relinquish control. Of the total Directors to be then elected, the number of nominees equal to one-half (1/2) of the Board to be elected plus one and receiving the most votes shall be elected to the Board for a two-year term; the nominees receiving the next highest number of votes equal to the remaining positions on the Board shall be elected for a one-year term. Directors elected at subsequent elections shall be elected for a term of two years, and shall be elected at the regular Annual Meeting of the Association. At such regular Annual Meetings, the voting members shall vote for the number of Directors necessary as there are vacancies on the Board; provided, however, there shall be no cumulative voting unless required by law. The candidates receiving the most votes shall be declared elected as members of the Board to fill the Board positions vacant at that time. Board members shall serve until their successors are elected and qualified.

Section 2. Any Director (other than members of the initial Board appointed by Declarant) who shall cease to be a Co-Owner or who shall be delinquent in payment of any common expenses or Assessments (as defined in the Master Deed and/or in the Act) shall automatically cease to be a Member of the Board.

Section 3. Each Board Member (other than members of the initial Board appointed by Declarant) must be a Co-Owner (or the Voting Member for a corporate Co-Owner) and in good standing, current in payment of all fees, Assessments and Common Expenses.

## ARTICLE IX
### Board of Directors

Section 1. Consistent with these By-Laws, the Board shall:

A. Transact all Association business and prescribe the Rules and Regulations for the use of the Regime and all facilities and property thereof and may appoint such officers, clerks, agents, servants or employees as it may deem necessary in its sole discretion and may fix their duties and compensation.

B. Annually set the Common Expenses for the operation of the Condominium.

EXHIBIT 3-3

BOOK 917 PAGE 937

937

C.   Fix, impose and remit penalties for violations of these By-laws and Rules and Regulations of the Association.

D.   Serve without compensation.

E.   Elect from the Board within thirty (30) days after each Annual Meeting a President, Vice President, Secretary and Treasurer, all of whom shall serve without renumeration.   In the event of a vacancy in any one of these offices during the year, the Board shall have the power to elect a member of the Board in good standing to fill the vacancy for the unexpired term.   In the event of a vacancy on the Board, the President shall have the power to appoint with the approval of the majority of the Board, a member in good standing to fill the vacancy until the next Annual Meeting.

F.   Carry out all other duties and obligations imposed and exercise all rights granted it by the Declaration and Exhibits thereto and The Act.

Section 2.   There shall be at least one regular meeting of the Board quarterly at a time designated by the President.   The President or two members of the Board may call special meetings of the Board as are deemed necessary or desirable and in the best interest of the Association.

Section 3.   Notice of regular and any special meetings of the Board of Directors shall be given at least twenty-one (21) days previously thereto by written notice delievered personally or sent by mail to each Director at his address as shown in the records of the Association.   If mailed, such notice shall be deemed to be delivered when deposited in the United States mail in a sealed envelope so addressed with postage thereon prepaid.   Any Director may waive notice of any meeting.   The attendance of a Director at any meeting shall constitute a waiver of notice for such meeting except for the express purpose of objection to the transaction of any business because the meeting is not lawfully called or convened.   Neither business to be transacted nor other purpose of any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting unless specifically required by law or by these By-Laws.

Section 4.   A simple majority of the members of the entire Board shall constitute a quorum for the purposes of transacting Association business and the affirmative vote of a simple majority of the entire Board shall be necessary to pass any resolution or authorize any act of the Association unless a different vote is required herein, in the Declaration, its Exhibits and/or The Act.   Absentee voting is permitted provided such Director register his vote in writing with the Secretary within twenty-four (24) hours after the termination of such meeting.

Section 5.   Any action required by law to be taken at any meeting of the Directors or any action which may be taken in a meeting of the Directors may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by two-thirds (2/3) of the Directors.

Section 6.   The Board of Directors shall annually on or before November 15th of each year, prepare a budget for the up-coming calendar year to include such sums as it deems necessary and adequate to provide for the Common Expenses of the Regime and such other expenses as are deemed necessary or appropriate expenses of the Regime.   The Board of Directors shall thereafter on or before December 1st deliver (which delivery may be by mail) the budget for the up-coming year together with statement of the amount(s) due from each Co-Owner for that year and the date or dates upon which payment

EXHIBIT 3-4

or payments are due to the Co-Owners. Thereafter, should any
increase or decrease be determined appropriate by the Board
of Directors in Assessments to be paid by Co-Owners, the
Board shall notify all Co-Owners so affected at least thirty
(30) days prior to the time such Assessment so changed shall
be due. The Association shall have a lien upon each
Apartment together with the Common Elements and Common
Surplus appurtenant thereto for payment of all Assessments
not paid when due in the amount of such unpaid Assessments
together with the interest thereon from the date due together
with the cost of collection thereof including a reasonable
attorney's fees. Such shall be collected and/or lien
foreclosed upon in the manner provided for in the Master Deed
and Exhibits thereto and/or in the Act.

## ARTICLE X
### Officers

Section 1. The principal officers of the
Association shall be a President, Vice-President, Secretary
and Treasurer, all of whom shall be elected by and from the
Board. The Directors may appoint assistant treasurers and
secretaries and such other officers as in their judgment may
be necessary. No two offices (except for Assistants) may be
held by the same person unless there be less directors than
officers to be elected in which case one may hold more than
one (1) office.

Section 2. The officers of the Association shall
be elected annually by the Board of Directors immediately
following the annual meeting of the Association and shall
serve for the twelve (12) month period next succeeding. New
offices may be created and filled at any meeting of the Board
of Directors. Each officer shall hold office until his
successor shall be duly elected and shall qualify.

Section 3. The President shall be the principal
executive officer of the Association, shall preside at all
meetings of the Board and all meetings of the membership,
shall appoint committees and shall have general charge of and
shall control the affairs of the Association according to
such rules and regulations as the Board shall determine.

Section 4. There shall be a Vice-President who
shall perform such duties as may be assigned to him by the
Board. In case of death, disability or absence of the
President, he shall be vested with all the powers and perform
all duties of the President. The Vice-President shall also
be chairman of the Operations Committee.

Section 5. There shall be a Secretary who shall
record and keep possession of the minutes of the meetings of
the Board and meetings of the Asociation and who shall
perform or have performed the correspondence of the Board and
shall have such further duties as may be assigned to the
Secretary by the Board.

Section 6. There shall be a Treasurer who shall
keep the funds of the Association and shall disburse them to
meet the ordinary and usual expenses of the Regime and for
other purposes as required by the Master Deed, the Act and/or
upon order of the Board of Directors after such disbursal
order has been entered in the minutes of the Board at a duly
constituted meeting and shall have such other duties as may
be assigned to him. He shall render a financial report to
each regular meeting of the Board and to the Annual Meeting
of the Association.

Section 7. If required by the Board of Directors,
assistant treasurer(s), if any, shall be bonded at the
expense of the Association. The assistant treasurers and the
EXHIBIT 3-5

assistant secretaries, in general, shall perform such duties
as shall be assigned to them by the Treasurer or the
Secretary or by the President. Any officer elected or
appointed by the Board of Directors may be removed by the
Board of Directors upon a two-thirds (2/3) majority vote
whenever in its judgment the best interests of the
Association will be served thereby, but such removal shall be
without prejudice of the contract rights, if any, of the
officers so removed.

Section 8. A vacancy in any office because of
death, resignation, removal, disqualification or otherwise
may be filled by the Board of Directors for the unexpired
portion of the term.

## ARTICLE XI
### Meetings

Section 1. There shall be an Annual Meeting of the
Association held during the first quarter of the calendar
year and at a time and place designated by the President.
Notice of the annual meeting shall be given to all Co-Owners
by mail at least twenty days prior to the date of the
meeting.

Section 2. Special meetings of the Association may
be called by the Board. Also, upon request of Voting Members
totaling fifty (50%) percent of the total votes of the
Association in writing made to the Secretary stating the
purpose therefor, a special meeting shall be called by the
Secretary of the Association to be held within forty (40)
days thereafter. Special meetings of the Association may be
held at the call of the President upon five days notice by
mail to all members. Such notice shall state the purpose for
which the special meeting is called and no other business
shall be transacted at said meeting.

Section 3. Voting Members holding fifty-one (51%)
percent of the total votes of the Association must be present
personally or by proxy to constitute a quorum at all Annual
and Special meetings of the Association. Should voting
members holding fifty-one percent of the vote not be present
or constitute a quorum at an Annual Meeting of the
membership, a special Board meeting may be called by the
President or the Secretary and by action of two-thirds (2/3)
of the entire membership of the Board of Directors a quorum
may be declared provided there are voting members holding at
least one-third (1/3) of the total outstanding votes of the
Association present and that the business to be conducted at
such meeting does not require that a greater number of voting
members be present.

Section 4. Any action required by law to be taken
at a meeting of the Association or any action which may be
taken in a meeting of the Association may be taken without a
meeting if a consent in writing, setting forth the action so
taken, shall be signed by Voting Members holding not less
than sixty-seven (67%) percent of the entire votes entitled
to vote on the subject matter thereof and further provided
the same is not otherwise prevented by these By-Laws, the
Declaration or the Act.

Section 5. When notice to Co-Owners is required,
the mailing of such notice to the last known address of the
Co-Owner in the Association's records shall constitute
notice.

EXHIBIT 3-6

940

ARTICLE XII
## Obligations of Co-Owners

Section 1. Each Co-Owner is obligated to pay all annual, monthly and special Assessments and charges levied or imposed by the Association and/or through its Board of Directors for such purposes as are enumerated in the Declaration, in the Act and in these By-Laws. Such charges or Assessments so levied shall be paid on or before the date(s) affixed by resolution of the Board. Written notice of the change in any Assessment and the date the payment shall be paid shall be sent to each Co-Owner at the address given by such Co-Owner to the Secretary of the Association. All common Assessments shall be prorated dependent upon each Co-Owner's percentage of ownership in the Common Elements as is determined and set forth in the Master Deed and the Exhibits thereto. Such Assessments shall include monthly payments to a general operating reserve in a reserve fund for replacements and all other things as required or set forth in Declaration, the Act and/or these By-Laws.

