**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| Liberty Property Holdings SC, LLC individually, derivatively on behalf of Renaissance Tower Horizontal Property Regime, and on behalf of a class of all others similarly situated; Azure Bleu, LLC; Edelyne Beauvais-Thomas; Jason E. Blosser; Nicole M. Blosser; Eshellah D. Calhoun; Zachary G. Calhoun; David DiMaio; Linda DiMaio; Susan H. Ferguson; Four Parts Whole, LLC; Sharon M. Hubbard; Carol A. Messenger; Jeffrey S. Palmer; Summalin, Inc.; Terry J. Tuminello; Shelley Ware; and Jonathan S. Williams, <br><br> Plaintiffs, <br><br> v. <br><br> Jeffrey L. Richardson; William S. Spears; Brent M. Whitesell; Laurie Z. Wunderley; Madeline R. Mercer; Catherine M. Gregor; Dennis J. Sassa; Tracy A. Meadows; Peter A. Grusauskas; and William Douglas Management, Inc., <br><br> Defendants. | CIVIL ACTION NO.: 4:22-cv-03556-RBH <br><br><br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Plaintiffs, by and through their undersigned counsel, respond to the Motion to Dismiss filed by Jeffrey L. Richardson, William S. Spears, Brent M. Whitesell, Laurie Z. Wunderley, Madeline R. Mercer, Catherine M. Gregor, Dennis J. Sassa, Tracy A. Meadows, and Peter A. Grusauskas (the "Director Defendants") and William Douglas Management, Inc. ("Defendant William Douglas") (collectively, "Defendants") as follows.

## SUMMARY OF THE CASE AND CONCISE STATEMENT OF FACTS

On October 7, 2022, the residents of the Renaissance Tower—a high-rise condominium building in Myrtle Beach, South Carolina—were required to evacuate the building as a result of

1

severe damage to the structural steel beneath the building that rendered it structurally unsound. (*See, e.g.*, ECF No. 1 at 2, 19, ¶¶1, 130.)  Plaintiffs are owners and residents in and of the Renaissance Tower who have suffered various damages, including in the form of lost rental income or loss of use of their condominiums, as well as relating to the cost of repairs.  (*See, e.g.*, *id.* at 7-10, ¶¶13, 33-53.)  Thereafter, it transpired that the Board of the Regime (the "Board") and its property manager—Defendant William Douglas—were on notice of the damage to the structural steel no later than in or around 2016, and yet neither of them did anything to repair it or bring the severity of the issue to the homeowners' attention for years, and during this time the condition of the structural steel worsened to the point that it now requires a substantially more extensive and intrusive fix.  (*See, e.g.*, *id.* at 15-16, 18-19, ¶¶95, 97, 100, 124, 129.)

On October 13, 2022, this action was filed by Plaintiffs, including derivatively on behalf of the Regime, against Defendant William Douglas as well as certain present and past members of the Board—i.e., the Director Defendants named herein.  (*See generally id.* at 1.)  Prior to answering, Defendants moved to dismiss the Complaint on four primary grounds, each of which is discussed below in detail.  (*See* ECF No. 8 at 4-20.)  However, as explained herein, the arguments set forth in Defendants' Motion must fail.  Among many other reasons, Defendants' arguments fail because they apply the incorrect legal standards—including by drawing inferences in their own favor which are counter to the facts actually alleged in the Complaint—and raise various arguments that are not applicable at the pleading stage.  (*See generally id.*)  In addition, this case is in its earliest stages.  Plaintiffs' investigation and understanding of the facts continues to develop, no discovery whatsoever has been conducted to date, and Plaintiffs anticipate that they

will seek leave from this Court to amend of their pleading consistent therewith.[1]  Accordingly, to

the extent this Court may be inclined to dismiss any portion of the Complaint at this early stage,

Plaintiffs would respectfully request that any such dismissal be without prejudice.

## LEGAL STANDARD

A FRCP 12(b)(6) motion to dismiss must be denied unless "it appears certain the plaintiff

cannot prove any set of facts in support of his claim entitling him to relief."  *McCaffrey v.*

*Chapman*, 921 F.3d 159, 164 (4th Cir. 2019).  In applying this standard, a district court must

generally accept the plaintiff's factual allegations as true and draw all reasonable inferences in the

plaintiff's favor.  *See E.I. Du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir.

2011).  Importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the

merits of a claim, or the applicability of defenses."  *Burgess v. Goldstein*, 997 F.3d 541, 562 (4th

Cir. 2021).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[O]nce a

claim has been stated adequately, it may be supported by showing any set of facts consistent with

the allegations in the complaint."  *Bell Atl. Corp.*, 550 U.S. at 563.

## ARGUMENT

## I.    THE SOUTH CAROLINA NONPROFIT CORPORATION ACT (the "SCNC Act").

### A.  Defendants' SCNC Act Argument is an Argument for Summary Judgment and Not Properly Before this Court at the Motion to Dismiss Juncture.

Even if S.C. Code Ann. § 33-31-202(b) of the SCNC Act applied to this matter and could

bar Plaintiffs' claims against the Director Defendants as suggested in Defendants' Motion—which

---

[1]  Indeed, Plaintiffs intend to move for leave to file an initial amendment before the instant motion
becomes fully ripe for adjudication.

it cannot for the reasons discussed below—determining whether § 33-31-202(b) applies requires the consideration of evidence well beyond the allegations in the pleadings.  However, "[a] motion to dismiss tests the sufficiency of a complaint, and [the court's] evaluation is thus generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (internal quotations and citation omitted).  Furthermore, "[c]onsideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment," and such a "conversion is not appropriate when the parties have not had an opportunity to conduct discovery." *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 606 (4th Cir. 2013).

Contrary to the Director Defendants' arguments, S.C. Code Ann. § 33-31-202(b) does not automatically apply to every nonprofit corporation organized in South Carolina.  Rather, § 33-31-202(b) provides that nonprofit directors are entitled to limited protection from personal liability "unless the articles [of incorporation] provide otherwise."  In other words, to the extent that § 33-31-202(b) may otherwise apply to limit the personal liability of nonprofit directors, that limitation of liability only applies if the nonprofit corporation's articles of incorporation do not "provide otherwise."  Thus, a threshold issue which this Court would be required to consider is whether the Regime's articles of incorporation limit the liability of the directors or "provide otherwise."  *Id.*

However, because the Regime's articles of incorporation is a document outside the pleadings, considering that document would be inappropriate at this stage.  *See, e.g.*, *Zak*, 780 F.3d at 606.  Plaintiffs have not had the opportunity to conduct discovery as to the Regime's articles of incorporation and any amendments.  Moreover, even if the Court could otherwise convert the Motion into a motion for summary judgment—so as to enable consideration of the Regime's articles of incorporation—Defendants have not submitted any articles of incorporation to the Court

4

in conjunction with their Motion, and thus any such motion for summary judgment would fail.

Accordingly, S.C. Code Ann. § 33-31-202(b) cannot serve as a basis for granting the Motion.

> **B.    Plaintiffs Allege that the Director Defendants are Liable for Failing to Act in Good Faith, and S.C. Code Ann. § 33-31-202(b) Does Not Bar Liability Where a Director Failed to Act in Good Faith.[2]**

Section 33-31-202(b)(2) provides, in pertinent part, that "no director of [a nonprofit] corporation is personally liable for monetary damages for breach of any duty to the corporation or members," except that this limitation of liability "shall not eliminate or limit the liability of a director: . . . for [*inter alia*] acts or omissions not in good faith . . . ."  In other words, if the acts or omissions serving as the basis for a plaintiff's claim for breach of fiduciary duty against a nonprofit director are acts or omissions which were not made in good faith, then the nonprofit director would remain personally liable for such acts or omissions.  Therefore, if at the motion to dismiss stage the plaintiff's complaint, viewed in the light most favorable to the plaintiff, alleges facts that if proven could show a lack of good faith, then a FRCP 12(b)(6) motion must be denied.