Section 2. The amount of Assessment levied shall be paid on or before the date due. If not so paid, the amount of such Assessment plus any other charges thereon including a late payment charge of ten (10%) percent of the payment due or ten and no/100 ($10.00), whichever is greater (but in no event more than the maximum limit allowed by law), and costs of collection, including attorney's fees unless prohibited by law, shall constitute and become a lien on the Co-Owner's Apartment and share of the Common Elements and Common Surplus appurtenant thereto. Such lien rights shall be as provided for and in accordance with the terms and provisions of the Master Deed and the Act. The notice of Assessment which shall state the amount of such Assessment and such other charges and give the number of the Apartment which has been assessed shall be mailed to the Co-Owner thereof. Upon payment of such said Assessments and charges or other satisfaction thereof, if notice of a lien has been recorded, the Board shall, within a reasonable time, cause to be recorded a notice stating the satisfaction of said lien. The priority of the lien hereinabove set forth shall be as provided in the Master Deed and/or the Act.

Section 3. The lien provided herein may be foreclosed by suit by the Board acting on behalf of the Association in like manner as a mortgage, deed of trust or other lien upon real property securing a debt and in accordance with the provisions of the Act and in such event, the Association may be a bidder at the foreclosure sale. The Association through its Board or any duly authorized agent or designee may file notice of and foreclose such lien and also pursue any other remedy against any Co-Owner owing money which is available by law or in equity for the collection of debt.

Section 4. Upon request and payment as provided in the Act, the Board shall within the time set by the Act furish a statement certifying that all Assessments then due have been paid or indicating the amount then due.

Section 5. Each and every Co-Owner shall perform promptly all maintenance and repair work required of individual Co-Owners by the Master Deed, the Act or these By-Laws or which is within his own Apartment which, if omitted, would affect the Master Deed in its entirety or in a part belonging to some other Co-Owner(s). The Association shall be responsible for all maintenance and repair work required of the Association in the Master Deed, these By-Laws and/or the Act.

A Co-Owner shall reimburse the Association if there be any expenditures incurred in repairing and/or replacing any Common Elements or facilities damaged by such Co-Owner, his family, guests, invitees or lessees.

EXHIBIT 3-7

Section ~.  Each Apartment, other than any Apartment owned by Declarant or designated as a Commercial Unit shall be utilized for residential purposes only, provided, however, such shall not prevent rent or lease of his Apartment by a Co-Owner to a lessee or rentor to use for residential purposes.

Section 7.  No Co-Owner shall make any structural modifications or alterations in his Apartment or upon any Common Elements without the approval of the Association through the Board of Directors.

Section 8.  No Co-Owner, his family, guests, invitees, or lessees shall place or cause to be placed in any common area or facilities any furniture, package(s) or object(s) of any kind.  Such areas shall be used for no purpose other than normal transit through them and/or use of the facilities provided; provided, however, the provisions hereof shall not prevent the Co-Owner of a Commercial Unit from using portions of the Common Elements adjoining such Commercial Unit for uses normally attendant to such Commercial Unit, provided such does not unduly interfere with normal use of such Common Elements by other Co-Owners, their families, guests, invitees and lessees.

Section 9.  Each Co-Owner shall and does hereby grant right of entry to the Board or its duly authorized agent in the case of any situation provided for in the Master Deed or the Act whether such Co-Owner is present at the time or not.

Section 10. No occupant of an Apartment shall post any advertisements or posters of any kind in or on the Regime property except as authorized by the Board or as is permitted in the Master Deed; provided, however, this provision shall not be applicable to Declarant or its assigns during the period it is managing, renting or selling units or prevent the owner of any Commercial Unit from displaying one or more signs (which must be architecturally and aesthetically harmonious with the appearance of the Property).

Section 11. Occupants of Apartments shall use extreme care about making noises or the use of musical instruments, radio, television and/or amplifiers that may distrub other occupants and in the event so notified by the Board or its duly authorized agent such occupant shall immediately cease and desist such activity.

It is prohibited to hang garments, rugs, etc. from the windows or from any sides or from any of the building or parts thereof.

It is prohibited to dust rugs, etc. from the windows or to clean rugs, etc. by beating on the exterior part of any of the building.

It is prohibited to throw or place garbage or trash outside the disposal installation(s) provided for such purposes.

Section 12. No Co-Owner, occupant or lessee of an Apartment shall install wiring for electrical or telephone installation, television antenna, machines or air conditioning units, etc. on the exterior of the buildings or that protrude through the walls or roof of any building except as authorized by the Board.

Section 13. Nothing herein contained shall limit in any manner the power of the Association and/or Board to issue or promulgate such Rules and Regulations as are deemed necessary or desirable for the use, occupancy and enjoyment of the Regime by the Co-Owners and/or occupants thereof.

EXHIBIT 3-8

Further, all obligations imposed by the Master Deed, its Exhibits and/or the Act are hereby incorporated by reference as further obligations as fully as if herein set forth.

Section 14. The Board of Directors shall have the right to enter into such agreements as it deems desirable to provide common services or to lease equipment for the use and enjoyment of the Co-Owners or any one or more Co-Owners. Such rights shall include but not be limited to the right to enter into lease and/or use and/or purchase agreements with third parties to provide recreational equipment and facilities and/or to install, sell and/or lease to the Regime an MATV system and/or cable television system and/or television sets and/or telephone systems and sets. Furthermore, Declarant shall have the right to enter into such agreements on behalf of and for the Association, its Board and the Co-Owners which agreement(s) shall be binding upon the Association and each and every Co-Owner.

## ARTICLE XIII
## Mortgages

Section 1.  Any Co-Owner who mortgages or grants a lien upon his Apartment or any interest therein shall notify the Board of Directors of the name and address of his mortgagee and the Board shall maintain such information in a book entitled "Mortgagees of Condominium Units."

Section 2.  The Board shall, at the request of such mortgagee, report any unpaid Assessments due from the Co-Owner of such Apartment so mortgaged.

Section 3.  Any and all Institutional Mortgagees shall have the rights and powers granted unto them by the Master Deed and/or the Act and nothing herein contained shall supersede such rights and powers.  In the event any right or duty or power herein delegated or granted unto the Association or Board by these By-Laws is given to an Institutional Mortgagee by reason of the Master Deed and/or the Act or should that Institutional Mortgagee by reason of the Master Deed and/or the Act have any voice in such decisions, then such Institutional Mortgagee is hereby given and granted such rights and powers and vote in such decisions as are thereby granted.

## ARTICLE XIV
## Rules and Regulations

The Board of Directors shall be and is hereby empowered to promulgate and issue such Rules and Regulations from time to time and to amend and alter any Rules and Regulations theretofore promulgated and issued as it may in its sole discretion determine necessary and desirable for the continued maintenance and upkeep, use and enjoyment of any Apartments, common areas or facilities contained within the Regime, subject, however, to such restrictions upon such as contained in the Master Deed, its Exhibits and the Act together with any Rules and Regulations issued thereunder. Such Rules and Regulations shall be binding upon and enforceable against all Co-Owners, their families, guest, invitees and/or lessees, and all occupants of Apartments.

## ARTICLE XV
## Contracts, Checks, Deposits, Agreements and Funds

Section 1.  The Board of Directors may authorize any officer or officers or agent or agents of the Association to enter into any contract or execute and deliver any

EXHIBIT 3-9

instrument in the name of and on behalf of the association and/or the Co-Owners thereof.  Such authority may be general or confined to specific instances.

Section 2.  All checks, drafts or orders for the payment of notes or other evidences of indebtedness issued in the name of the Association shall be signed by such officer or officers, agent or agents of the Association in such manner as shall from time to time be determined by the resolution of the Board.  In the absence of such determination by the Board, such instruments shall be signed by the Treasurer (or duly authorized assistant treasurer) and by the President (or Vice President).

Section 3.  All funds of the Association and/or received by it from or on behalf of the Co-Owners shall be deposited from time to time to the credit of the Association at such banks, insurance companies, trust companies or other depository as the Board may select or as the circumstances and purposes of such deposits may require; provided, however, all payments of Common Expenses by Co-Owners shall be paid by the Co-Owners into a lock-box account which shall be owned by the Association and maintained in a federally insured bank, designated by unanimous vote of the Board and concurred in by the Institutional Mortgagee(s) (if any), described in Article X, Section 2 of the Declaration.  No payment shall be considered made until delivered into such lock box.

Section 4.  The Board may accept on behalf of the Association any contribution, gift, bequest or devise for the general purposes or for any of the special purposes of the Association.

ARTICLE XVI
Certificates of Membership

Section 1.  The Board may provide for the issuance of certificates evidencing membership in the Association of each Co-Owner which shall be in such form as may be determined by the Board.  Such certificates shall be signed by the President and by the Secretary and shall be sealed with the seal of the Association, if any.  All certificates shall be consecutively numbered.  The name and address of each Co-Owner and the date of the issuance of the certificates shall be entered on the records of the Association.  If any certificate may become lost, mutilated or destroyed, a new certificate may be issued therefor upon such terms and conditions as the Board may determine.

Section 2.  Upon purchase of the Apartment, a certificate of membership may be issued in the name of the Co-Owner thereof and delivered to him by the Secretary.  Such certificate shall be non-transferable and shall be immediately surrendered to the Board upon termination of ownership for any reason.  Further, should such Co-Owner fail to surrender such certificate upon termination of ownership such termination shall automatically terminate membership in the Association and such membership certificate shall become null and void.

Section 3.  Any Co-Owner failing to pay Assesments when due may, in addition to any other remedies available against him, have his membership in the Association suspended by the Board.  Any Co-Owner thus suspended shall immediately be notified in writing by the Secretary.

EXHIBIT 3-10



# ARTICLE XVII
## Books and Records

Section 1.  The Association and the Board shall keep correct and complete books and records of account, in accordance with generally accepted accounting principles, open to inspection by Co-Owners at reasonable times.  Such records shall include:

    a.  A record of all receipts and expenditures.

    b.  An account for each Apartment setting forth any shares of Common Expenses or other charges due, the due dates thereof, the present balance due and any interest in Common Surplus.