Notably, the SCNC Act does not expressly define what constitutes an act or omission that is "not in good faith," and the undersigned is not aware of any South Carolina appellate decisions applying this phrase within the context of the SCNC Act.  However, the meaning of this phrase

---

[2] Defendants secondarily contend the business judgment rule bars Plaintiffs' claims against the Director Defendants.  As set forth in this section, Plaintiffs allege acts and omissions not in good faith, and the business judgment rule does not apply to acts or omissions not in good faith.  *See, e.g.*, *Kuznik v. Bees Ferry Assocs.*, 538 S.E.2d 15, 25 (S.C. Ct. App. 2000) ("Under the business judgment rule, a court will not review the business judgment of a corporate governing board when it acts . . . in good faith.").  The business judgment rule also does not apply as discussed in Argument § III.A., *infra*, in relation to demand futility for the derivative claims, and where a plaintiff states allegations sufficient to establish demand futility, "that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)."  *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ct. Ch. 2007).  Although Defendants do not appear to raise any specific argument under S.C. Code Ann. § 33-31-830(a) or (d), any such argument would be defeated by Plaintiffs allegations of acts and omissions not in good faith, and also because Plaintiffs have alleged negligence and similar conduct in violation of § 33-31-830(a)(2)-(3).

can otherwise be discerned from: (1) the surrounding statutory language of the SCNC Act; (2) the use of "good faith" in corporate statutes outside South Carolina and court decisions applying this phrase in those jurisdictions; (3) the use of "good faith" in other contexts within South Carolina jurisprudence; and, (4) the South Carolina Reporter's Comments to the SCNC Act.

First, while the SCNC Act does not define the phrase "not in good faith," § 33-31-202(b)(2) of the SCNC Act—which expressly exempts "acts or omissions not in good faith" from its limitation of liability—reads in full: "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."  Importantly, the statutory language does not require "intentional misconduct" or a "knowing violation of law " for an act or omission to be "not in good faith."  *Id.*  To read the statute otherwise would be to render "or which involve intentional misconduct or a knowing violation of law" surplusage, but South Carolina courts interpret statutes to give effect to *all* the language of a statute to avoid rendering any statutory language superfluous.  *See, e.g.*, *CFRE, LLC v. Greenville Cnty. Assessor*, 716 S.E.2d 877, 881 (S.C. 2011) ("[W]e must read the statute so that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous.").  Similarly, when considering identical statutory language, the Delaware Supreme Court relied on the inclusion of "intentional misconduct" and "knowing violation of law" as indicating that "not in good faith" was a standard that did not require "subjective bad faith" but means something between "conduct involving subjective bad faith and gross negligence."  *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

Moreover, jurisdictions across the United States—including South Carolina—generally recognize that directors owe a triad of fiduciary duties in their service as directors: (i) the duty of good faith; (ii) the duty of care; and, (iii) the duty of loyalty.  *See, e.g.*, S.C. Code Ann. § 33-8-300.  While often stated as a triad of duties, courts recognize that the duty of good faith is a

component of the duties of loyalty and care, such that a director's failure to act in the face of a known duty, conscious disregard of responsibilities, egregious or conspicuous failure to fulfill responsibilities, or making of a material decision not supported by facts which are reasonably available, would each constitute an act or omission not in good faith and, therefore, a breach of the duty of care or loyalty. *See, e.g.*, *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006); *Seraph Garrison, LLC ex rel. Garrison Enterprises, Inc. v. Garrison*, 787 S.E.2d 398, 404 (N.C. Ct. App. 2016); *Menezes v. WL Ross & Co., LLC*, 744 S.E.2d 178, 183 (S.C. 2013); *Vontz v. Miller*, 111 N.E.3d 452, 463 (Ohio Ct. App. 2016). Accordingly, for an act or omission to be considered "not in good faith", there must generally be conduct which is more egregious than the gross negligence standard, but subjective bad faith is not required. *See, e.g.*, *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 66–67. However, some jurisdictions treat "not in good faith" as existing whenever gross negligence exists. *See, e.g.*, Ga. Code Ann. § 14-3-830.

For example, in Delaware—widely regarded as the most prolific and instructive jurisdiction in the realm of corporation law, and one which Defendants cite to as persuasive for South Carolina's courts, (*see* ECF No. 8 at 11)—the "good faith" standard falls between the stricter standard of "disloyalty in the classic sense" and the looser standard of "gross negligence." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 66. In other words, a failure to act in good faith can exist where a director has no conflicting self-interest in a corporate decision. *Id.*; *see also Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ct. Ch. 2000). Courts in Delaware also routinely find a lack of good faith in corporate director acts or omissions "where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Stone ex rel. AmSouth Bancorporation*, 911 A.2d at 370; *see also Nagy*, 770 A.2d at 48 n.2 ("[T]he good faith iteration's utility may rest in it its constant reminder . . . that, regardless of his motive,

a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes.").

Notably, the South Carolina Supreme Court has also recognized this good faith standard when applying Delaware law, explaining that "corporate directors and officers acting in good faith abide by the norms of corporate governance and comply with legal standard while performing their jobs" and "[e]gregious or conspicuous failures to do so are subject to liability under the duty of good faith." *Menezes*, 744 S.E.2d at 183. The South Carolina Supreme Court further specified that one component of the duty of good faith is that "material decisions must be supported by all reasonably available facts." *Id.* Similarly, the Court of Appeals of North Carolina has recognized that the duty of good faith requires a director to "discharge his responsibilities openly, honestly, *conscientiously*, and with the utmost devotion to the corporation." *Seraph Garrison, LLC ex rel. Garrison Enterprises, Inc.*, 787 S.E.2d at 404 (emphasis added). In North Carolina, the requirement that directors "conscientiously" discharge their duties is described as "requiring conscientious effort in discharging the duty of care." *Id.* (citation omitted).

Applying this standard to the Complaint reveals that Plaintiffs have plausibly alleged numerous acts or omissions which were "not in good faith." For example, Plaintiffs allege that pursuant to the Master Deed, the directors bore the responsibility of maintaining, repairing, and replacing the Common Elements. (*See, e.g.*, ECF No. 1 at 14, ¶89 & 29, ¶¶185–86.) Plaintiffs further allege that the Director Defendants knew of the dire need to perform repairs on the structural steel components under the Renaissance Tower building for years and were even advised by a professional engineer that the structural steel components under the Renaissance Tower building required timely repairs or further and significant damage to the Regime's property would occur. (*See, e.g.*, *id.* at 14-17, ¶¶91–109.) Plaintiffs also allege that instead of acting on their

8

superior knowledge and heeding the professional opinion of their engineer, the Director Defendants continuously failed to take action to repair the structural steel components. *(See, e.g.*, *id.* at 17, ¶¶110–12 & 29, ¶¶187–88.) Furthermore, the Complaint alleges that the Director Defendants disregarded the engineer's professional opinion "without any justification." *(Id.* at 26, ¶167.) Plaintiffs also allege that instead of addressing the structural steel components—which the Director Defendants intimately knew were worsening with the passage of time and would result in a dangerous safety hazard for the building if not repaired—the Director Defendants expended the Regime's funds to undertake non-safety, non-structural work on the building. (*Id.* at 17, ¶110.)

As demonstrated above, Plaintiffs have plausibly alleged that the Director Defendants had a legal responsibility to maintain, repair, and generally protect the HOA's property—*i.e.*, the Common Elements. Moreover, it is well established that a duty to protect their corporation's property is an indisputable component of the fiduciary duties owed by directors. *See, e.g.*, *Clarence L. Martin, P.C. v. Chatham Cnty. Tax Com'r*, 574 S.E.2d 407, 409 (Ga. Ct. App. 2002) ("It fell within Martin's fiduciary duties as a corporate officer to protect corporate property."); *Allied Freightways v. Cholfin*, 91 N.E.2d 765, 767 (Mass. 1950) ("The directors stood in a fiduciary relation to the corporation, and were bound to protect the assets of the corporation . . ."). In the matter *sub judice,* the Director Defendants knew that the structural components of the Regime's property required significant repairs, that these components were aggressively worsening with the passage of time, and had specific knowledge that this also presented a significant structural and safety problem—and yet, the Director Defendants consciously disregarded their obligations to maintain, repair, or otherwise protect the corporate property. The Director Defendants' conscious disregard of their duties is demonstrated by, *inter alia*, Plaintiffs' allegations that the Director Defendants affirmatively stated the steel components needed to be

repaired, disregarded the advice of a professional engineer without any justification, and instead spent Regime funds on non-structural, non-safety work on the building. Additionally, Plaintiffs allege that the Director Defendants' failure to repair the structural components was a conscious disregard of their responsibilities because they were consciously "permitting damage to the steel structural components . . . to continue," (*id.* at 27, ¶172), and Plaintiffs also allege that the Director Defendants' breaches of their duties were "willful or deliberate." (*Id.* at 29-30, ¶¶184, 191.)