The Association shall also keep minutes of the proceedings of the Association, of the Board and committees having any authority of the Board and/or the Association and shall keep at the registered office a record giving the names and addresses of the Co-Owners who are Voting Members.

Section 2.  For purposes of voting at all meetings of the Association, that person designated as Voting Member for a particular Apartment shall be conclusively so presumed to be the Voting Member therefor until the Secretary be notified of a change in the Voting Member.  The name of the Voting Members entitled to vote at any meeting may not be changed at such meeting without the express permission of the Board.  For purposes of this section, deposit of notice in the United States mail prepaid or personal delivery shall constitute delivery.

# ARTICLE XVIII
## Miscellaneous

Section 1.  Each person elected and qualified as a Director or Officer shall be indemnified by the Association against expenses actually and necessarily incurred by and in connection with the defense by such person of any action, suit or proceeding in which he is made a party by reason of his being a Director or Officer except as to matter as to which he is adjudged to be liable for gross negligence or wilful misconduct.  The right of indemnification shall inure to each Director or Officer when such matter occurred during the time that such person was a Director or Officer even though such action takes place after such Director or Officer has been succeeded in office by someone else.  Such payment by the Association to the extent not paid by insurance shall be included as a part of the Common Expenses.

Section 2.  Any question as to the interpretation of these By-Laws shall be determined by simple majority of the full Board.

Section 3.  Robert's Rules of Order shall apply in any meeting of the Board or of the Association unless in conflict with the By-Laws, Master Deed or the Act in which case these By-Laws, the Master Deed and/or the Act shall control.

# ARTICLE XIX
## Compliance

These By-Laws are set forth to comply with the requirements of the Act.  In case any of these By-Laws conflict with the provisions of the Act, the Provisions of
EXHIBIT 3-11

the Act shall apply where no variance is allowed. If
variance is allowed, the provisions of these By-Laws shall
apply. In the event of any conflict between these By-Laws
and the Master Deed, the provisions of the Master Deed shall
control.

### ARTICLE XX
#### Amendments

These By-Laws may be amend^ by a vote of
sixty-seven (67%) percent of the tot vote of the Regime
unless some other or greater vote is required herein, in the
Master Deed and/or in the Act; provided, however, no
amendment may be enacted affecting the security or rights of
an Institutional Mortgagee. No Amendment may be enacted
affecting any right of the Declarant without consent of the
Declarant.

### ARTICLE XXI
#### Dissolution

Termination of the Regime shall automatically
dissolve this Association. It may also be dissolved in the
manner provided by law. Upon dissolution those funds held by
the Association for the Co-Owners shall be turned over to the
Association's successor as governing entity of the
Regime, or if the Regime be terminated, after payment of all
debts and expenses, divided as provided according to the
percentage ownership interests of the Co-Owners in the Common
Elements and disbursed as provided in the Act and/or the
Master Deed, provided, however, the residual of any property
of any nature owned by the Association not held by it on
behalf of the Co-Owners or any of them, shall, if
appropriate, be turned over to one or more organizations
which, themselves, are exempt from Federal Income Tax as
organizations described in Sections 501(e) (3) and 170(c) of
the Internal Revenue Code and from Alabama income Tax, or to
the Federal, State or Local Government for exclusively public
purposes.

THESE BY-LAWS are hereby adopted, accepted and
fully ratified as the By-Laws of THE RENAISSANCE TOWER
HORIZONTAL PROPERTY REGIME this 21st day of November,
1994.

WITNESSETH:                    THE RENAISSANCE TOWER
                               HORIZONTAL PROPERTY REGIME

                               BY: _____ (Seal)

                               ATTEST: James L. Elkins (Seal)

EXHIBIT 3-12                    BOOK 917 PAGE 946

EXHIBIT 4

PROPERTY RIGHTS AND PERCENTAGE OF INTEREST

947

PROPERTY RIGHTS AND PERCENTAGE OF INTEREST
THE RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME

Each Co-Owner owns, in addition to his Apartment, an interest in the Common Elements of the Property, which percentage of ownership interest has been determined and computed by taking as a basis the value of each individual Apartment in relation to the value of the Property as a whole. The Regime consists of one hundred seventy-eight (178) two bedroom Apartments, nine (9) one bedroom Apartments, one hundred thirty-five (135) Suites and five (5) Commercial Units, for a total of three hundred twenty-seven (327) Units.

The percentage of interest in the Common Elements of each Co-Owner of each Apartment represents the percentage of the total votes of all Co-Owners as set out below. There are five (5) votes appurtenant to each Grand two bedroom (Units "16" and "17") and Front two bedroom (Units "01" and "02", floors 14-22) Apartments, four (4) votes appurtenant to each Side two bedroom Apartment (Units "10", "11", "12", "13", "14" and "15"), three (3) votes appurtenant to each one bedroom Apartment (Units "06", floors 14-22) and each Front Suite containing approximately 548 square feet (Units "01" and "04", floors 2-12), two (2) votes appurtenant to each remaining Suite (Units "02", "03" and "06", floors 2-12, and Units "05", "07", "08" and "09"), twenty (20) votes appurtentant to Commercial Unit A, three (3) votes appurtenant to Commercial Unit B, Commercial Unit C and Commercial Unit D each, respectively, and one (1) vote appurtenant to Commercial Unit E. The percentage of the total vote that the vote assigned to each Apartment represents is shown on the attached chart entitled "Unit Percentage Interest in Common Elements". The percentage of ownership stated therein represents that Apartment's share in the Common Elements of the Property and share in the Common Expenses and Assessments and Common Surplus of the Regime.

There are one thousand one hundred nineteen (1119) total votes in the Regime. Such voting rights and the percentage of the total vote appurtenant to each Apartment have been computed by taking as a basis the value of each individual Apartment in relation to the value of the Property as a whole. Each Grand two bedroom and Front two bedroom Apartment has an equal value to every other like Apartment. Commercial Unit A has a value equal to approximately four times the value of each Grand two bedroom and Front two bedroom Apartment. Each Side two bedroom Apartment has an equal value to every other Side two bedroom Apartment. Each one bedroom Apartment and each Front Suite containing approximately 548 square feet has a value equal to every other like Apartment. Likewise, Commercial Unit B, Commercial Unit C and Commercial Unit D each, respectively, have a value equal to equal one bedroom Apartment. Each remaining Suite has an equal value to every other like Suite. Commercial Unit E is smaller in size than any other Unit and has been assigned a value proportional to the other Units.

## UNIT PERCENTAGE INTEREST IN COMMON ELEMENTS

| Floor | Unit No. | Type | Percentage of Common Elements |
|-------|----------|------|-------------------------------|
| 2 | 201 | Suite | .2681 |
| | 202 | Suite | .1787 |
| | 203 | Suite | .1787 |
| | 204 | Suite | .2681 |
| | 205 | Suite | .1787 |
| | 206 | Suite | .1787 |
| | 207 | Suite | .1787 |
| | 208 | Suite | .1787 |
| | 209 | Suite | .1787 |
| | 210 | 2BR | .3575 |
| | 211 | 2BR | .3575 |
| | 212 | 2BR | .3575 |
| | 213 | 2BR | .3575 |
| | 214 | 2BR | .3575 |
| | 215 | 2BR | .3575 |
| | 216 | 2BR | .4468 |
| | 217 | 2BR | .4468 |
| 3 | 301 | Suite | .2681 |
| | 302 | Suite | .1787 |
| | 303 | Suite | .1787 |
| | 304 | Suite | .2681 |
| | 305 | Suite | .1787 |
| | 306 | Suite | .1787 |
| | 307 | Suite | .1787 |
| | 308 | Suite | .1787 |
| | 309 | Suite | .1787 |
| | 310 | 2BR | .3575 |
| | 311 | 2BR | .3575 |
| | 312 | 2BR | .3575 |
| | 313 | 2BR | .3575 |
| | 314 | 2BR | .3575 |
| | 315 | 2BR | .3575 |
| | 316 | 2BR | .4468 |
| | 317 | 2BR | .4468 |
| 4 | 401 | Suite | .2681 |
| | 402 | Suite | .1787 |
| | 403 | Suite | .1787 |
| | 404 | Suite | .2681 |
| | 405 | Suite | .1787 |
| | 406 | Suite | .1787 |
| | 407 | Suite | .1787 |
| | 408 | Suite | .1787 |
| | 409 | Suite | .1787 |
| | 410 | 2BR | .3575 |
| | 411 | 2BR | .3575 |
| | 412 | 2BR | .3575 |
| | 413 | 2BR | .3575 |
| | 414 | 2BR | .3575 |
| | 415 | 2BR | .3575 |
| | 416 | 2BR | .4468 |
| | 417 | 2BR | .4468 |
| 5 | 501 | Suite | .2681 |
| | 502 | Suite | .1787 |
| | 503 | Suite | .1787 |
| | 504 | Suite | .2681 |
| | 505 | Suite | .1787 |
| | 506 | Suite | .1787 |
| | 507 | Suite | .1787 |
| | 508 | Suite | .1787 |
| | 509 | Suite | .1787 |
| | 510 | 2BR | .3575 |
| | 511 | 2BR | .3575 |
| | 512 | 2BR | .3575 |
| | 513 | 2BR | .3575 |
| | 514 | 2BR | .3575 |
| | 515 | 2BR | .3575 |
| | 516 | 2BR | .4468 |
| | 517 | 2BR | .4468 |