Similarly, Plaintiffs allege that the Director Defendants failed to perform reserve studies or identify and fund the necessary reserves for years, despite knowing of the need to repair damaged and worsening structural steel components supporting the building. (*Id.* at 7, ¶¶15–16.) Again, Plaintiffs allege that both pursuant to the Master Deed and the duty to protect corporate property included within a corporate director's fiduciary duties, that the Director Defendants are responsible for maintaining, repairing, and replacing the Regime's property. A component of that responsibility is to maintain reserves reasonably sufficient to enable the Regime to undertake those repairs or replacements when building components reach the end of their useful lives. The Director Defendants received the professional opinion of the Regime's accountant that the Regime "needed a reserve study and larger reserves," yet the Director Defendants disregarded that professional opinion and failed to take any action to address the insufficient reserves, all without any justification for doing so. (*Id.* at 18, 26, ¶¶120–23, 167.)

As discussed, the failure to repair the structural steel components, permitting the structural steel to suffer further damage, and failing to maintain sufficient reserves were all acts or omissions that were a conscious disregard of the Director Defendants' responsibilities which rise to the level of acts or omissions not in good faith. For the same reasons, each was also an egregious failure to comply with the norms of corporate governance and the legal standards applicable to the directors.

Finally, those acts and omissions were also not in good faith because they were not supported by the available information.  To the contrary, the Director Defendants received professional advice to take action in regard to the structural steel and reserves, but they disregarded those professionals without any justification.  Accordingly, Plaintiffs alleged acts or omissions that rise to the level of " not in good faith" and S.C. Code Ann. § 33-31-202(b) does not bar Plaintiffs' claims.

### C.    Plaintiffs Assert Claims Against the Director Defendants Under the Horizontal Property Act that are Independent of and Not Affected by Any Limitation of Liability in Section 33-31-202(b), Which Only Protects Directors from Personal Liability and is Not a Complete Bar to Claims Against Directors.

Even were § 33-31-202(b) an applicable limitation on director liability here, Plaintiffs assert a claim under the Horizontal Property Act (the "HP Act"), S.C. Code Ann. §§ 27-31-10, *et seq.*, that is independent of and not impacted by the SCNC Act and its limitation of liability in Section 33-31-202(b).  Defendants contend that Plaintiffs' HP Act claim fails to stage a cognizable claim on the basis that the "only allegations Plaintiffs make against the Director Defendants relate to their activities as directors" and "[t]here are no general allegations supporting a cause of action against the Director Defendants in their personal capacities as general Members of the Regime." (ECF No. 8 at 6.)  Defendants' contentions misapprehend the relationship between the HP Act, the SCNC Act, and directors of corporate entities incorporated for a horizontal property regime.

As Plaintiffs allege, "the Renaissance Tower is subject to and in a horizontal property regime as provided by the [HP Act]."  (ECF No. 1 at 12, ¶71.)  A horizontal property regime is essentially a statutorily created form of property whereby property owners can each individually and exclusively own an "apartment" in the regime and share the ownership of, use of, and responsibilities for "common elements" in the regime.  *See* S.C. Code Ann. §§ 27-31-20, -60, -80, -100, & -190.  The HP Act provides that a horizontal property regime is established by the owner of property declaring "through the recordation of a master deed . . . their desire to submit their

11

property to the regime established by this chapter." *Id.* at § 27-31-30. As alleged by Plaintiffs, for the Renaissance Tower horizontal property regime, "[t]he regime was created by the Master Deed of The Renaissance Tower Horizontal Property Regime recorded with the Horry County Register of Deeds on November 28, 1984, at deed book 917 and page 855." (ECF No. 1 at 12, ¶72.)

The HP Act provides for the affairs of a horizontal property regime to be carried out by a "council of co-owners" or the master deed and by-laws of the regime can provide for the powers and duties of the council of co-owners to be exercised by a board or other form of administration. S.C. Code Ann. § 27-31-20, -160, -220, -230, -240, -250, -260, & -280. Specifically, the HP Act provides that by-laws of a regime "must necessarily provide" for the "[f]orm of administration, indicating whether this shall be in charge of an administrator or of a board of administration, or otherwise, and specifying the powers, manner of removal and, where proper, the compensation thereof." *Id.* at § 27-31-160. The HP Act further provides that the "council of co-owners" can be incorporated "pursuant to the laws of South Carolina for the purpose of the administration of the property constituted into a horizontal property regime." *Id.* at § 27-31-90. Therefore, a "co-owner"—defined by § 27-31-20 as the owner of property in the regime—is a member of the council of co-owners and in serving in the administration of the regime—whether on a council, a board, or as a director of an incorporated entity—can only do so as a co-owner. (*See also* ECF No. 8-2 at By-Laws, Art. VIII.3 ("Each Board Member . . . must be a Co-Owner . . .").)

Accordingly, a horizontal property regime and its co-owners are subject to the HP Act and the duties, liabilities, and remedies set forth therein regardless of whether the regime elects to incorporate its administration into a corporate entity. A limitation of liability provision in a corporation statute does not preempt or alter the duties, liabilities, and remedies imposed on a regime and its co-owners by the HP Act. That result is compelled by the rules of statutory

interpretation which provide that for one statute to impliedly eliminate the application of a second statute, the repugnancy between the two statutes "must be plain, and if the two provisions can be construed so that both can stand, a court shall so construe them."  *Spectre, LLC v. S.C. Dep't of Health & Env't Control*, 688 S.E.2d 844, 852 (S.C. 2010).  "Repeal by implication is disfavored, and is found only when two statutes are incapable of any reasonable reconcilement."  *Capco of Summerville, Inc. v. J.H. Gayle Const. Co., Inc.*, 628 S.E.2d 38, 41 (S.C. 2006).  "Where there is one statute addressing an issue in general terms and another statute dealing with the identical issue in a more specific and definite manner, the more specific statute will be considered an exception to, or a qualifier of, the general statute and given such effect."  *Spectre*, 688 S.E.2d at 852.

Plaintiffs submit there is no repugnancy between the HP Act and the SCNC Act.  The HP Act is a more specific statute that applicable only to horizontal property regimes whereas the SCNC Act is a more general statute applicable to nonprofit corporations of all types, whether associated with a horizontal property regime or not.  There would be a conflict between the HP Act and the SCNC Act were the SCNC Act able to displace the duties, liabilities, and remedies available under the HP Act, but any such conflict can be resolved due to the HP Act being a more specific statute applicable only to horizontal property regimes with any limitations on liability in the SCNC Act having no impact on duties, liabilities, and remedies provided in the HP Act.  Additionally, the rights of the co-owners under the HP Act are property rights provided by the Master Deed and ownership of property in the regime, and those rights cannot be altered by an election to incorporate the council of co-owners under the SCNC Act, especially in relation to this Regime which was created in 1984, years prior to the 1994 enactment of the SCNC Act and its § 33-31-202(b) liability limitations.[3]  (ECF No. 8-2 at 1 ("THIS MASTER DEED is made this 27th

---

[3] The SC General Assembly enacted, and the Governor signed, the SCNC Act in 1994, with it

day of November, 1984"), Art. XIX.5 ("All provisions of this Master Deed and all Exhibits hereto and amendments hereof shall be construed as covenants running with the land and of every part thereof and interest therein including, . . . and every Co-Owner . . . of the Submitted Property or any part thereof or owning any interest therein, his heirs, executors, successors, administrators and assignees shall be bound by all the provisions of this Master Deed . . .").)