| Floor | Unit No. | Type | Percentage of Common Elements |
|-------|----------|------|-------------------------------|
| 6 | 601 | Suite | .2681 |
|   | 602 | Suite | .1787 |
|   | 603 | Suite | .1787 |
|   | 604 | Suite | .2681 |
|   | 605 | Suite | .1787 |
|   | 606 | Suite | .1787 |
|   | 607 | Suite | .1787 |
|   | 608 | Suite | .1787 |
|   | 609 | Suite | .1787 |
|   | 610 | 2BR | .3575 |
|   | 611 | 2BR | .3575 |
|   | 612 | 2BR | .3575 |
|   | 613 | 2BR | .3575 |
|   | 614 | 2BR | .3575 |
|   | 615 | 2BR | .3575 |
|   | 616 | 2BR | .4468 |
|   | 617 | 2BR | .4468 |
| 7 | 701 | Suite | .2681 |
|   | 702 | Suite | .1787 |
|   | 703 | Suite | .1787 |
|   | 704 | Suite | .2681 |
|   | 705 | Suite | .1787 |
|   | 706 | Suite | .1787 |
|   | 707 | Suite | .1787 |
|   | 708 | Suite | .1787 |
|   | 709 | Suite | .1787 |
|   | 710 | 2BR | .3575 |
|   | 711 | 2BR | .3575 |
|   | 712 | 2BR | .3575 |
|   | 713 | 2BR | .3575 |
|   | 714 | 2BR | .3575 |
|   | 715 | 2BR | .3575 |
|   | 716 | 2BR | .4468 |
|   | 717 | 2BR | .4468 |
| 8 | 801 | Suite | .2681 |
|   | 802 | Suite | .1787 |
|   | 803 | Suite | .1787 |
|   | 804 | Suite | .2681 |
|   | 805 | Suite | .1787 |
|   | 806 | Suite | .1787 |
|   | 807 | Suite | .1787 |
|   | 808 | Suite | .1787 |
|   | 809 | Suite | .1787 |
|   | 810 | 2BR | .3575 |
|   | 811 | 2BR | .3575 |
|   | 812 | 2BR | .3575 |
|   | 813 | 2BR | .3575 |
|   | 814 | 2BR | .3575 |
|   | 815 | 2BR | .3575 |
|   | 816 | 2BR | .4468 |
|   | 817 | 2BR | .4468 |
| 9 | 901 | Suite | .2681 |
|   | 902 | Suite | .1787 |
|   | 903 | Suite | .1787 |
|   | 904 | Suite | .2681 |
|   | 905 | Suite | .1787 |
|   | 906 | Suite | .1787 |
|   | 907 | Suite | .1787 |
|   | 908 | Suite | .1787 |
|   | 909 | Suite | .1787 |
|   | 910 | 2BR | .3575 |
|   | 911 | 2BR | .3575 |
|   | 912 | 2BR | .3575 |
|   | 913 | 2BR | .3575 |
|   | 914 | 2BR | .3575 |
|   | 915 | 2BR | .3575 |
|   | 916 | 2BR | .4468 |
|   | 917 | 2BR | .4468 |

BOOK 917 PAGE 950

95

| Floor | Unit No. | Type | Percentage of Common Elements |
|-------|----------|------|-------------------------------|
| 10 | 1001 | Suite | .2681 |
| | 1002 | Suite | .1787 |
| | 1003 | Suite | .1787 |
| | 1004 | Suite | .2681 |
| | 1005 | Suite | .1787 |
| | 1006 | Suite | .1787 |
| | 1007 | Suite | .1787 |
| | 1008 | Suite | .1787 |
| | 1009 | Suite | .1787 |
| | 1010 | 2BR | .3575 |
| | 1011 | 2BR | .3575 |
| | 1012 | 2BR | .3575 |
| | 1013 | 2BR | .3575 |
| | 1014 | 2BR | .3575 |
| | 1015 | 2BR | .3575 |
| | 1016 | 2BR | .4468 |
| | 1017 | 2BR | .4468 |
| 11 | 1101 | Suite | .2681 |
| | 1102 | Suite | .1787 |
| | 1103 | Suite | .1787 |
| | 1104 | Suite | .2681 |
| | 1105 | Suite | .1787 |
| | 1106 | Suite | .1787 |
| | 1107 | Suite | .1787 |
| | 1108 | Suite | .1787 |
| | 1109 | Suite | .1787 |
| | 1110 | 2BR | .3575 |
| | 1111 | 2BR | .3575 |
| | 1112 | 2BR | .3575 |
| | 1113 | 2BR | .3575 |
| | 1114 | 2BR | .3575 |
| | 1115 | 2BR | .3575 |
| | 1116 | 2BR | .4468 |
| | 1117 | 2BR | .4468 |
| 12 | 1201 | Suite | .2681 |
| | 1202 | Suite | .1787 |
| | 1203 | Suite | .1787 |
| | 1204 | Suite | .2681 |
| | 1205 | Suite | .1787 |
| | 1206 | Suite | .1787 |
| | 1207 | Suite | .1787 |
| | 1208 | Suite | .1787 |
| | 1209 | Suite | .1787 |
| | 1210 | 2BR | .3575 |
| | 1211 | 2BR | .3575 |
| | 1212 | 2BR | .3575 |
| | 1213 | 2BR | .3575 |
| | 1214 | 2BR | .3575 |
| | 1215 | 2BR | .3575 |
| | 1216 | 2BR | .4468 |
| | 1217 | 2BR | .4468 |
| 14 | 1401 | 2BR | .4468 |
| | 1402 | 2BR | .4468 |
| | 1405 | Suite | .1787 |
| | 1406 | 1BR | .2681 |
| | 1407 | Suite | .1787 |
| | 1408 | Suite | .1787 |
| | 1409 | Suite | .1787 |
| | 1410 | 2BR | .3575 |
| | 1411 | 2BR | .3575 |
| | 1412 | 2BR | .3575 |
| | 1413 | 2BR | .3575 |
| | 1414 | 2BR | .3575 |
| | 1415 | 2BR | .3575 |
| | 1416 | 2BR | .4468 |
| | 1417 | 2BR | .4468 |

| Floor | Unit No. | Type | Percentage of Common Elements |
|-------|----------|------|-------------------------------|
| 15 | 1501 | 2BR | .4468 |
|    | 1502 | 2BR | .4468 |
|    | 1505 | Suite | .1787 |
|    | 1506 | 1BR | .2681 |
|    | 1507 | Suite | .1787 |
|    | 1508 | Suite | .1787 |
|    | 1509 | Suite | .1787 |
|    | 1510 | 2BR | .3575 |
|    | 1511 | 2BR | .3575 |
|    | 1512 | 2BR | .3575 |
|    | 1513 | 2BR | .3575 |
|    | 1514 | 2BR | .3575 |
|    | 1515 | 2BR | .3575 |
|    | 1516 | 2BR | .4468 |
|    | 1517 | 2BR | .4468 |
| 16 | 1601 | 2BR | .4468 |
|    | 1602 | 2BR | .4468 |
|    | 1605 | Suite | .1787 |
|    | 1606 | 1BR | .2681 |
|    | 1607 | Suite | .1787 |
|    | 1608 | Suite | .1787 |
|    | 1609 | Suite | .1787 |
|    | 1610 | 2BR | .3575 |
|    | 1611 | 2BR | .3575 |
|    | 1612 | 2BR | .3575 |
|    | 1613 | 2BR | .3575 |
|    | 1614 | 2BR | .3575 |
|    | 1615 | 2BR | .3575 |
|    | 1616 | 2BR | .4468 |
|    | 1617 | 2BR | .4468 |
| 17 | 1701 | 2BR | .4468 |
|    | 1702 | 2BR | .4468 |
|    | 1705 | Suite | .1787 |
|    | 1706 | 1BR | .2681 |
|    | 1707 | Suite | .1787 |
|    | 1708 | Suite | .1787 |
|    | 1709 | Suite | .1787 |
|    | 1710 | 2BR | .3575 |
|    | 1711 | 2BR | .3575 |
|    | 1712 | 2BR | .3575 |
|    | 1713 | 2BR | .3575 |
|    | 1714 | 2BR | .3575 |
|    | 1715 | 2BR | .3575 |
|    | 1716 | 2BR | .4468 |
|    | 1717 | 2BR | .4468 |
| 18 | 1801 | 2BR | .4468 |
|    | 1802 | 2BR | .4468 |
|    | 1805 | Suite | .1787 |
|    | 1806 | 1BR | .2681 |
|    | 1807 | Suite | .1787 |
|    | 1808 | Suite | .1787 |
|    | 1809 | Suite | .1787 |
|    | 1810 | 2BR | .3575 |
|    | 1811 | 2BR | .3575 |
|    | 1812 | 2BR | .3575 |
|    | 1813 | 2BR | .3575 |
|    | 1814 | 2BR | .3575 |
|    | 1815 | 2BR | .3575 |
|    | 1816 | 2BR | .4468 |
|    | 1817 | 2BR | .4468 |

952

| Floor | Unit No. | Type | Percentage Of Common Elements |
|-------|----------|------|-------------------------------|
| 19 | 1901 | 2BR | .4468 |
|    | 1902 | 2BR | .4468 |
|    | 1905 | Suite | .1787 |
|    | 1906 | 1BR | .2681 |
|    | 1907 | Suite | .1787 |
|    | 1908 | Suite | .1787 |
|    | 1909 | Suite | .1787 |
|    | 1910 | 2BR | .3575 |
|    | 1911 | 2BR | .3575 |
|    | 1912 | 2BR | .3575 |
|    | 1913 | 2BR | .3575 |
|    | 1914 | 2BR | .3575 |
|    | 1915 | 2BR | .3575 |
|    | 1916 | 2BR | .4468 |
|    | 1917 | 2BR | .4468 |
| 20 | 2001 | 2BR | .4468 |
|    | 2002 | 2BR | .4468 |
|    | 2005 | Suite | .1787 |
|    | 2006 | 1BR | .2681 |
|    | 2007 | Suite | .1787 |
|    | 2008 | Suite | .1787 |
|    | 2009 | Suite | .1787 |
|    | 2010 | 2BR | .3575 |
|    | 2011 | 2BR | .3575 |
|    | 2012 | 2BR | .3575 |
|    | 2013 | 2BR | .3575 |
|    | 2014 | 2BR | .3575 |
|    | 2015 | 2BR | .3575 |
|    | 2016 | 2BR | .4468 |
|    | 2017 | 2BR | .4468 |
| 21 | 2101 | 2BR | .4468 |
|    | 2102 | 2BR | .4468 |
|    | 2105 | Suite | .1787 |
|    | 2106 | 1BR | .2681 |
|    | 2107 | Suite | .1787 |
|    | 2108 | Suite | .1787 |
|    | 2109 | Suite | .1787 |
|    | 2110 | 2BR | .3575 |
|    | 2111 | 2BR | .3575 |
|    | 2112 | 2BR | .3575 |
|    | 2113 | 2BR | .3575 |
|    | 2114 | 2BR | .3575 |
|    | 2115 | 2BR | .3575 |
|    | 2116 | 2BR | .4468 |
|    | 2117 | 2BR | .4468 |
| 22 | 2201 | 2BR | .4468 |
|    | 2202 | 2BR | .4468 |
|    | 2205 | Suite | .1787 |
|    | 2206 | 1BR | .2681 |
|    | 2207 | Suite | .1787 |
|    | 2208 | Suite | .1787 |
|    | 2209 | Suite | .1787 |
|    | 2210 | 2BR | .3575 |
|    | 2211 | 2BR | .3575 |
|    | 2212 | 2BR | .3575 |
|    | 2213 | 2BR | .3575 |
|    | 2214 | 2BR | .3575 |
|    | 2215 | 2BR | .3575 |
|    | 2216 | 2BR | .4468 |
|    | 2217 | 2BR | .4468 |
| Ground | Commercial Unit A | | 1.7877 |
|        | Commercial Unit B | | .2681 |
|        | Commercial Unit C | | .2681 |
|        | Commercial Unit D | | .2681 |
|        | Commercial Unit E | | .0894 |