Moreover, here the covenants and by-laws for the regime explicitly provide that the HP Act and the duties, liabilities, and remedies provided therein remain in force and effect for the regime. The Master Deed provides that it "submit[s] the Property to the provisions of the South Carolina Horizontal Property Act." (*Id.* at 1.) As permitted by the HP Act, the Master Deed provides that the administration of the regime—including "the maintenance, repair, replacement and operation of the Common Elements"—"shall be the responsibility of the Association *acting through the Board of Directors*." (*Id.* at Art. II.1; *see also id.* at By-Laws, Art. IX.1 ("[T]he Board shall: . . . The Master Deed further provides that "[s]uch administration shall be in accordance with and under the powers granted by the provisions of the Act, this Master Deed, . . .").) The Master Deed defines the "Association" that is to carry out the administration of the regime through its "Board of Directors" as "the Council of Co-Owners as defined in the Act and specifically formed for the purpose of exercising the powers and duties of the Council of Co-Owners of such Horizontal Property Regime." (*Id.* at Art. I.3; *see also* Art. VIII ("The Association shall have all the powers and duties set forth in the Act as well all the powers and duties granted to and imposed

---

taking effect on May 10, 1994. S.C. B. Hist., 1994 Reg. Sess. H.B. 4180, attached as Exhibit A. As stated in the SC Reporter's Comments to the SCNC Act, § 33-31-202(b) was an "item[] added" to SC's nonprofit corporation laws by the SCNC Act and was not a provision existing in SC law before that time. Additionally, a review of Chapter 31 of Title 33 of the South Carolina Code as it existed prior to the enactment on the SCNC Act, attached as Exhibit B, confirms the limitation of liability provided in the current § 33-31-202(b) was not present prior to 1994.

upon it by the Master Deed, the Act and the By-Laws of the Association, and, in addition, all other powers and duties necessary to operate the Regime *which shall be exercised through its Board of Directors*.") (emphasis added).)  The Master Deed further provides that "[a]ll remedies for non-compliance provided in the Act shall be in full force and effect."  (*Id.* at Art. XIX.8.)

The result of the HP Act and the Master Deed provisions is that the duties, liabilities, and remedies provided in the HP Act remain in effect and are not altered by the SCNC Act.  The Director Defendants both served on the Regime's board solely by virtue of and in their capacity as co-owners in the regime and were subject to specific duties and liabilities imposed on them by the HP Act and the Master Deed.  As such, the HP Act makes the Director Defendants liable for their failure to comply with the duties imposed by the Master Deed.  *See* S.C. Code Ann. § 27-31-170 ("Failure [by a co-owner] to comply with [the covenants or by-laws] shall be grounds for a civil action to recover sums due for damages or injunctive relief, or both, maintainable . . . on behalf of the council of co-owners, or in a proper case, by an aggrieved co-owner.").

Plaintiffs allege acts and omissions by the Director Defendants that, if proven, would be failures to comply with the Master Deed and entitle Plaintiffs to recover for the regime and themselves for damages caused by those failures.  Specifically, the Master Deed obligated the Director Defendants to maintain, repair, and replace the Common Elements of the Regime, including the steel structural components supporting the building.  (*See* ECF No. 8-2 at Art. II.1 & Art. VIII.)  Plaintiffs allege the Director Defendants received the professional opinion of an engineer that the structural steel supporting the building needed to be repaired and would continue to worsen until repairs were made, yet the Director Defendants, without justification, disregarded the engineer's opinion and failed to take any action to repair the steel.  (*See* ECF No. 1 at 7, 15-17, 29, ¶¶14–16, 96–112, 187–88.)  Plaintiffs also allege the Director Defendants, with knowledge

of the structural steel repairs needed at the building, failed to undertake efforts to adequately fund the reserves for the Regime.  (*Id.* at 7, 18, ¶¶15, 120–23.)  Plaintiffs further allege that both the Regime and Plaintiffs were damaged by the Director Defendants' failures to fulfill their duties under the Master Deed and the HP Act.  (*Id.* at 7, 19-20, 29-30, ¶¶17, 130–39, 189–90.)

In conclusion, the HP Act and the Master Deed provide for the liability of the Director Defendants and cause of action to Plaintiffs to recover for that liability, and that liability and remedy is independent of and not impacted by the SCNC Act.  Plaintiffs make factual allegations sufficient to state a claim under the HP Act and the Master Deed, and accordingly, the Court should deny Defendants' motion as to Plaintiffs' claims under the HP Act and the Master Deed.

## II.     DEFENDANTS' STATUTE OF LIMITATIONS DEFENSES ARE UNAVAILING.

On the statute of limitations, Defendants argue that Plaintiffs both "failed to bring their claims against the Director Defendants within the necessary timeframe under the Non-Profit Act," and "failed to bring their claim against William Douglas within the general statute of limitations ("SOL") for negligence actions."  (ECF No. 8 at 6.)  However, as explained below, Defendants' arguments are unavailing and, therefore, the Motion should be denied with respect to such grounds.

### A.     A Rule 12(b)(6) Motion Tests the Legal Adequacy of a Complaint Rather than the Merits of Affirmative Defenses, and Defendants Cannot Meet the High Burden of Showing that a Statute of Limitations Defense is Clearly Apparent from the Face of the Complaint.

As an initial matter, Defendants fail to cite to a single case in their Motion or Memorandum which explains and applies the relevant standard for reviewing a FRCP 12(b)(6) motion which raises a purported statute of limitations defense.  Indeed, the only two cases cited by Defendants within the statute of limitations portion of its Memorandum involve South Carolina state court appeals—the first, an appeal from two circuit court orders granting summary judgment under Rule 56 of the South Carolina Rules of Civil Procedure ("SCRCP") and entered more than a year after

16

the complaint was filed, *see Rumpf v. Massachusetts Mut. Life Ins. Co.*, 593 S.E.2d 183 (S.C. Ct. App. 2004); the second, an appeal from a circuit court's grant of a directed verdict pursuant to SCRCP 50, *see Dean v. Ruscon Corp.*, 468 S.E.2d 645 (S.C. 1996). These cases have no relevance with respect to the burden to be applied on the Motion pending before this Court. *See, e.g.*, Rule 12(b)(6), FRCP. The applicable standard—set forth below and missing from Defendants' Memorandum—presents an obstacle which Defendants cannot overcome at this stage.

As explained by the Fourth Circuit, "[a] motion under Rule 12(b)(6) is intended to test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses." *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). Nevertheless, Defendants ask this Court to dismiss this action under FRCP 12(b)(6) on the theory that Plaintiffs' claims are barred by certain statutes of limitations—a defense that generally "must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c)," as "the burden of establishing the [statute of limitations] defense rests on the defendant." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 1999)). While "[i]n [] limited circumstances . . . [an affirmative] defense may be raised under Rule 12(b)(6)," a statute of limitations defense may be so raised "*only if it clearly appears on the face of the complaint*." *Richmond, Fredericksburg & Potomac R. Co.*, 4 F.3d 244 at 250 (emphasis added); *see also Low v. VantageSouth Bank*, No. CIV.A. 4:13-3396-BHH, 2015 WL 1275396, at *2 (D.S.C. Mar. 18, 2015) ("*The dismissal of a complaint on statute of limitations grounds is itself a rare occurrence . . .*") (emphasis added and citations omitted).

In the matter *sub judice*, Plaintiffs' Complaint is not infected with such self-defeating allegations. Defendants instead attempt to shift their own burden onto Plaintiffs, as if *to require Plaintiffs* to "clearly 'allege[s] all facts necessary to [disprove Defendants' purported] affirmative defense." *Berry v. Perdue Farms, Inc.*, No. 4:19-CV-794-RBH-KDW, 2019 WL 5558221, at *2

17

(D.S.C. Oct. 29, 2019) (quoting *Goodman*, 494 F.3d at 464).  For example, Defendants argue that "Plaintiffs do not . . . allege with any specificity when the alleged breaches/harms occurred or when Plaintiffs learned of them."  (ECF No. 8 at 7.)  Setting aside that whether a Defendant can discern the timeline of alleged events is not the test for reviewing a statute of limitations defense at the Rule 12(b)(6) stage, Defendant's argument concedes the statute of limitations defense does not clearly appear on the face of the complaint, thereby demonstrating the impossibility of Defendants carrying their burden.  *See, e.g.*, *Goodman*, 494 F.3d at 464 (reversing the dismissal of a "complaint [that] allege[d] neither a date when [a] contract was breached nor a date when [the plaintiff] may have discovered the breach" and concluding "the face of the complaint d[id] not allege facts sufficiently clear to conclude that the statute of limitations had run.").

### B.    The Director Defendants Failed to Articulate any Cognizable Argument Supporting a Dismissal of the Complaint on a Statute of Limitations Defense.