BOOK 917 PAGE 953

2BR = two bedroom apartment
1BR = one bedroom apartment

953

EXHIBIT 5
TELEVISION RENTAL AND SERVICE AGREEMENT

954

STATE OF SOUTH CAROLINA)

                     )       TELEVISION RENTAL AND SERVICE

COUNTY OF HORRY    )                AGREEMENT

THIS AGREEMENT, made and entered into this 21st day of November, 1984, by and between CAPITAL TELECOMMUNICATIONS CORPORATION (hereinafter referred to as "Capital"), and THE RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME COUNCIL OF CO-OWNERS, on behalf of itself and each and every Unit Owner thereof (hereinafter referred to as "Renter").

W I T N E S S E T H :

Capital and Renter do hereby mutually agree as follows:

1.    Capital will furnish and rent unto Renter, and Renter does hereby rent from Capital, for the term and under the terms and conditions herein set forth, the number and type of television sets and/or equipment herein specified. Said equipment shall be delivered by Capital (with the exception of conduit which is to be supplied by Renter at its expense), in Units located upon premises owned or rented or otherwise lawfully operated by Renter located in THE RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME, a Condominium, (the "Regime"), County of Horry, State of South Carolina. Capital shall not be liable for delay in, or failure to make, delivery of equipment or installation caused by circumstances beyond its reasonable control, including, but no limited to, acts of God, fire, flood, wars, accidents, labor or different contingencies. The number and types of television sets and/or equipment rented under the terms hereof are as follows and are the model, type and design selected by the Renter as suitable, in its judgment, for Renter's purpose:

(a)    One (1) 19-inch Solid State Television for each residential Unit included in the Condominium;

(b)    One locking furniture swivel for each television set so provided; and

(c)    Cable, access outlets, and distribution equipment and amplification equipment for signal distribution.

All equipment to be prepaid by Capital.

2.    SERVICE: Capital shall keep and maintain, or cause to be kept and maintained, at its sole expense, said rented equipment in good operating order, condition and repair during the full term hereof except for damage to or repair to such equipment as might be made necessary by the negligent acts or omissions of the Renter, its agents and/or employees. Capital shall promptly replace any defective set or injured part or parts thereof; provided, however, that in the event replacement of any defective set or sets shall occur, such substituted equipment shall be subject to all the terms hereof. The extent, nature, type channel capacity, periods or the like of cable TV programming service shall be within Capital's sole discretion.

It is the obligation of the Renter to notify Capital of any deficiency in service as rendered by Capital or its service representative. Capital shall not be liable to Renter for any loss, damage or expense of any kind or nature directly or indirectly caused by the television equipment covered hereby, or because of any failure thereof, or because of any interruption of service or loss of use or for any loss of business or damage whatsoever or howsoever caused, and Capital shall in no event be liable for any special or consequential damages. Renter further agrees there shall be no abatement of rental during the time that may be required for repair, adjustment, servicing or replacement of equipment covered hereby.

BOOK 917 PAGE 955

EXHIBIT 5-1

955

3.   ASSIGNMENT OF AGREEMENT:   Except as provided for herein this Agreement shall not be assigned by Renter except upon prior written consent of Capital.   Capital may assign this Agreement, its rights hereunder and all or any part of the rentals, charges and all other claims or rights to money due or to become due hereunder (except for those charges and rental fees or portions thereof made hereunder by Capital in order to provide service, maintenance and replacement herein required of Capital) at any time to an independent third party ("Assignee") and upon notice of any assignment from Assignee, Renter shall make all payments (except for those portions of payment which are made in order to provide service, maintenance and replacement hereunder) coming due thereafter to the Assignee without offset, counterclaim or defense of any kind.   Renter's rights under this Agreement shall at all times be subject, junior and subordinate to any and all rights and remedies of the Assignee.   Notwithstanding any assignment, Renter shall continue to look to Capital for the performance of its obligations hereunder and in no event shall the Assignee become liable or responsible to perform any of the obligations imposed upon Capital for service, maintenance or replacement by this Agreement.   In the event of default by Capital of any provisions of this Agreement, Renter will remain responsible to Assignee to perform those of Renter's obligations hereunder assigned to Assignee. However, with consent of Assignee, Renter may (a) purchase for cash all equipment covered by this Agreement or (b) assume all obligations that Capital has with Assignee with respect to the equipment covered by this Agreement.

4.   LOCATION:   Renter shall not remove said equipment or any part thereof from the premises where installed nor sell or encumber any of said leased equipment.   Renter further agrees to make no alteration in or repairs to said equipment except through the authorized service representative of Capital.

5.   TERM:   The term hereof shall be for a period of one hundred twenty (120) months beginning on the date of the completion of the delivery of the equipment on the premises of Renter, said date to be confirmed in writing by Renter upon request of Capital.

6.   RENT PAYMENTS:   As rental for said equipment, Renter shall pay to Capital, at Columbia, South Carolina, during the full term hereof, the sum of $26.26 inclusive of applicable taxes per set delivered per month as "Base Rental" (which includes a television rental fee of $14.18 and a cable fee of $12.08).   Upon each anniversary from the date of this Agreement furing the term of this Agreement and any renewals hereof, the Base Rental may be adjusted by Capital in accordance with and by the same percentage as the percentage change in the cost of living index shown by the Consumer Price Index (or similar government index) and increases in royalty costs or similar fees paid to suppliers of cable programming from time to time, provided, further, in no event shall the Base Rental during the term of this Agreement and any renewals hereof ever be less than $26.26 inclusive of applicable taxes per month.   Capital may further charge to Renter any fees, charges or similar costs imposed by the Federal Communications Commission (FCC).   Base Rental payments plus tax are due on or before the first day of the month, the first of which shall be due on or before the first day of the month following the delivery of equipment.   In the event that Renter requests partial delivery of equipment, Renter agrees to pay billing on an interim basis, with such billing based on rates for equipment in use, and upon completion of delivery, the full term of this lease shall commence.

7.   OWNERSHIP:   The equipment, together with wiring, reception and distribution facilities, rented under the terms hereof shall at all times be the sole property of

BOOK 917 PAGE 956

EXHIBIT 5-2

956

contained.  Said equipment shall remain perso.__l property
and, no matter how connected with or attached to the premises
of Renter, will not become a part of the realty or fixtures
therein, and Renter, if so requested by Capital, will obtain
written consent of any other party holding a mortgage,
encumbrance or lien on the premises of Renter, or of any
Purchaser of the premises of Renter in the event of sale of
same, that said equipment shall remain personal property.
Renter shall not at any time during the term hereof transfer,
assign, mortgage or otherwise encumber any interest in said
personal property.

8.  DELIVERY:  Should Renter or his agent order
delivery of equipment and installation on specified dates and
the Renter's premises are not ready for installation of same,
Renter assumes full responsibility for storage, insurance and
any redelivery charges on equipment.

9.  INSPECTION:  Renter grants unto Capital the right
to inspect said equipment at all reasonable times during the
full term hereof.

10.  INDEMNITY:  Renter shall be responsible to all
third parties, including paying guests, for any injury
received as a result of the installation of said television
sets in or about the premises of Renter and shall carry
public liability insurance to save Capital harmless in the
event of such injury, except such personal injury or property
damage as may be occasioned solely by negligent acts or
omissions of agents or employees of Capital.

11.  INSURANCE:  Capital agrees during the term of this
lease to replace or repair any of its equipment, including
television sets in guest rooms, which is stolen, burglarized,
damaged by fire or maliciously damaged while on the premises
of Renter, excepting television sets or equipment in storage
awaiting use of servce, providing, however:  (a) Renter
reports within 48 hours of occurrence any such loss or damage
to Capital and to local law enforcement authorities--notice
of loss to be sent to Capital by Certified Mail; (b) Renter
furnishes in such report all available information regarding
such loss, including name and address of last occupant of
room and room number in which loss occurred (if applicable),
auto license number and other pertinent information which
would assist in recovery of loss; (c) Renter and its
employees, agents and representatives cooperate fully with
Capital and local law enforcement authorities in their
subsequent efforts to effect recovery and prosecution if
necessary.  Renter agrees to notify Capital immediately in
the event of subsequent recovery of property covered by any
and all loss reports.

Renter agrees at all times to maintain and exercise
due care, caution and watchfulness in the protection and
accounting for the rented equipment.  Failure to cooperate in
providing such care, caution and watchfulness shall make the
terms and provisions of Item 11 "INSURANCE" null and void and
Renter shall be responsible for the replacement of and/or
repair to equipment for which such insurance is provided.

In the event loss or damage proves to have been
caused by employees, agents or representatives or Renter, or
if Renter fails to comply with (a), (b) or (c) above, it
shall be the responsibility of the Renter to pay Capital for
its cost of replacement or repair of Capital's equipment
involved in such loss.  In the event that service by Capital
is not included in this Agreement, Renter agrees to maintain
the theft equipment installed hereunder; otherwise, theft and
burglary insurance will be null and void in the event of any
losses while the equipment is inoperative.