The Director Defendants assert that any claims against them are time-barred by the statute of limitations set forth at S.C. Code Ann.§ 33-31-830(f) of the SCNC Act (the "SCNC Act SOL").  The SCNC Act SOL relied upon by the Director Defendants provides as follows:[4]

> An action against a director asserting the director's failure to act in compliance with this section [i.e., Section 33-31-830 – "General standards for directors."] and consequent liability must be commenced before the sooner of (i) three years after the failure complained of or (ii) two years after the harm complained of is, or reasonably should have been, discovered.  This limitations period does not apply if the failure to act in compliance with this section has been fraudulently concealed.

The Director Defendants raise two theories as to why Plaintiffs' claims against them must be dismissed based on the SCNC Act SOL, which are addressed below.  (*See* ECF No. 8 at 8-9.)

---

[4] Because Defendants' SCNC Act SOL arguments fail to support a dismissal of the Complaint, Plaintiffs address those arguments first.  However, Plaintiffs do not concede that the SCNC Act SOL necessarily applies to any claims they raised, or could raise, against the Director Defendants.

1.     **The Director Defendants Failed to Demonstrate it is Clearly Apparent on the Face of the Complaint that "This Action Accrued in 2018."**

The Director Defendants first argue that Plaintiffs "discovered or should have discovered" that they may have a claim against the Director Defendants in 2018.  In doing so, Defendants continue to misapply the appropriate standard for reviewing a statute of limitations defense raised in a FRCP 12(b)(6) motion.  (*See, e.g.*, supra at Argument § II.A.)  For example, Defendants again attempt to criticize Plaintiffs for not making additional allegations as to certain facts appearing in the Complaint.  (*See, e.g.*, ECF No. 8 at 8 ("Plaintiffs do not allege why the Regime did not move forward with the bids for repairs in 2018.").)  However, the absence of such an allegation is irrelevant, as Plaintiffs are not required "to plead affirmatively in [their] complaint [any and all possible] matters that might be responsive to affirmative defenses even before the affirmative defenses are raised."  *Goodman*, 494 F.3d at 466.  Nevertheless, after asserting that specific allegation wasn't made, Defendants proffer their own presumption of "facts."  (*See, e.g.*, *id.* at 8 ("Presumably the Members were aware of the need for repairs, the bids, and the Board's ultimate failure to act in 2018 and that is why these allegations are included in the Complaint").)[5]

---

[5] Defendants admit a single "failure to act in 2018" by "the Board[]," which at the time would have included some of the Director Defendants.  (ECF No. 8 at 8.)  However, their use of "ultimate" to qualify the concession suggests this is nothing more than an attempt to bait Plaintiffs into agreeing with a mischaracterization of their allegations, thereby allowing Defendants to present their own version of the facts to the Court under the auspices of it being Plaintiffs' alleged theory.  Plaintiffs suspect that this concession may also foreshadow a belated attempt to raise, for the first time in a Reply, substantive arguments as to the three-year prong of the SCNC Act SOL which Defendants never apply in their Motion.  If they do, Plaintiffs respectfully request that this Court reject such attempt.  Neither the phrase "ultimate failure" nor the word "ultimate" appear in the Complaint.  Indeed, Plaintiffs' Complaint does not allege a single failure in 2018—it alleges multiple failures, including in 2020 and beyond.  *See, e.g.*, *Haley v. Josey*, No. CA 0:09-714-PMD-PJG, 2010 WL 705907, at *3 (D.S.C. Feb. 24, 2010) (denying motion to dismiss where "the Complaint could be construed to assert that some of the actions . . . took place . . . within the applicable statute of limitations").  And the actionable nature of the failures was concealed by Defendants' selective non-disclosures of material facts known to them.  *See, e.g.*, S.C. Code Ann.§ 33-31-830(f).  The Director Defendants were never going to institute or even suggest an action against themselves.

Defendants' improper presumption not only runs afoul of the basic principle that all facts and inferences are to be construed in the light most favorable *to Plaintiffs*, *see* Rule 12(b)(6), FRCP, but it is also irrelevant because such allegations do not appear on the face of the Complaint. *See, e.g., Richmond, Fredericksburg & Potomac R. Co.*, 4 F.3d at 250. After presenting nothing more than a self-serving presumption dressed up as "facts" supporting their argument, Defendants awkwardly land their logical leap with a conclusion in the very next sentence that, "*[a]ccordingly,* this action accrued in 2018 when the Plaintiffs discovered or should have discovered through reasonable diligence that they may have a remedy for an (alleged) harm." (*See, e.g.*, ECF No. 8 at 8 (emphasis added).) Simply put, the Director Defendants cannot rely on unpled hypothetical facts to support their FRCP 12(b)(6) Motion, and Defendants have failed to advance any other argument how the allegations appearing on the face of the Complaint clearly establish that Plaintiffs' claims against the Director Defendants accrued in 2018. Accordingly, this Court must deny the Director Defendants' first statute of limitations ground.

> **2.** **The Director Defendants Failed to Demonstrate it is Clearly Apparent on the Face of the Complaint that any and all Claims Against the Director Defendants Must Have Accrued No Later than August 2020.**

The Director Defendants argue that "[e]ven reading Plaintiffs' allegations more charitably, the Members were ***at the latest*** made aware in the August 2020 newsletter" of a potential claim against the Director Defendants. (*See, e.g.*, ECF No. 8 at 8-9 (emphasis in original).)[6] According to the Director Defendants, "the August 2020 newsletter provided notice to the Members that they

---

[6] While the Director Defendants' self-described "more charitabl[e]" reading of the Complaint still falls well short of the "light most favorable" reading required when reviewing a FRCP 12(b)(6) Motion, it is nevertheless telling that in advancing their second argument, the Director Defendants have conceded that the Complaint can be viewed in a light more favorable than that which they applied in their first argument wherein they asserted that Plaintiffs' claims against the Director Defendants must have accrued in 2018. This is yet another reason why the Director Defendants' first SCNC Act SOL argument should be denied outright.

might have a remedy for a harm (*e.g.*, disputing the Board's decision by making [sic] demand and/or initiating a lawsuit to compel action)." (*Id.* at 9.) Applying this "theory," the Director Defendants suggest "a person of common experience who exercised reasonable diligence would have known in August 2020 that repairs to [sic] Renaissance Tower were necessary at some point in the near future and that there could be some risk of delaying repairs." (*Id.*) This argument fails.

Crucially, no allegations appear on the face of the Complaint which clearly establish that Plaintiffs discovered—or should have discovered—the many "harm[s]" complained of by August 2020. Instead, Defendants are yet again inserting their own theory of the facts instead of viewing Plaintiffs' allegations in the light most favorable to Plaintiffs. Furthermore, Defendants ignored the numerous allegations in the Complaint describing a myriad of harms occurring beyond August 2020, including in 2022. (*See, e.g.*, ECF No. 1 at 7, ¶ 11 ("The evacuation of the Renaissance Tower building left some owners who reside in their units homeless with some owners left to purchase and live from tents in a nearby campground."); *id.* at ¶ 12 ("Some owners had their unit listed for sale and are now unable to sell or had a contract for the sale of their unit and had the buyer back out of the deal.").) Accordingly, Defendants' argument is defective on its face, and this Court should deny the Director Defendants' second statute of limitations argument.

### 3. The Allegations Do Not Otherwise Clearly Establish That an Applicable Statute of Limitations for Any Claim Against the Director Defendants Expired Prior to the Commencement of this Action.

Even if this Court were to look beyond the numerous facial defects in Defendants' SCNC Act SOL arguments, a review of the Complaint under the appropriate standard reveals there cannot be a reasonable basis for granting Defendants' Motion. It is apodictic that in reviewing a motion to dismiss, all facts and reasonableness inferences derived therefrom must be viewed in the light most favorable to the non-moving party, which in this matter is Plaintiffs. *See, e.g.*, *E.I. Du Pont*

21

*de Nemours & Co.*, 637 F.3d at 440.  This is particularly important where, as here, the defense at issue involves inherent questions of fact—e.g., like when a party "reasonably should have [] discovered" a harm—and the defense is raised before any discovery has been conducted.  S.C. Code Ann. § 33-31-830(f).  Indeed, as the Fourth Circuit explained, "[g]enerally, whether a plaintiff exercised due diligence is a jury issue not amenable to resolution on the pleadings at summary judgment."  *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 554 (4th Cir. 2019).