12.  TAXES:  Renter agrees to be responsible for the
collection and payment of any local, state and federal fees,
sales, use or property taxes or penalties that may be

EXHIBIT 5-3                    BOOK 917 PAGE 957

applicable now or any time during the term of this Agreement to the property covered hereby or the use or rental thereof.

13. RENEWAL: At the expiration of the term hereof, this Rental and Service Agreement shall be automatically renewed for additional terms of two (2) years, unless either party hereto should give written notice to the other party hereto at least sixty (60) days prior to the expiration of the term hereof, or at least sixty (60) days prior to the expiration of any additional term of two (2) years thereafter, of the desire of such party to terminate this agreement.

14. DEFAULT: In the event that any payment of rent shall have become due as herein provided and shall remain unpaid for ten (10) days, or in the event of any other breach of the terms or conditions of this Agreement by Renter, which breach shall not have been cured within ten (10) days after notice thereof by mail postage prepaid to Renter's last known address, or should Renter be adjudged as bankrupt or there be filed against Renter a petition under the bankruptcy laws, or if any insolvency proceeding is initiated by or against Renter, or if any equipment covered hereby is attached, seized or taken under any judicial process, all of the entire remaining unpaid rental payments shall, at the option of Capital, become immediately due and payable. If Renter does not (a) pay the entire remaining rental payments under this Agreement or (b) cure its breach of the provisions of this Agreement, then and in that event Capital shall have the right, without giving further notice to Renter, to remove the property thereby without liability and Renter shall forthwith pay any and all damages, including attorneys' fees, suffered by Capital. Further, in the event of non-payment, Capital shall be, and hereby is, subrogated to the lien rights of the Condominium as to each Unit Owner failing to pay his share of Common Expenses necessary to make the rental payments herein required to the extent of the amount(s) due and owing to Capital, but unpaid, which shall include the right to file notice of and perfect a lien(s) against such Unit Owner(s) as granted to Renter by the Alabama Condominium Ownership Act; PROVIDED, HOWEVER, such right and any lien filed thereunder shall be subordinate in lien and interest recorded prior to the recording of such notice of lien.

Renter agrees to pay late charges of five ($.05) cents per dollar in addition to the regular monthly payment or installment if payments hereunder are not made within ten (10) days after due date, but not exceeding One Hundred and No/100 ($100.00) Dollars, or the lawful maximum, if any. Capital's failure to exercise a right or remedy under this Agreement or to require strict performance by the Renter or any provision of this Agreement shall not waive or diminish Capital's right thereafter to demand strict compliance with any such right or provision or with any other rights or provisions. Waiver by Capital or any default by the Renter shall not constitute waiver of any other or subsequent default.

15. SURRENDER: Upon expiration of this Agreement, Renter shall remove the rented equipment from the premises referred to herein and surrender such equipment in good operating condition to Capital or its assignee and if the Renter fails to so remove and surrender the rented equipment, Capital shall have the right to enter any premises where the rented equipment may be located and take possession and remove all such equipment either with or without permission and without prejudice to any other rights or remedies of Capital.

If Capital determines, upon termination or expiration of this Agreement, that, as a result of causes other than its failure to provide service as expressly required herein, the equipment covered hereby is not in good operating condition, reasonable wear and tear excepted, the Renter shall upon demand by Capital either: BOOK 517 PAGE 598

EXHIBIT 5-4

958

equipment in good operating condition at its sole expense or (b) reimburse Capital for the reasonable expense of so restoring the equipment.

16.  SUBORDINATION OF AGREEMENT:  Should the equipment rented herein be covered by a Conditional Sales Contract, Chattle Mortgage or Security Agreement on which Capital is the purchaser or obligor, it is understood and agreed that this Agreement is subject and subordinate to the terms and conditions of said Conditional Sales Contract, Chattel Mortgage or Security Agreement.

17.  NOTICE:  Any notice required to be given by one party hereto to the other party hereto shall be in writing and sent by Certified Mail, addressed, postage prepaid, to the mailing address which shall be provided by the other party.

18.  AMENDMENTS:  This Agreement constitutes the entire and only Agreement between the parties with respect to renting the equipment covered hereby and any representation, promise or conditions with respect to said renting not set forth in this Agreement or such amendments as may be accepted in writing by the designated officers or either party, shall not be binding on either party.

19. SOUTH CAROILNA LAW:  Should any question arise as to the validity, construction, interpretation or performance of this rental and service agreement in any court of any State of the United States, or of Canada, it is agreed that the laws of the State of SOUTH CAROLINA shall govern without reference to the place of execution or performance of same.

The invalidity of any provision of this Agreement shall not affect the validty of any other provision hereof. This Agreement and any amendment hereto shall become binding upon the parties hereto when executed by a duly authorized officer or agent of Renter.

20.  EASEMENTS:  Renter on behalf of itself and each and every of the Unit Owners does hereby grant to Capital during the term hereof and any renewals each and every such easement through, over, under and across the Submitted Property; the structures on and to be located thereon, including individual Units, as may be necessary and/or appropriate, for the purposes of location, installation, maintenance and service of the cable, access outlets, distribution amplification equipment herein rented, as well as the locking furniture swivels and television sets.  -

21.  ASSIGNS:  All rights, remedies and powers reserved or given to Capital shall inure to the benefit of Capital's assigns.

22.  INTERIM BILLING:  Renter shall be billed per terms herein on the first day of the month following delivery of each television increment, and when units are delivered, the 120-month rental term will commence.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SIGNED, SEALED & DELIVERED
In The Presence Of:

THE RENAISSANCE TOWER HORIZONTAL PROPERTY
REGIME COUNCIL OF CO-OWNERS

By _____
Its _____

CAPITAL TELECOMMUNICATIONS
CORPORATION

By _____
Its _____

BOOK 917 PAGE 959    459

EXHIBIT 5-5

EXHIBIT 6
TELEPHONE RENTAL AND SERVICE AGREEMENT

STATE OF SOUTH CAROLINA)
                  )     TELEPHONE RENTAL AND SERVICE
COUNTY OF HORRY       )              AGREEMENT

      THIS AGREEMENT, made and entered into this $\underset{\sim}{21}$ day of
November, 1984, by and between CAPITAL TELECOMMUNICATIONS
CORPORATION (hereinafter referred to as "Capital"), and THE
RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME COUNCIL OF
CO-OWNERS, on behalf of itself and each and every Unit Owner
thereof (hereinafter referred to as "Renter").

<center>W I T N E S S E T H :</center>

      Capital and Renter do hereby mutually agree as follows:

      1.    Capital will furnish and rent unto Renter, and
Renter does hereby rent from Capital, for the term and under
the terms and conditions herein set forth, the telephones and
equipment herein specified.  Said equipment shall be
delivered by Capital (with the exception of conduit which is
to be supplied by Renter at its expense), upon premises and
in Units located upon said premises owned or rented or
otherwise lawfully operated by Renter located in THE
RENAISSANCE TOWER HORIZONTAL PROPERTY REGIME, (the "Regime"),
County of Horry, State of South Carolina.  Capital shall not
be liable for delay in, or failure to make, delivery of
equipment or installation caused by circumstances beyond its
reasonable control, including, but no limited to, acts of
God, fire, flood, wars, accidents, labor or different
contingencies.  The number and types of television sets
and/or equipment rented under the terms hereof are as follows
and are the model, type and design selected by the Renter as
suitable, in its judgment, for Renter's purpose.

      (a)   One (1) touch tone telephone for each
residential Unit included in the Condominium mounted upon
suitable bracket;

      (b)   Non-exclusive use of one (1) central PBX
system providing limited message forwarding and security; and

      (c)   Cable and distribution equipment.

      2.    SERVICE:  Capital shall keep and maintain, or cause
to be kept and maintained, at its sole expense, said rented
equipment in good operating order, condition and repair
during the full term hereof except for damage to or repair to
such equipment as might be made necessary by the negligent
acts or omissions of the Renter, its agents and/or employees.
Capital shall promptly replace any defective set or injured
part or parts thereof; provided, however, that in the event
replacement of any defective telephone set or sets shall
occur, such substituted equipment shall be subject to all the
terms hereof.

      It is the obligation of the Renter to notify Capital of
any deficiency in service as rendered by Capital or its
service representative(s).  Capital shall not be liable to
Renter for any loss, damage or expense of any kind or nature
directly or indirectly caused by the telephone sets or
equipment covered hereby, or because of any failure thereof,
or because of any interruption of service or loss of use or
for any loss of business or damage whatsoever or howsoever
caused, and Capital shall in no event be liable for any
special or consequential damages.  Renter further agrees
there shall be no abatement of rental during the time that
may be required for repair, adjustment, servicing or
replacement of equipment covered hereby.

<center>EXHIBIT 6-1</center>

961

3.   ASSIGNMENT OF AGREEMENT:   Except as provided for herein this Agreement shall not be assigned by Renter except upon prior written consent of Capital.   Capital may assign this Agreement, its rights hereunder and all or any part of the rentals, charges and all other claims or rights to money due or to become due hereunder (except for those charges and rental fees or portions thereof made hereunder by Capital in order to provide service, maintenance and replacement herein required of Capital) at any time to an independent third party ("Assignee") and upon notice of any assignment from Assignee, Renter shall make all payments (except for those portions of payment which are made in order to provide service, maintenance and replacement hereunder) coming due thereafter to the Assignee without offset, counterclaim or defense of any kind.   Renter's rights under this Agreement shall at all times be subject, junior and subordinate to any and all rights and remedies of the Assignee.   Notwithstanding any assignment, Renter shall continue to look to Capital for the performance of its obligations hereunder and in no event shall the Assignee become liable or responsible to perform any of the obligations imposed upon Capital for service, maintenance or replacement by this Agreement.   In the event of default by Capital of any provisions of this Agreement, Renter will remain responsible to Assignee to perform those of Renter's obligations hereunder assigned to Assignee. However, with consent of Assignee, Renter may (a) purchase for cash all equipment covered by this Agreement or (b) assume all obligations that Capital has with Assignee with respect to the equipment covered by this Agreement.