As is apparent from the Complaint, Defendants' failures included the failure to disclose the severity of the deterioration of the structural steel such that Plaintiffs were never aware there was a problem and that the problem resulted from the failure of the Defendants to fulfill their duties. This failure was ongoing well beyond Defendants' activities in 2018 and the newsletter released in August 2020, which simply noted that "minor structural steel elements" were "in need of repair." This was insufficient to put Plaintiffs on notice of any claim, as Plaintiffs were and remained unaware: (i) that the severity of the issue had been known and understood by Defendants for at least four years, and (ii) that Defendants' failure to act caused the severe issue.  Plaintiffs at that time had no reason to distrust Defendants, upon whom they relied for truthful, complete, and accurate information and disclosures regarding the condition of the building and the recommendations of professionals.  Thus, Plaintiffs' claims did not accrue in 2018 or by August 2020.  Again, this is doubly true when the appropriate standard is applied, and all inferences are read in the light most favorable to Plaintiffs.  Accordingly, Defendants' Motion should be denied as to any defense of statute of limitations raised by the Director Defendants.

### C. The Allegations Appearing on the Face of the Complaint Do Not Clearly Establish The Statute of Limitations as to Plaintiffs' Claim against Defendant William Douglas Must Have Expired Prior to Commencement of this Action.

Defendant William Douglas asserts that Plaintiffs' claim against it is time-barred by the

three-year statute of limitations contained within S.C. Code Ann. § 15-3-530 (the "Negligence SOL"). Generally, to bring a claim within the three-year Negligence SOL, "all actions . . . must be commenced within three years after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action." *Id.* at § 15-3-535. Defendant William Douglas raises one Negligence SOL theory: that "based on the timeline alleged in the Complaint, Plaintiffs knew or should have known about the need for repairs and William Douglas' failure to move forward with the bids for repairs in 2018" and that "any potential action against William Douglas for negligence would have accrued in 2018 and run through 2021." (ECF No. 8 at 9.)

Much like the Director Defendants' arguments, Defendant William Douglas's conclusory argument fails to meet the burden of showing that it is *clearly apparent* from the face of Plaintiffs' Complaint that the statute of limitations *must* have accrued in 2018 and expired as to the claim against it. In the absence of such a showing, Defendant William Douglas's statute of limitations argument fails for the same reasons set forth *supra*, at Argument § II.C, with respect to the Director Defendants. Like the Director Defendants, Defendant William Douglas had superior knowledge that the deterioration of the structural steel was severe and yet it continuously breached its duty of care to Plaintiffs, who were not aware that a *critical* problem existed. Importantly, as alleged in the Complaint, Defendant William Douglas's failures were also ongoing well beyond their activities in 2018 and resulted in harms stretching into 2022. At all relevant times, Plaintiffs had no reason to distrust Defendant William Douglas, upon whom they relied for truthful, complete, and accurate information and disclosures regarding repairs and maintenance required to their building. And again, this is doubly true when the appropriate standard is applied, and all inferences are read in the light most favorable to Plaintiffs. Accordingly, Defendants' Motion should be denied as to the statute of limitations raised by Defendant William Douglas.

### D.   The Statute of Limitations Does not Apply to the Derivative Claims.

Defendants' arguments must also fail as to the derivative claims, which are not subject to the statute of limitations.  Rather, they would be subject to laches.  *See, e.g.*, *Pelfrey v. Bank of Greer*, 244 S.E.2d 315, 316 (S.C. 1978) ("Historically the shareholder's derivative suit has always been tried exclusively in equity.  'Even where the only relief allowable is a recovery of damages the suit is nevertheless one in equity and not an action at law.'") (citation omitted).  Accordingly, the Court must deny Defendants' Motion as to the derivative claims on this separate ground.

## III.   SUFFICIENCY OF THE PLEADING OF DERIVATIVE CLAIMS.

### A.   The Complaint Contains Factual Allegations Demonstrating Demand Futility.

Defendants contend the derivative claims must be dismissed because no demand was made on the Regime, and the pleading of demand futility is insufficient.  Defendants correctly assert that whether a plaintiff satisfied the demand requirement for a derivative claim is determined under the substantive law of the state of incorporation—*i.e.*, South Carolina (ECF No. 8 at 10.)  Defendants then veer off into an irrelevant discussion of whether a plaintiff made "[t]he necessary pre-suit demand . . . that the Board move forward with repairs in or after August 2020."  (*Id.* at 12.)  Defendants' discussion of a demand for repairs rests on an erroneous understanding of South Carolina derivative claim law.

Under South Carolina law, the demand must be a demand specific to initiating litigation.  *Walbeck v. The I'On Company, LLC*, 827 S.E.2d 348, 357 (S.C. Ct. App. 2019).  In *Walbeck*, the derivative claim plaintiffs did exactly what Defendants contend was necessary here.  The *Walbeck* plaintiffs alleged they demanded that the corporation take certain actions in relation to a dock.  *Id.* at 357.  When the corporation failed to take the demanded actions, the plaintiffs filed suit derivatively.  *Id.*  The Court of Appeals held the plaintiffs' demand did not satisfy the demand requirement because there was no demand "to initiate litigation."  *Id.*  *Walbeck* thus establishes

that the demand requirement is not satisfied by a demand on corporate directors that they take some action which their failure to take is later alleged to constitute a breach of their fiduciary duties.  *Id.*  Rather, the demand requirement under South Carolina law is a requirement that the derivative claim plaintiff either demand the corporate directors initiate the litigation that the derivative claim plaintiff later initiates derivatively or allege that making a demand for the initiation of litigation on the directors would have been futile.  *Id.*; *see also Carolina First Corp. v. Whittle*, 539 S.E.2d 402, 408 (S.C. Ct. App. 2000) ("The demand requirement of Rule 23 balances a shareholder's right to assert a derivative claim against a board's duty to decide whether to invest the resources of the corporation in pursuit of the shareholder's claim of a corporate wrong."); *Allison ex rel. General Motors Corp. v. General Motors Corp.*, 604 F. Supp. 1106, 1112 (D. Del. 1985) (stating that under Rule 23, "the shareholder must either make a demand or plead with particularity the exception circumstances that demonstrate why a demand would be futile, i.e., why the Board of Directors should not be allowed to decide whether to institute litigation").

Therefore, the issue before the Court here is whether the Complaint sufficiently alleges that a demand on the Board that it initiates this litigation would have been futile.  The Complaint alleges that such a demand on the Board would have been futile because the members of the Board "suffer from conflicts of interest and divided loyalties which preclude them from exercising business judgment in deciding to initiate suit."  (ECF No. 1 at 21, ¶145.)  The Complaint then provides further specificity as to the nature of those conflicts of interest and divided loyalties, alleging that "Defendants comprise the majority of the current Board of the Regime, and it would be futile to demand Defendants have the Regime bring claims against themselves."  (*Id.* at ¶146.)

The *Walbeck* decision indicates that demanding a board initiate suit where the directors potentially face personal liability, or the discovery of their wrongdoing renders such a demand

futile.  827 S.E.2d at 357.  There, in considering whether there were sufficient allegations that a demand on the board would have been futile, the Court of Appeals considered that "there are no allegations that the non-developer members of the Board were guilty of some wrongdoing that would give them an incentive to automatically reject such a demand."  *Id.*  Notably, allegations of potential liability or potential uncovering of wrongdoing that the *Walbeck* decision indicated would be sufficient for demand futility are weaker conflicts of interests and divided loyalties than those presented here.  Here, the derivative claims asserted are claims against the majority of the Regime's current Board.  In other words, for the demand on the Board to not have been futile, it would have to be possible for the members of the Board to set aside their self-interest and objectively decide whether they were liable for improper conduct as directors and should be sued. Such a decision necessarily involves conflicts of interests and divided loyalties that render an objective decision in the best interests of the corporation impossible.