4.   LOCATION:   Renter shall not remove said equipment or any part thereof from the premises where installed nor sell or encumber any of said leased equipment.   Renter further agrees to make no alteration in or repairs to said equipment except through the authorized service representative of Capital.

5.   TERM:   The term hereof shall be for a period of one hundred twenty (120) months beginning on the date of the completion of the delivery of the equipment on the premises of Renter, said date to be confirmed in writing by Renter upon request of Capital.

6.   RENT PAYMENTS:   Renter shall pay to Capital an installation fee of fifty ($50.00) Dollars per Unit in which a telephone set is installed.   In additon to the fifty ($50.00) Dollar installation fee per Unit, as rental for said equipment Renter shall pay to Capital, at Columbia, South Carolina, during the full term hereof, the sum of $20.48 inclusive of applicable taxes per telephone set delivered per month as "Base Rental".   Upon each anniversary from the date of this Agreement during the term of this Agreement and any renewals hereof, the Base Rental may be adjusted by Capital in accordance with and by the same percentage as the percentage change in the cost of living index as shown by the Consumer Price Index (or similar government index) and increases mandated or approved by the applicable Public Service Commission or Public Utility Commission for such telephone service from time to time, provided, further, in no event shall the Base Rental during the term of this Agreement and any renewals hereof ever be less than $20.48 inclusive of applicable taxes per month.   Base Rental payments plus tax are due on or before the first day of the month, the first of which shall be due on or before the first day of the month following the delivery of equipment.   In the event that Renter requests partial delivery of equipment, Renter agrees to pay billing on an interim basis, with such billing shall be based on rates for equipment in use, and upon completion of delivery, the full term of this Agreement shall commence. The rent charges herewith shall include local telephone service but not charges for long distance service, which shall be in addition to the base rental charge, if available.

BOOK 917 PAGE 962

7.   OWNERSHIP:   The equipment, together with PBX switchboard wiring, reception facilities rented under the terms hereof shall at all times be the sole property of

EXHIBIT 6-2

Capital, its successors and assigns, and Renter shall have no
property interest therein, except under any conditions herein
contained.  Said equipment shall remain personal property
and, no matter how connected with or attached to the premises
of Renter, will not become a part of the realty or fixtures
therein, and Renter, if so requested by Capital, will obtain
written consent of any other party holding a mortgage,
encumbrance or lien on the premises of Renter, or of any
Purchaser of the premises of Renter in the event of sale of
same, that said equipment shall remain personal property.
Renter shall not at any time during the term hereof transfer,
assign, mortgage or otherwise encumber any interest in said
personal property.

8.    DELIVERY:  Should Renter and/or his agent order
delivery of equipment and installation on specified dates and
the Renter's premises are not ready for installation of same,
Renter assumes full responsibility for storage, insurance and
any redelivery charges on equipment.

9.    INSPECTION:  Renter grants unto Capital the right
to inspect said equipment at all reasonable times during the
full term hereof.

10.    INDEMNITY:  Renter shall be responsible to all
third parties, including paying guests, for any injury
received as a result of the installation of said telephone
sets and system in or about the premises of Renter and shall
carry public liability insurance to save Capital harmless in
the event of such injury, except such personal injury or
property damage as may be occasioned solely by negligent acts
or omissions of agents or employees of Capital.

11.    INSURANCE:  Capital agrees during the term of this
lease to replace or repair any of its equipment, including
telephone sets in Units, which is stolen, burglarized,
damaged by fire or maliciously damaged while on the premises
of Renter, excepting telephone sets or equipment in storage
awaiting use of servce, providing, however:  (a) Renter
reports within 48 hours of occurrence any such loss or damage
to Capital and to local law enforcement authorities--notice
of loss to be sent to Capital by Certified Mail; (b) Renter
furnishes in such report all available information regarding
such loss, including name and address of last occupant of
room and room number in which loss occurred (if applicable),
auto license number and other pertinent information which
would assist in recovery of loss; (c) Renter and its
employees, agents and representatives cooperate fully with
Capital and local law enforcement authorities in their
subsequent efforts to effect recovery and prosecution if
necessary.  Renter agrees to notify Capital immediately in
the event of subsequent recovery of property covered by any
and all loss reports.

Renter agrees at all times to maintain and exercise
due care, caution and watchfulness in the protection and
accounting for the rented equipment.  Failure to cooperate in
providing such care, caution and watchfulness shall make the
terms and provisions of Item 11 "INSURANCE" null and void and
Renter shall be responsible for the replacement of and/or
repair to equipment for which such insurance is provided.

In the event loss or damage proves to have been
caused by employees, agents or representatives of Renter, or
if Renter fails to comply with (a), (b) or (c) above, it
shall be the responsibility of the Renter to pay Capital for
its cost of replacement or repair of Capital's equipment
involved in such loss.  In the event that service by Capital
is not included in this Agreement, Renter agrees to maintain
the theft equipment installed hereunder; otherwise, theft and
burglary insurance will be null and void in the event of any
losses while the equipment is inoperative.

12.    TAXES:  Renter agrees to be responsible for the
collection and payment of any local, state and federal fees,
sales, use or property taxes or penalties that may be

applicable now or any time during the term of this Agreement to the property covered hereby or the use or rental thereof.

13.  RENEWAL:  At the expiration of the term hereof, this Rental and Service Agreement shall be automatically renewed for additional terms of two (2) years, unless either party hereto should give written notice to the other party hereto at least sixty (60) days prior to the expiration of the term hereof, or at least sixty (60) days prior to the expiration of any additional term of two (2) years thereafter, of the desire of such party to terminate this Agreement.

14.  DEFAULT:  In the event that any payment of rent shall have become due as herein provided and shall remain unpaid for ten (10) days, or in the event of any other breach of the terms or conditions of this Agreement by Renter, which breach shall not have been cured within ten (10) days after notice thereof by mail postage prepaid to Renter's last known address, or should Renter be adjudged as bankrupt or there be filed against Renter a petition under the bankruptcy laws, or if any insolvency proceeding is initiated by or against Renter, or if any equipment covered hereby is attached, seized or taken under any judicial process, all of the entire remaining unpaid rental payments shall, at the option of Capital, become immediately due and payable.  If Renter does not (a) pay the entire remaining rental payments under this Agreement or (b) cure its breach of the provisions of this Agreement, then and in that event Capital shall have the right, without giving further notice to Renter, to remove the property thereby without liability and Renter shall forthwith pay any and all damages, including attorneys' fees, suffered by Capital.  Further, in the event of non-payment, Capital shall be, and hereby is, subrogated to the lien rights of the Condominium as to each Unit Owner failing to pay his share of Common Expenses necessary to make the rental payments herein required to the extent of the amount(s) due and owing to Capital, but unpaid, which shall include the right to file notice of and perfect a lien(s) against such Unit Owner(s) as granted to Renter by the Alabama Condominium Ownership Act; PROVIDED, HOWEVER, such right and any lien filed thereunder shall be subordinate in lien and interest to any lien recorded prior to the recording of such notice of lien.

Renter agrees to pay late charges of five ($.05) cents per dollar in addition to the regular monthly payment or installment if payments hereunder are not made within ten (10) days after due date, but not exceeding One Hundred and No/100 ($100.00) Dollars, or the lawful maximum, if any. Capital's failure to exercise a right or remedy under this Agreement or to require strict performance by the Renter or any provision of this Agreement shall not waive or diminish Capital's right thereafter to demand strict compliance with any such right or provision or with any other rights or provisions.  Waiver by Capital or any default by the Renter shall not constitute waiver of any other or subsequent default.

15.  SURRENDER:  Upon expiration of this Agreement, Renter shall remove the rented equipment from the premises referred to herein and surrender such equipment in good operating condition to Capital or its assignee and if the Renter fails to so remove and surrender the rented equipment, Capital shall have the right to enter any premises where the rented equipment may be located and take possession and remove all such equipment either with or without permission and without prejudice to any other rights or remedies of Capital.

BOOK 917 PAGE 564

If Capital determines, upon termination or expiration of this Agreement, that, as a result of causes other than its failure to provide service as expressly required herein, the equipment covered hereby is not in good operating condition, reasonable wear and tear excepted, the Renter shall upon demand by Capital either:  (a)  restore the

EXHIBIT 6-4

STATE OF SOUTH CAROLINA )      FIRST AMENDMENT THE
                            )     MASTER DEED OF THE RENAISSANCE TOWER
COUNTY OF HORRY         )        HORIZONTAL PROPERTY REGIME

       WHEREAS, RESORT INVESTMENT CORPORATION, as Declarant, did

cause to be recorded on November 28, 1984, the Master Deed of The

Renaissance Tower Horizontal Property Regime (the "Master Deed"), said

Master Deed being recorded in the Office of the Clerk of Court for

Horry County, South Carolina, in Deed Book 917 at Page 885; and

       WHEREAS, due to a scrivener's error, the Legal Description of

The Renaissance Tower Horizontal Property Regime was incorrectly set

forth in Exhibit 1 to said Master Deed; and

       WHEREAS, the Declarant desires to amend said Master Deed to

correct said scrivener's error;

       NOW, THEREFORE, Know all men by these presents that the

Master Deed of The Renaissance Tower Horizontal Property Regime,

recorded November 28, 1984, in the Office of the Clerk of Court for

Horry County, South Carolina, in Deed Book 917 at Page 885 is hereby

amended by deleting the first page of Exhibit 1 thereto in its entirety

and substituting the attached page therefor.

       The Master Deed, as amended herein, is hereby ratified and

shall remain unchanged in all other respects.

       IN WITNESS WHEREOF, this Amendment has been executed this

12th day of August, 1985.

Signed, Sealed & Delivered       RESORT DEVELOPMENT CORPORATION
In the Presence of:                f/k/a RESORT INVESTMENT CORPORATION

_Carl Rogers_

                               By: _____ (SEAL)
                               Its: Vice Chairman

_Marc R. Williams_

                               Attest:
                               By: _____
                               Its: ASSISTANT SECRETARY

STATE OF SOUTH CAROLINA     )
                              )
COUNTY OF RICHLAND          )

       PERSONALLY appeared before me the undersigned witness and
made oath that (s)he saw the within named RESORT DEVELOPMENT
CORPORATION f/k/a RESORT INVESTMENT CORPORATION, by and through its
duly authorized agent, execute the within written FIRST AMENDMENT TO
THE MASTER DEED OF THE RENAISSANCE TOWER HORIZONTAL REGIME, and that
(s)he with the other witness whose signature appears above, witnessed
the execution thereof.