Moreover, assuming South Carolina courts would apply Delaware's demand futility law as suggested by Defendants does not change the result.  Under Delaware law, for a suit against a corporation's directors, the analysis for determining whether demand was futile are: "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand."  *United Food & Com. Workers Union & Participating Food Indus. Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).  "If the answer to any of the questions is 'yes' for at least half

of the members of the demand board, then demand is excused as futile." *Id.*

Here, the Complaint alleges demand futility under the second *United Food* question—a demand would be futile because more than half of the demand board faces a substantial likelihood of liability on the claims that would be the subject of the litigation demand. Under Delaware law, a substantial likelihood of director liability exists where a derivative plaintiff's allegations create a "reasonable doubt" that the act or omission that would be the basis for the derivative claim not protected by the business judgment rule. *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984). In the instance where a corporation's articles of incorporation contain a director liability exculpatory provision—for example, a provision permitted by § 102(b)(7) of Delaware's General Corporation Law—a substantial likelihood of director liability "may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008).

Under South Carolina's business judgment rule, a director is immunized except where the director's conduct was not "in good faith" or resulted from "incompetence." *Fisher v. Shipyard Village Council of Co-Owners, Inc.*, 781 S.E.2d 903, 910 (S.C. 2016); *Kiriakides v. Atlas Food Systems & Services, Inc.*, 541 S.E.2d 257, 268 n.32 (S.C. 2001). While South Carolina's business judgment rule expressly states that "incompetence" is a basis for an action falling outside the protection of the business judgment rule, Delaware courts' statements of the business judgment rule are in accord. Delaware's business judgment rule is "a presumption that . . . the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812 (Del. 1984). As stated by the Delaware Supreme Court, a director is not protected by the business judgment rule if, prior to taking the action at issue, the director did not inform himself of all material information reasonably available.

*Id.* at 812.  A director also is not protected by the business judgment rule if the director acted in a grossly negligent manner.  *Id.* at 812.  Thus, while stated differently, both South Carolina and Delaware recognize that grossly negligent acts or omissions of directors are not protected by the business judgment rule.

Here, the Complaint makes allegations creating a reasonable doubt as to whether the acts and omissions that are the basis for the claims are not protected by the business judgment rule, and were S.C. Code Ann. § 33-31-202(b) applicable, the Complaint alleges non-exculpated claims. First, as set forth in Argument § I of this Response, Plaintiffs allege the Director Defendants' actions and omissions were not in good faith.  Because director acts or omissions not in good faith are both outside the business judgment rule and outside the liability limitations of S.C. Code Ann. § 33-31-202(b), the Complaint stating allegations rising to level of director acts or omissions not in good creates a substantial likelihood of director liability.

Second, the Complaint alleges the Director Defendants received professional advice from an engineer and an accountant but acted contrary to that advice without any justification.  (ECF No. 1 at 17, ¶ 111.)  The business judgment rule generally protects directors where the directors acted in reliance on the advice of an expert.  *See, e.g.*, *Brehm v. Eisner*, 746 A.2d 244, 261–62 (Del. 2000); Alexandros N. Rokas, *Reliance on Experts from a Corporate Law Perspective*, 2 Am. U. Bus. L. Rev. 323, 327–29 (2013) (reviewing history of the rule).  However, where a complaint alleges an expert advised directors and "the directors did not in fact rely on the expert," the complaint alleges acts outside the protection of the business judgment rule.  *Brehm*, 746 A.2d at 262.  Therefore, there is a substantial likelihood of director liability on the claims in the Complaint because the claims are for actions where the Director Defendants were advised by experts, the Director Defendants did not follow their advice, and the Director Defendants have no justification

for failing to follow the advice.

Third, the Complaint makes numerous allegations of gross negligence by the Director Defendants.  (ECF No. 1 at 24-25, ¶154g-m.)  Because grossly negligent acts or omissions are not protected by the business judgment rule, the claims in the Complaint create a substantial likelihood of director liability.  For any of the foregoing reasons, a demand on the Regime would have been futile, and the demand requirement must be excused.

**B.  Plaintiffs' Complaint is Verified in Accordance with Rule 23.1 of the Federal Rules of Civil Procedure.**

Defendants contend that because Plaintiffs' Complaint is verified by one plaintiff, rather than all plaintiffs, it does not meet the verification requirements of Rule 23.1 of the Federal Rules of Civil Procedure for asserting claims derivatively.  As discussed below, Defendants' verification argument fails both because Rule 23.1 does not require that all plaintiffs verify a derivative pleading and because the Complaint was verified by the one plaintiff asserting derivative claims.

While Defendants contend Rule 23.1 requires that a derivative pleading be verified by all plaintiffs, Rule 23.1 contains no such requirement.  Rather, Rule 23.1 only states that "[t]he complaint must be verified."  A complaint verified by one plaintiff among many plaintiffs is a "verified" complaint.  Once one plaintiff verifies the complaint, the complaint has been "verified."  Moreover, Rule 23.1 expressly contemplates that a derivative action may be brought by multiple shareholders or members of a corporation, providing in Rule 23.1(a): "This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action . . . ."  Were the intent of Rule 23.1 to require that a complaint be verified by all plaintiffs, Rule 23.1 would state as much.  Moreover, Defendants fail to identify any language in Rule 23.1 which Defendants contend indicates all plaintiffs, rather than one plaintiff, must verify a derivative complaint.  Defendants also fail to identify any authority supporting their position that

29

Rule 23.1 requires that all plaintiffs verify a derivative complaint.

Finally, while the foregoing analysis is compelled by the language of Rule 23.1, the analysis is also supported by the caselaw applying Rule 23.1 and the recognized purpose of Rule 23.1. First, in one of the only decisions addressing the verification requirement of Rule 23.1, FRCP, in a multi-plaintiff case, the United States District Court for the Northern District of California, in *In re Extreme Networks, Inc. Shareholder Derivative Litigation*, 573 F. Supp. 2d 1228 (N.D. Cal. 2008), indicated verification by one plaintiff among many would be sufficient to satisfy the verification requirement of Rule 23.1. In *In re Extreme Networks*, multiple plaintiffs asserted derivative claims against a corporation, but no plaintiff verified the complaint. *Id.* at 1238. Instead, the complaint was verified by an individual who sought to, but had not been permitted to, intervene as a plaintiff. *Id.* The court analyzed whether verification by a non-party was sufficient, concluded the verification was not sufficient, and held the complaint must be verified "by *a* proper party to the case." *Id.* (emphasis added). Not only did the court there indicate that verification by "a" plaintiff would be sufficient, the nature of the court's holding indicates verification by only one plaintiff was required. If verification by all plaintiffs was required under Rule 23.1, the court's analysis of whether the intervenor's verification was sufficient would be superfluous. If Defendants' argument here that a complaint must be verified by all plaintiffs was correct, the *In re Extreme Networks* court would simply have held the lack of verification by all plaintiffs did not meet the requirement of Rule 23.1, and the court would not have needed to analyze whether verification by a non-party meets the requirements of Rule 23.1.

Indeed, Defendants' argument is contrary to the recognized purpose of Rule 23.1 which is "to insure that the plaintiff, or some other person has investigated the claims and found them to have substance, and not to be a general impediment to shareholder derivative actions." *Recchion*

*v. Kirby*, 637 F. Supp. 1309, 1317 (W.D. Penn. 1986); *see also, e.g., Porte v. Home Federal Savings & Loan Ass'n*, 409 F. Supp. 752, 754 (N.D. Ill. 1976) ("Before a court can proceed with a derivative suit, it must be assured that the plaintiff or some other person has investigated the charges and found them to have substance."). Therefore, the purpose of Rule 23.1 is to ensure some investigation of the claims occurred, and that purpose is satisfied where one plaintiff verifies the complaint. That purpose is not furthered by requiring every plaintiff to verify a derivative complaint. Rather, requiring every plaintiff to verify a derivative complaint would turn Rule 23.1 into "a general impediment to shareholder derivative actions" which it is not intended to be. *Recchion*, 637 F. Supp. at 1317.

Additionally, even were there a deficiency in the verification of the Complaint, a defective verification is grounds for granting a plaintiff leave to replead and properly verify the pleading, not grounds for dismissing a complaint. *See, e.g., McDonough v. Americom Intern. Corp.*, 151 F.R.D. 140, 143 (M.D. Fla. 1993) ("Failure to verify is a technical defect curable by amendment."); *Smachlo v. Birkelo*, 576 F. Supp. 1439, 1443 (D. Del. 1983) ("[C]ourt have generally granted plaintiff leave to replead the complaint and properly verify it."); *Nussbacher v. Continental Illinois Bank & Trust Co. of Chicago*, 61 F.R.D. 399, 401 (N.D. Ill. 1973) ("The best authorities maintain that failure to verify is a technical defect, curable by amendment."), *rev'd on other grounds*, 518 F.2d. 873 (7th Cir. 1975). Therefore, even were Defendants' arguments regarding verification not erroneous, the result would be that Plaintiffs should be given the opportunity to replead.