                            _Marc R. Williams_
                            Witness

                                     BOOK 984 PAGE 045

SWORN and subscribed to before
me this 12th day of August, 1985.

_Deborah A. Willard_ L.S.     HORRY COUNTY ASSESSOR
Notary Public for South Carolina   122-05-03 ALL Parcels
My Commission Expires: 1-3-95      Map    Blk    Parcel   8/23/85

## LEGAL DESCRIPTION

All that piece, parcel, or tract of land, situate in the County of Horry, State of South Carolina, and Township of Socastee, situate, lying, and being on the South Eastern side of U.S. Highway 17 containing 8.672 acres, more or less, and designated as a Portion of Lot 5 of Lakewood Plantation Tract, further designated as Phase III of The Myrtle Beach Resort, and described on a Map prepared by Culler Land Surveying Co., Inc. dated November 16, 1984, also being shown as Phase III on a Plat of 44.668 +/- Acres, Lot 5 of Lakewood Plantation Property, Socastee Township, Horry County, South Carolina, revised November 27, 1984, prepared by Culler Land Survey Co., Inc.  Said Plats being recorded with the Condominum Plats and Plans in Condominium Plat Book 8, Page 6, Office of the Clerk of Court, Horry County, South Carolina, to wit:

THE POINT OF BEGINNING is located by commencing at iron on the southern margin of U.S. Highway 17, the common corner of lands deeded to Resort Investment Corporation and lands serving as Ocean Lakes Campground, and thence running S28°08'10"E a total of 2972.19 feet, more or less, to the highwater mark of the Atlantic Ocean; thence N40°52'00"E 216.7 feet, more or less, to the POINT OF BEGINNING of the property; thence N38°08'08"W 1201.36 feet, more or less, to a point; thence N40°52'00"E 234.69 feet, more or less, to a point; thence N42°15'00"W 23.61 feet, more or less, to a point; thence N63°00'00"W 195.30 feet, more or less, to a point; thence N63°00'00"W an arc distance of 107.62 feet, more or less, to a point; thence S51°51'50"W 330.0 feet, more or less, to a point; thence S38° 08'10"E 1454.47 feet, more or less, to a point; thence N51°51'50"E 104.0 feet to a point, thence S38°08'10"E 116.79 feet to a point, thence N40°52'00"E 110.75 feet to the POINT OF BEGINNING.

Said parcel has appurtenant to it non-exclusive easements for access and ingress and egress to and from said parcel and for parking over, across and upon those portions of the Submitted Property suitable for vehicular and pedestrian traffic, and non-exclusive easements for the installation and maintenance upon the Submitted Property of utilities to service said parcel including, but not limited to, water, sewer, telephone, electrical, cable television, satellite dish, and drainage structures, including the right to connect such utilities to those servicing the Submitted Property.

TOGETHER WITH all right, title and interest in and to all the land lying between the southeastern boundary of said tract and the low water mark of the Atlantic Ocean formed by an extension of the northeastern and southwestern boundaries of said tract.  PROVIDED, HOWEVER, no warranties of title are made as to said parcel lying between said boundary and the low water mark of the Atlantic Ocean.

The above described tract is bounded on the northeast by parcel designated as "Ocean Spa Phase II", on the southwest by the Ocean Lakes Campground and on the southeast by the Atlantic Ocean.

TOGETHER WITH a non-exclusive easement for purposes of ingress and egress for vehicular and pedestrian traffic from U.S. Highway 17 Business to and from the parcel designated as "Phase I", on a Plat of 44.668 +/- Acres, Lot 5 of Lakewood Plantation Property, Socastee Township, Horry County, South Carolina dated June 10, 1982, revised July 13, 1982, and July 19, 1982, prepared by Culler Land Surveying Co., Inc., which plat is recorded in the Office of the Clerk of Court for Horry County, South Carolina in Plat Book 74 at Page 32, said easement being 75 feet in width whereon it adjoins U.S. Highway 17 Business, thereupon being reduced to 50 feet in width, the location and dimensions of which are shown upon the plats to which reference has been made above; reference being craved thereto for additional description; AND a non-exclusive easement for the underground installation and maintenance of utilities including, but not limited to, water, sewer, telephone, electrical, cable television and drainage structures from U.S. Highway 17 Business

STATE OF SOUTH CAROLINA    )    SECOND AMENDMENT TO THE
                           )    MASTER DEED OF THE RENAISSANCE TOWER
COUNTY OF HORRY            )    HORIZONTAL PROPERTY REGIME

WHEREAS, RESORT INVESTMENT CORPORATION, as Declarant, did cause to be recorded on November 28, 1984, the Master Deed of The Renaissance Tower Horizontal Property Regime (the "Master Deed"), said Master Deed being recorded in the Office of the Clerk of Court for Horry County, South Carolina, in Deed Book 917 at Page 885; and

WHEREAS, RESORT INVESTMENT CORPORATION has subsequently changed its name to RESORT DEVELOPMENT CORPORATION, which name change has been duly filed with the Secretary of State of South Carolina; and

WHEREAS, due to a scrivener's error, two lines in Article XIV, Easements, Paragraph 2, of the Master Deed were inadvertantly deleted; and

WHEREAS, the Declarant desires to amend said Master Deed to correct said scrivener's error;

NOW, THEREFORE, Know all men by these presents that the Master Deed of The Renaissance Tower Horizontal Property Regime, recorded November 28, 1984, in the Office of the Clerk of Court for Horry County, South Carolina, in Deed Book 917 at Page 885 is hereby amended by deleting the page of the Master Deed recorded in Deed Book 917 at Page 903 in its entirety and substituting the attached page therefor.

The Master Deed, as amended herein, is hereby ratified and shall remain unchanged in all other respects.

IN WITNESS WHEREOF, this Amendment has been executed this 4th day of September, 1985.

Signed, Sealed & Delivered
In the Presence of:

_Carl Rogers_

_Carol L. Lytton_


RESORT DEVELOPMENT CORPORATION
f/k/a RESORT INVESTMENT CORPORATION

By: _____ (SEAL)
Its: Vice Chairman

Attest:

By: Ronald O. Swinson, Jr.
Its: Assistant Secretary


STATE OF SOUTH CAROLINA    )
                           )
COUNTY OF RICHLAND         )

PERSONALLY appeared before me the undersigned witness and made oath that (s)he saw the within named RESORT DEVELOPMENT CORPORATION f/k/a RESORT INVESTMENT CORPORATION, by and through its duly authorized agent, execute the within written SECOND AMENDMENT TO THE MASTER DEED OF THE RENAISSANCE TOWER HORIZONTAL REGIME, and that (s)he with the other witness whose signature appears above, witnessed the execution thereof.

_Carl Rogers_
Witness

SWORN and subscribed to before me this 4th day of September, 1985.

_____ L.S.
Notary Public for South Carolina
My Commission Expires: 5/14/92

HORRY COUNTY ASSESSOR
192-05-03- All Parcels
Map    Blk    Parcel

BOOK 988 PAGE 274

## ARTICLE XIV
### Easements

Each Person who acquires an interest in an Apartment shall be deemed, thereby, to agree that: (i) if any portion of an Apartment shall encroach upon any portion of the Common Elements or another Apartment or any portion of the Common Elements shall encroach upon any Apartment, there shall exist a valid easement for such encroachment and for the maintenance and repair of the same so long as it stands; and (ii) in the event a building or other improvement or an Apartment is partially or totally destroyed and the reconstruction thereof shall create an encroachment on portions of the Common Elements or on any Apartment, there shall exist a valid easement for such encroachment and the maintenance thereof.

The Property is subject to all conditions, limitations, restrictions, reservations and all other matters of record, the rights of the United States of America, the State of South Carolina and any governmental authority or agency, including those pertaining to the use and ownership of any submerged lands and any lands lying below the natural high water line of the surrounding bodies of water, any taxes, applicable zoning ordinances which now exist or are hereafter adopted and easements for ingress and egress, for pedestrian and vehicular purposes and for utility services and drainage which now exist or are hereafter granted by the Declarant for the benefit of such persons as the Declarant designates. The Declarant shall have the right to grant easements for such purposes as it determines in its sole discretion appropriate and designate the beneficiaries thereof for such time as it determines in its sole discretion. Such rights include, but are not limited to, reservation unto itself, its successors and assigns, and the right to grant to others (including owners, occupants and users of other properties, facilities and horizontal property regimes within the Resort or in proximity thereto) easements for access and for ingress and egress across portions of the Submitted Property suitable for such purpose, for pedestrian and vehicular purposes and for utility services and drains, and easements and licenses of use of the beach area, and amenities and facilities of the Regime, provided any grant of use(s) of facilities or amenities shall require the grantee(s) thereof to pay fees commensurate with such use(s) for such use(s). When the Declarant relinquishes such right, the Association shall be empowered to grant such easements. While the Declarant has the right to grant easements, the consent and approval of the Association to the granting thereof shall not be required. No easement shall be granted by the Declarant or the Association if as a result thereof any buildings or other improvement in the Regime would be structurally weakened or the security of any mortgagee of record would be adversely affected without its written consent.

The Declarant reserves for itself, its successors, assigns, designees, and licensees, the right to place a satellite dish in an unobtrusive location on the Submitted Property and/or the right to place cable wiring on the Submitted Property in order to facilitate television reception to the Regime and hereby reserves such general easement to the Submitted Property as is necessary and consistent with this purpose.

The rights of all Co-Owners shall be subject to all such easements as presently exist or as are hereinafter granted.

The Association, all present and future Co-Owners and Occupants, the Declarant and their respective successors, assigns, designees, invitees, licensees and guests are hereby granted a perpetual easement over, through and across and a license to use the areas of the Common Elements in the manner for which such is ordinarily intended and are further granted a pedestrian easement over, through and across the Common Elements upon such paths and ways as are suitable for pedestrian traffic and a license to use the same.