### C.   The Complaint is Verified by the Plaintiff Asserting Derivative Claims.

For the reasons discussed previously, Rule 23.1 does not require that the Complaint be verified by all Plaintiffs; but even were that the requirement, only one plaintiff—Liberty Property Holdings SC, LLC ("Liberty")—asserts derivative claims, and the Complaint is verified by Liberty through the affidavit of Liberty's sole member and manager. (ECF No. 1 at 8-9, ¶¶33–34.)

31

Defendants' contentions are without merit.

## IV. **PLAINTIFFS' NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS.**

Plaintiffs' negligence and gross negligence claims are well-pled and are not subject to dismissal as to any Defendant.

### A. **Duty of Care as to Defendant William Douglas & Economic Loss Doctrine.**

Defendants contend that "Plaintiffs fail to plead [a] duty of care of William Douglas" because "Plaintiffs fail to identify the source of William Douglas' alleged duty of care to Plaintiffs" and instead "presuppose that a duty of care exists without identifying the source of that duty." (ECF No. 8 at 15.)  Based on the same argument, Defendants contend that the only source of any duty of care as to Defendant William Douglas inferable from Plaintiffs' complaint is the contract between Defendant William Douglas and the Regime, and therefore the Economic Loss Doctrine bars any negligence claim against Defendant William Douglas.  Neither argument is meritorious.

The question is whether Plaintiffs' allegations render it plausible that a duty flows from Defendant William Douglas to the owners.  In South Carolina, a duty of care may arise from the relationship of the parties, property interests, status, statute, or "some other special circumstance." *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 714 (S.C. 2003).  Existence of a contract does not preclude separate, independent duties.  *See, e.g.*, *Enhance-It, L.L.C. v. Am. Access Techs., Inc.*, 413 F. Supp. 2d 626, 631 (D.S.C. 2006) ("[W]here the contract creates a certain relationship between the parties, and certain duties arise by operation of law, irrespective of the contract, because of this relationship, the breach of such duties will warrant an action in tort.").[7]

---

[7] "As was said in one South Carolina case . . . '[a]ctions in tort often have their beginning in contractual matters.'" *Enhance-It*, 413 F. Supp. 2d at 631 (citation omitted).

Here, Plaintiffs allege:

> William Douglas served as the community manager for the Renaissance Tower and the Regime from some time prior to 2015 until 2020.

(ECF No 1 at 13, ¶85), and:

> The Regime. . . is responsible for maintenance and repair of the common elements of the Renaissance Tower.

(*Id.* at 11, ¶66), and:

> As the manager for the Renaissance Tower and the Regime, William Douglas owed duties to the Regime and its members to exercise due care in the management, operations, maintenance, and repair of the Renaissance Tower and the Regime.

(*Id.* at 30-31, ¶194.)  Defendants contend that "Plaintiffs' allegation implies (although does not state) that the source of William Douglas' duty is an agreement with the Regime." (ECF No. 8 at 16); however, in so doing, Defendants construe Plaintiffs' allegation in the light most favorable to Defendant William Douglas, not to Plaintiffs.

Viewing the allegations and all possible inferences in the proper light, Plaintiffs have alleged sufficient facts to establish a duty on the part of Defendant William Douglas' arising from its relationship to the property owners in its capacity as manager for the building and the Regime.[8] As Plaintiffs do not simply allege a failure to fulfill contractual obligations, but rather that Defendants, including Defendant William Douglas, knew and failed to act upon knowledge of weakening structural steel to Plaintiffs' detriment, the negligence and gross negligence claims

---

[8] *See Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995) ("When, however, there is a special relationship between the alleged tortfeasor and the injured party not arising in contract, the breach of that duty of care will support a tort action. . . .  These professionals, however, owe a duty to the client and sometimes to third parties which arises separate and distinct from the contract for services. We see no logical reason to insulate design professionals from liability when the relationship between the design professional and the plaintiff is such that the design professional owes a professional duty to the plaintiff arising separate and distinct from any contractual duties between the parties or with third parties.").

against Defendant William Douglas are not barred by the Economic Loss Doctrine.[9]  *See, e.g.*,

*Enhance-It*, 413 F. Supp. 2d at 631 ("Defendant is not entitled to the protection of the economic

loss rule, which protects only those defendants who have breached only contractual duties.").

### B.   Proximate Cause.

Defendants' next contention as to the negligence and gross negligence claims is that

Plaintiffs failed to adequately plead that Defendants proximately caused Plaintiffs' harm.  (ECF

No. 8 at 17–20.)  To this end, Defendants note myriad allegations not included in the complaint

that would support a finding of proximate cause.  (*Id.* at 18.)  However, Defendants arguments go

not to the sufficiency of the pleading of proximate cause, but rather to the merits of Plaintiffs'

claims, and are therefore premature.[10]  But at the pleading stage, Plaintiffs are not required to

allege *every* possible fact supporting a claim; only facts sufficient to render the claim plausible.

*See, e.g.*, *Ashcroft*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Id.*

Plaintiffs meet this standard by alleging that Defendants failed to exercise due care in:

> failing to promptly repair the steel structural components under the
> Renaissance Tower, failing to prevent further damage to the steel
> structural components . . . permitting further structural damage . . . .

(ECF No. 1 at 31, ¶196.)  The Complaint further alleges, for example, that:

---

[9]   Moreover, the economic loss doctrine, which has its origins in products liability, does not bar
liability for damage to property other than the property sold/provided by a defendant.  Defendant
William Douglas performed a service, and did not supply a product, so the damage alleged by
Plaintiffs necessarily goes beyond the scope of the economic loss doctrine.

[10]   It is well settled that proximate cause is ordinarily a question for the jury, not a question of law.
*E.g.*, *S. Fruit Distribs. v. Fulmer*, 107 F.2d 456 (4th Cir. 1939).

> The engineer who evaluated the structural steel components under the building in 2021 found, as expected, that the steel was substantially more corroded and weakened than in 2018 . . . .

(*Id.* at 3, ¶5), that:

> [d]ue to the lack of maintenance and repairs and the grossly insufficient reserves held by the Regime, the unit owners are being forced to pay for repairs to the building *and the assessments continue to increase given the temporary shoring and expanded steel repairs now necessary* at the building.

(*Id.* at 7, ¶17) (emphasis added), and that:

> [t]he Regime, Plaintiffs, and the Class members were damaged as the direct, foreseeable, and proximate result of Defendants' negligence and gross negligence.

(*Id.* at 31, ¶197.) Thus, Plaintiffs allege Defendants' inaction led to further damage to the structural steel, causing damage to Plaintiffs, and establishing the "but for" component of proximate cause.

Finally, Defendants contend that Plaintiffs have not adequately pled the second component of proximate cause, foreseeability. However, the complaint *does* allege that the harm was foreseeable.[11] But even if it did not, no great leap of imagination is required to infer foreseeability from the facts alleged: that the failure to remedy worsening damage to structural steel beneath an condominium building would foreseeably lead to myriad harms to the buildings' residents, including increased costs of repair, or much worse, is hardly earth shattering. Defendants' foreseeability argument is therefore unavailing as well.

Plaintiffs have adequately pled both components of proximate cause, and their negligence and gross negligence claims are not subject to dismissal.

## CONCLUSION

---

[11] "Plaintiffs . . . were damaged as the direct, *foreseeable*, and proximate result of Defendant's negligence and gross negligence." (ECF No. 1 at 31, ¶197 (emphasis added).)

For the reasons stated herein, Plaintiffs respectfully request the Court deny Defendants'

Motion to Dismiss.

THE STEINBERG LAW FIRM, L.L.P.
P.O. Box 2670
Summerville, SC 29484
(843) 871-6522 - office
(843) 871-8565 - facsimile

By:  *s/Elliotte Quinn*
F. Elliotte Quinn IV
Federal Bar No. 12563
equinn@steinberglawfirm.com

*Attorneys for Plaintiffs*